UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case no. 22-cv-62076-WPD

GREGORY TONY, in his official
capacity as Sheriff of Broward County,

    Plaintiff,

v.

EVANSTON INSURANCE COMPANY,

    Defendant.
_____/

# ORDER ON DEFENDANT EVANSTON'S
# MOTION TO DISMISS AND MOTION TO STRIKE

THIS CAUSE is before the Court on Defendant EVANSTON INSURANCE COMPANY ("Evanston")'s Motion to Dismiss and Motion to Strike, filed February 6, 2023 [DE 21] (the "Motion"). The Court has carefully considered the Motion [DE 21], Plaintiff GREGORY TONY, in his official capacity as Sheriff of Broward County ("BSO" or "Plaintiff")'s Response [DE 23], Evanston's Reply [DE 26], argument by counsel at the May 15, 2023 hearing, and is otherwise fully advised in the premises.

    **I.**    **Background**

On September 20, 2022, Plaintiff BSO filed a Complaint in the Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida against Defendant Evanston for Declaratory Judgment. *See* [DE 1-1]. The Complaint alleged that numerous lawsuits were filed against BSO and other parties by the victims of the Parkland Shooting Incident (as defined in the Complaint). *See* [DE 1-1]. BSO's Complaint requested that the Court declare that the Parkland Shooting Incident was a single Occurrence, and thus, determine whether BSO must exhaust a single Self-

Insured Retention of $500,000, or a Self-Insured Retention of $500,000 for each Plaintiff that filed a lawsuit. *See* [DE 1-1]. Defendant filed the Notice of Removal on November 8, 2022, alleging that there exists diversity jurisdiction under 28 U.S.C. § 1332, allowing removal pursuant to 28 U.S.C. § 1441. [DE 1]. Defendant moved to dismiss the state court complaint, *see* [DE 6], and Plaintiff filed an Amended Complaint, the operative pleading, on January 23, 2023. *See* [DE 20].

Prior to the February 14, 2018 horrific massacre perpetrated by Nikolas Cruz ("Cruz") on February 14, 2018, at Marjory Stoneman Douglas High School (the "Parkland Shooting Incident"), BSO purchased from Evanston Public Entities Policy No. MPEMID0002-16-01 with a policy period of October 1, 2017 to October 1, 2018 (the "Policy"). *See* [DE 20-3]. The Policy has a Self-Insured Retention ("SIR") of $500,000, with an each occurrence limit of liability of $2,500,000 and an aggregate limit of $5,000,000. *See* [DE 20-3] at p. 7. The Policy contains a "Defense Of Claim Or Suit" provision which provides that BSO has the duty to investigate and defend any claim or suit to which this insurance applies and BSO is responsible for the payment of any "claim expenses." All payments of "claim expenses" are to be made by BSO and applied toward the SIR. [D.E. 20-3, p. 31]. Additionally, Evanston has no duty to defend any claim or suit. *Id.*

The Policy further provides that the SIR "applies separately to each and every 'occurrence' and offense covered under this Coverage Part." *See* [DE 20-3] at p. 22. The Policy provides that Evanston "will pay 'ultimate net loss' in excess of the SIR that the Insured is legally obligated to pay because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies." *See id.* The Policy in turn provides that this insurance applies to "bodily injury" "[c]aused by an 'occurrence' that takes place in the 'covered

territory.'" *See* [DE 20-3] at p. 11.  The term "Occurrence" is defined to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See* [DE 20-3] at p. 25.  The term "accident" is not defined in the Policy. *See* [DE 20-3].

Following the February 14, 2018 Parkland Shooting Incident, numerous lawsuits were filed against BSO (and others) by the shooting victims and their families—two of which are attached to the Amended Complaint. *See* [DE's 20-1, 20-2]. The lawsuits generally allege that BSO, including its agent Scott Peterson ("Peterson")—the School Resource Officer on duty at the high school to protect teachers and students from threats, including those posed by active shooters like Cruz—were negligent in, among other things, failing to follow BSO's own policies and procedures by, inter alia, failing to radio a Code Red as soon as Peterson heard there was a viable active shooting threat on campus, which would have resulted in the immediate lockdown of all school buildings; failing to intercept Cruz before he entered Building 12; failing to immediately enter Building 12 and locate and neutralize Cruz; calling for a lock down after hearing shots fired, thereby preventing officers from entering Building 12 and engaging Cruz; and providing other officers with misinformation about Cruz's location, thereby preventing other officers from entering Building 12 to engage and kill Cruz. *See* [DE 20] at ¶ 8. The lawsuits further allege that, but for this negligence, none of the shootings would have taken place or, at the very least, some of the deaths and injuries would have been prevented. *See* [DE 20] ¶ 9.

Defendant Evanston has taken the position that each victim of the Parkland Shooting Incident constitutes a separate occurrence under the Policy such that the Self-Insured Retention of $500,000 must be separately met by BSO for each victim or gunshot that did harm. In other words, according to Evanston, BSO must incur tens of millions of dollars before being entitled to any coverage under the Policy. BSO, on the other hand, contends that the Parkland Shooting

Incident constitutes a single "occurrence," such that it must exhaust only a single Self-Insured Retention of $500,000 under the Policy before coverage is triggered. Given this bona fide interpretive dispute between the parties, BSO seeks declaratory relief to have the Court determine the parties' rights and obligations under the Policy. *See* [DE 20].

On February 6, 2023, Defendant Evanston filed the instant Motion, seeking to dismiss the above-styled declaratory action case pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In the instant motion to dismiss, Evanston argues that BSO fails to state a cause of action against it because the Parkland Shooting Incident constitutes more than one occurrence as a matter of law. Alternatively, in the event the Complaint is not dismissed, Defendant requests that the Court strike pursuant to Fed. R. Civ. P. 12(f) Plaintiff's claims for supplemental relief in its prayer for relief, as well as its claims for pre-judgment and post-judgment interest.

## II.     Standard of Review

To adequately plead a claim for relief, Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Under Rule 12(b)(6), a motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (*abrogating Conley*, 355 U.S. at 41). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).

The Court need not take allegations as true if they are merely "threadbare recitals of a cause of action's elements, supported by mere conclusory statements." *Iqbal*, 129 S. Ct. at 1949.

In sum, "a district court weighing a motion to dismiss asks 'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Twombly*, 550 U.S. at n. 8 (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v. Scherer*, 468 U.S. 183 (1984)).

### III. Discussion

#### a. Declaratory Judgment Claim

"In a diversity jurisdiction case like this one, a court will apply federal law if the matter at hand is procedural, and will apply the law of the forum state if the matter is substantive." *Coccaro v. Geico Gen. Ins. Co.*, 648 F. App'x 876, 880–81 (11th Cir. 2016). "Florida's Declaratory Judgment Act, found in Chapter 86 of the Florida Statutes, is a procedural mechanism that confers subject matter jurisdiction on Florida's circuit and county courts; it does not confer any substantive rights." *Id.*; *see Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, the legal standard for reviewing a declaratory judgment claim in a diversity jurisdiction action in federal court is exclusively under 28 U.S.C. § 2201. *See id.*

> The Federal Declaratory Judgment Act states that:
>
> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). Thus, under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, a court may declare the rights and other legal relations of any interested party in the case of an actual controversy within its jurisdiction. "For a controversy to exist, 'the facts alleged, under all the circumstances, [must] show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.'" *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409, 414 (11th Cir. 1995) (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

**b. Florida law regarding interpretation of insurance policy**

Under Florida law, interpretation of an insurance policy is a question of law for the court. *Technical Coating Applicators, Inc. v. U.S. Fid. & Guar. Co.*, 157 F.3d 843 (11th Cir. 1998); *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000 (Fla. 2010). "[I]nsurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties." *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) (quoting *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 470 (Fla. 1993)). "In construing an insurance policy, courts should read the policy as a whole, endeavoring to give every provision its full and operative effect." *Gen. Star Indem. Co. v. W. Florida Vill. Inn, Inc.*, 874 So. 2d 26, 30 (Fla. 2d DCA 2004). The insurance contract is interpreted based on what a reasonable person in the position of the insured would have understood it to mean. *See Harris v. Carolina Life Ins. Co.*, 233 So. 2d 833, 834 (Fla. 1970). *Flores v. Allstate Ins. Co.*, 819 So. 2d 740, 750 (Fla. 2002); *Colony Ins. Co. v. Nicholson*, No. 10-60042-CIV, 2010 WL 3522138, at *3 (S.D. Fla. Sept. 8, 2010) (quoting *Ga. Farm Bureau Mut. Ins. Co. v. Huncke,* 240 Ga. App. 580, 524 S.E.2d 302 (Ga.Ct.App.1999) ("The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney.")).[1]

Whether the contract's plain language is ambiguous is a matter of law. *Strama v. Union Fidelity Life Ins. Co.*, 793 So. 2d 1129, 1132 (Fla. 1st DCA 2001). Ambiguous language is that susceptible to more than one reasonable interpretation. *Fayad v. Clarendon Nat'l Ins. Co.,* 899

---

[1] The Court finds this to be a standard principle of contract interpretation that applies in the state of Florida.

So. 2d 1082, 1086 (Fla. 2005). An undefined term is not necessarily ambiguous. *Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1138 (Fla. 1998). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." *Taurus Holdings, Inc. v. United States Fid. Co.*, 913 So. 2d 528, 532 (Fla. 2005) (quoting Anderson, 756 So. 2d at 34). "Ambiguous policy provisions . . . should be construed liberally in favor of coverage of the insured and strictly against the insurer." *Dickson v. Econ. Premier Assur. Co.*, 36 So. 3d 789, 790 (Fla. 5th DCA 2010). *See also Stuyvesant Ins. Co. v. Butler*, 314 So. 2d 567, 570 (Fla. 1975) (holding that insurance policies "should be construed so as to give effect to the intent of the parties and if uncertainty is present in a policy, it should be construed against the insurer and in favor of the insured."). Where the Florida Supreme Court has laid to rest that a policy term in a particular type of policy is clear and unambiguous, courts applying Florida law to an insurance contract interpretation are constrained by the determination of unambiguity. *City of Delray Beach v. Agric. Ins. Co.*, 936 F. Supp. 931, 937 (S.D. Fla. 1994), *aff'd sub nom. City of Delray Beach, Fla. v. Agric. Ins. Co.*, 85 F.3d 1527 (11th Cir. 1996)

  c. **Application**

  The Policy has a Self-Insured Retention ("SIR") of $500,000. *See infra.* The Policy further provides that the SIR "applies separately to each and every 'occurrence' and offense covered under this Coverage Part." *See* [DE 20-3] at p. 22. The Policy provides that Evanston "will pay 'ultimate net loss' in excess of the SIR that the Insured is legally obligated to pay because of 'bodily injury'… to which this insurance applies." *See id.* The Policy in turn provides that this insurance applies to "bodily injury" "[c]aused by an 'occurrence' that takes place in the 'covered territory.'" *See* [DE 20-3] at p. 11. The term "Occurrence" is defined to mean "an

accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See* [DE 20-3] at p. 25.  The term "accident" is not defined in the Policy. *See* [DE 20-3].

Defendant Evanston argues that each victim of the Parkland Shooting Incident constitutes a separate "occurrence" under the Policy, such that the SIR of $500,000 must be separately met by BSO for each victim or gunshot that did harm. In other words, according to Evanston, BSO must incur tens of millions of dollars before being entitled to any coverage under the Policy. BSO, on the other hand, contends that the Parkland Shooting Incident constitutes a single "occurrence," such that it must exhaust only a single SIR of $500,000 under the Policy before coverage is triggered.

In support of its position, Defendant Evanston relies on the Florida Supreme Court case *Koikos v. Travelers Ins. Co.*, 849 So. 2d 263 (Fla. 2003), which it contends controls the outcome in this case. *Koikos* involved a scenario where an assailant entered a restaurant and shot two individuals in the same round of shots in the aftermath of a dispute. The insured, Koikos, was sued for negligent security related to the incident. A declaratory action was filed, and the parties filed cross-motions as to whether the case involved one occurrence or multiple occurrences under the policy.  The definition of "occurrence" at issue in *Koikos* was nearly identical to that here in the Evanston Policy – "an accident, including continuous or repeated exposure to substantially the same harmful conditions." The Florida Supreme Court set to answer the following question:

> WHEN THE INSURED IS SUED BASED ON NEGLIGENT FAILURE TO PROVIDE ADEQUATE SECURITY ARISING FROM SEPARATE SHOOTINGS OF MULTIPLE VICTIMS, ARE THERE MULTIPLE OCCURRENCES UNDER THE TERMS OF AN INSURANCE POLICY THAT DEFINES OCCURRENCE AS "AN ACCIDENT, INCLUDING CONTINUOUS

OR REPEATED EXPOSURE TO SUBSTANTIALLY THE SAME GENERAL HARMFUL CONDITIONS"?

*Koikos*, 849 So. 2d at 264.  In *Koikos,* the Florida Supreme Court construed the insurance policy language in favor of the insured policyholder, ruling that each shooting constituted a separate occurrence, each subject to a separate limitation of liability under the insurance policy. *Id.* at 273.  In doing so, the Florida Supreme Court adopted the "cause theory," in which a court focuses on the independent immediate acts which gave rise to the injury – not on the basis for liability asserted against the insured (i.e., negligent security).  Importantly in *Koikos*, construing the policy language to mean that each shooting was a separate occurrence was a construction determination in favor of the *insured* and against the insurer. The Florida Supreme Court specifically stated that:

> Further, even if we accepted [the insurance company] Travelers' construction of the policy as a reasonable interpretation, the insurance policy would be considered ambiguous because the relevant language would be susceptible to more than one reasonable interpretation-one providing coverage and the other limiting coverage. *See Auto-Owners*, 756 So.2d at 34. "Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy." *Id.; see also CTC Dev. Corp.*, 720 So.2d at 1076 ("[W]here policy language is subject to differing interpretations, the term should be construed liberally in favor of the insured and strictly against the insurer.").

*Koikos*, 849 So. 2d at 271.  *See also Koikos v. Travelers Ins. Co*., 849 So. 2d 263, 272 (Fla. 2003) ("Travelers had several means by which to effectively limit its liability under the policy, including policy exclusions, the $500,000 per occurrence limit, and the policy's $1,000,000 'aggregate limit.' If Travelers intended for the multiple shootings to constitute one occurrence, it could have drafted clear policy language to accomplish that result.").  Here, on the other hand, construing the policy language to mean that each shooting is a separate occurrence would be a determination in favor of the *insurer*, which the Court may not do if there are multiple reasonable interpretations of the policy language.

Defendant Evanston contends that the Florida Supreme Court's *Koikos* decision did not determine that "occurrence" as defined in the policy was ambiguous when applied to a mass shooting incident. Rather, Evanston insists that construing an ambiguity in favor of the insured played no role in the *Koikos* holding. The Court disagrees. First, the opinion in *Koikos* makes it clear that the Florida Supreme Court determined that "occurrence" was ambiguous as applied to a multiple shooting incident and that the Court would therefore construe it liberally in favor of the insured and strictly against the insurer:

> **The policy's definition of occurrence as applied to the facts of this case is susceptible to more than one reasonable interpretation.** "Occurrence" can reasonably be stated to refer to the entire shooting spree or to each separate shot that resulted in a separate injury to a separate victim. Accordingly, we construe the term "occurrence" in Travelers' policy in favor of the insured.

*Koikos*, 849 So. 2d 263, 273 (Fla. 2003) (emphasis added). Second, the Florida Supreme Court in 2005 explicitly stated in *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 534 (Fla. 2005) that their ruling in *Koikos* was based upon construing the term "occurrence," which it found ambiguous as applied to the facts of that case, in favor of the insured:

> In [*Koikos*], two individuals were shot in a restaurant. The victims sued the owner for negligence. The policy covered "bodily injury or property damage arising out of any one occurrence." *Id.* at 266. The policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." It did not define "accident." *Id.* The Eleventh Circuit certified a question, which we rephrased as follows:
>
>> When the insured is sued based on negligent failure to provide adequate security arising from separate shootings of multiple victims, are there multiple occurrences under the terms of an insurance policy that defines occurrence as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions"?
>
> *Id.* at 264. **We answered the question in the affirmative, holding that the "policy's definition of occurrence as applied to the facts of this case is susceptible to more than one reasonable interpretation."** *Id.* **at 273. Because the term "occurrence" was ambiguous, we construed it in the insured's favor.** *Id.*

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 534 (Fla. 2005) (emphasis added). Accordingly, while the Court agrees with Evanston that *Koikos* is controlling precedent here, *Koikos* does not compel the result that each shooting is a separate "occurrence" under the Policy. *Koikos* instead found each shooting to be a separate occurrence because the definition of the term "occurrence" was ambiguous, and the policyholder in that case favored that interpretation to maximize coverage. *See Koikos*, 849 So. 2d at 271; *see also Washington Nat. Ins. Corp. v. Ruderman,* 117 So. 3d 943, 949–50 (Fla. 2013) ("[W]here the provisions of an insurance policy are at issue, any ambiguity which remains after reading each policy as a whole and endeavoring to give every provision its full meaning and operative effect must be liberally construed in favor of coverage and strictly against the insurer.").

In 2014, the Florida Fifth District Court of Appeal, expressly following *Koikos,* ruled that it must construe the policy's definition of occurrence, which was ambiguous as to the facts in that case, against the insurer and in favor of the insured. *See Maddox v. Fla. Farm Bureau Gen.*, 129 So. 3d 1179, 1180 (Fla. 5th DCA 2014). That case involved a mother and son who were injured by dog bites; the dog bit the son first and then bit the mother after the mother tried to get the dog to release its grip on the son's face. *Id.* at 1180. The issue in *Maddox* was whether injuries to two people from dog bites constituted separate occurrences under a homeowners' policy, which policy had personal liability coverage limited to $100,000 for each "occurrence." *Id.* at 1180-81. Like in the present case, the term "occurrence" in that policy was defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 1180-81. The *insurance carrier* argued that the "dog attack" constituted *one occurrence, so as to limit its coverage.* The Fifth DCA disagreed. Relying on *Koikos,* the Fifth

DCA ruled that it must construe the policy's definition of occurrence, which was ambiguous as to the facts in that case, against the insurer and in favor of the insured:

> Likewise, in this case, it is reasonable to construe the occurrence as the entire dog attack or as each separate dog bite. *Because ambiguous provisions must be construed against the insurer, the occurrence language in the instant policy must be construed as meaning each separate dog bite that resulted in a separate injury to a separate victim was a separate occurrence.* For these reasons, the trial court erred in holding that the injuries which Maddox and Ivan sustained were not separate occurrences under Bullard's policy.

*Maddox*, 129 So. 3d at 1182 (emphasis added).

The term "occurrence" likewise is ambiguous here as to the facts in this case, as it reasonably can be interpreted to mean either the entire shooting spree by Cruz or each shot he fired that resulted in separate injuries to a separate victim. Accordingly, applying *Koikos*, because BSO favors the Parkland Shooting Incident to be a single "occurrence" under the Policy, that is the interpretation this Court must adopt under Florida's well-settled principles of insurance policy interpretation, which require ambiguity in an insurance policy to be construed in favor of the insured. *See Koikos*, 849 So. 2d at 273; *Taurus*, 913 So. 2d at 534.

The cases Defendant Evanston cites in urging the Court to reach the contrary result are distinguishable. *State Nat. Ins. Co. v. Lamberti*, 362 F. App'x 76 (11th Cir. 2010) involved a mass protest in Miami, Florida in 2003 when Miami hosted the Free Trade Area of the Americas (the "FTAA"). In attempt to prevent the protestors from disrupting FTAA meetings, BSO made preemptive "sweeps" of certain public areas and detained or arrested hundreds of people. Many of those detained or arrested sued BSO for civil rights violations under 42 U.S.C. § 1983, alleging that BSO had suppressed their lawful exercise of their First Amendment rights, and that certain individual officers committed specific civil rights violations, including arrest without probable cause, excessive force and unlawful detention (the "FTAA Claims"). BSO's insurer

filed suit seeking a declaration that the FTAA claims constituted multiple occurrences, each one subject to its own SIR.  On appeal, the Eleventh Circuit analyzed whether the FTAA claims represent only one occurrence, or more than one occurrence under the policy language of the insurance contract. *See State Nat. Ins. Co. v. Lamberti*, 362 F. App'x 76, 81 (11th Cir. 2010) ("The final issue is whether the FTAA claims represent only one occurrence, or more than one occurrence. If the FTAA claims constitute one occurrence, State National may be subject to substantial liability, whereas if the FTAA claims constitute more than one occurrence, State National may not be liable to BSO at all.").  Citing to the Florida Supreme Court's 2003 decision in *Koikos*, the Eleventh Circuit held that, "[u]nder Florida law, the FTAA claims, which include separate lawsuits by **many different plaintiffs, all of whom had their own interactions with members of the BSO**, represent more than one occurrence." *State Nat. Ins. Co.*, 362 F. App'x at 81–82 (emphasis added).  "[E]ach interaction with the individual officers is the cause of the claim, and is distinguishable in time and space. Thus, each interaction could be a separate occurrence." *Id.* at 82. *Lamberti*, with various civil rights plaintiffs, each with their own separate interactions with separate law enforcement officers, is thus totally distinct on its facts from the case presented here.

*State Nat'l Ins. Co. v. City of Miami*, 2010 WL 11506250 (S.D. Fla. May 11, 2010), *aff'd sub nom. State Nat. Ins. Co. v. City of Miami*, 403 F. App'x 478 (11th Cir. 2010), which was decided after the Eleventh Circuit's decision in *State Nat. Ins. Co. v. Lamberti*, 362 F. App'x 76, 81 (11th Cir. 2010), involved two groups of lawsuits filed against the City for false arrest, assault, battery, negligence, and other misconduct allegedly committed by City of Miami law enforcement.  The first group of lawsuits involved claims that as a result of Miami's failure to provide officers for security purposes at a high school graduation party, an altercation occurred

that led to a single gunman engaging in a 45-second shooting spree where he shot six partygoers. *State Nat'l Ins. Co.* 2010 WL 11506250, at *2. The other group of lawsuits consisted of actions relating to law enforcement's response to the protests at the FTAA meeting, alleging that illegal activities were used to limit protests, including excessive force and improper restrictions of protestors' constitutional rights. *See id.* The insurance policy at issue provided that the insurance coverage applied only in excess of a $500,000 SIR responsibility for each "occurrence." *Id.* at p. 2. The court, relying on *Koikos* and *Lamberti*, held that the claims in each set of actions arose from multiple occurrences, not one occurrence. *Id.* at *4-5. However, in making this determination, the district court overlooked the Florida Supreme Court's determination and application of ambiguity in its *Koikos* opinion, where it had found the term "occurrence" ambiguous as applied to the multiple shooting facts of that case and thus construed the term in favor of the insured. There is no indication in her order that Judge Seitz considered the Florida Supreme Court's opinion in *Taurus* (explicitly pointing out this finding of ambiguity in *Koikos*) in her analysis of the Florida Supreme Court's decision in *Koikos*. *See City of Miami*, 2010 WL 11506250.

In *Port Consolidated, Inc. v. Intern. Ins. Co. of Hannover, PLC*, 826 F. App'x 822 (11th Cir. 2020), the plaintiff issued cards to its customers to pump fuel. Due to an error with a fuel dispensing system, drivers were able to exceed the 75-gallon limit despite only being charged for 75 gallons. Numerous *different* truck drivers *over the span of nearly a year* used this error to steal fuel from different fuel dispensers, making that case vastly dissimilar on the facts from the mass shooting incident that occurred in this case. The court that each theft of fuel by truck drivers (in excess of the 75-gallon limit) was an act separate and distinguishable in "time and space" and constituted a separate "occurrence" under the insurance policy. *Id.* at 828. And *South*

*Central Educ. Risk Mgmt. Program v. Star Ins. Co.*, 2018 WL 11353289 (S.D. Fla. Dec. 18, 2018) involved an underlying lawsuit that alleged a child was sexually abused on multiple dates during a period of more than a year while she attended an elementary school afterschool program. On those facts, the court held that each instance of abuse during that year-plus period was a separate occurrence subject to a separate SIR. *S. Cent. Educ. Risk Mgmt. Program*, 2018 WL 11353289, at *9.

The Court's conclusion in this case that it reasonable to interpret the facts of the Parkland Shooting Incident as a single "occurrence" under the Policy is further supported by the Florida Supreme Court's sovereign immunity decisions in *Barnett v. Dep't of Fin. Services*, 303 So. 3d 508 (Fla. 2020) and *Guttenberg v. School Bd. of Broward Cty.*, 303 So. 3d 518 (Fla. 2020) -- which arose from Parkland Shooting Incident. *Barnett v. Dep't of Fin. Services*, 303 So. 3d 508 (Fla. 2020), involved a situation in which a man fatally shot his estranged wife and four of her children, and severely wounded a fifth child. Following this incident, representatives of the deceased filed complaints alleging that the Florida Department of Children and Families (DCF) breached multiple nondelegable duties and failed to protect the children from an unreasonable risk of harm. The Florida Supreme Court rephrased the certified question as follows:

> WHEN MULTIPLE CLAIMS OF INJURY AGAINST A STATE AGENCY OR ACTOR ARISE FROM ONE OVERALL INJURY-CAUSING EVENT, DOES THE LIMITATION ON THE WAIVER OF SOVEREIGN IMMUNITY IN SECTION 768.28(5), FLORIDA STATUTES, CAP THE LIABILITY OF STATE AGENCIES AT $200,000 FOR ALL RESULTING INJURIES OR DEATHS AS CLAIMS AND JUDGMENTS "ARISING OUT OF THE SAME INCIDENT OR OCCURRENCE"?

*Barnett*, 303 So. 3d at 510. The Florida Supreme Court, interpreting the phrase "same incident or occurrence," held that it "is most reasonably understood as referring to the criminal (more broadly, injury-causing) event as a whole, not to the smaller segments of time and action that

make up the crime against each individual victim, because this is the way that we commonly talk about this type of tragic occurrence—as a single event with multiple victims." *Id.* at 517. Moreover, the Florida Supreme Court stated that, "[h]owever, to the extent that the phrase 'incident or occurrence' is ambiguous and could reasonably be read as referring either to the overall incident or to the smaller segments of time and action that constitute the individual crimes against each separate victim, this would lead us to the substantive rules of statutory construction that statutes altering the common law 'are narrowly construed' and that '[w]aivers of sovereign immunity must be construed narrowly in favor of the government.'" *Id.* Accordingly, the Florida Supreme Court answered the certified question in the affirmative, ruling that "**the claims stemming from the mass shooting of Dell's victims arose from the same incident or occurrence** and are therefore subject to the $200,000 aggregate cap for damages paid by the State, its agencies, or subdivisions." *Id.* at 517 (emphasis added).

*Guttenberg v. School Bd. of Broward Cty.*, 303 So. 3d 518 (Fla. 2020), involved multiple claims against the School Board of Broward County related to the same Parkland shooting incident at issue in this case. The Florida Supreme Court held that the Parkland Shooting Incident was a single occurrence for purposes of the sovereign immunity damages cap: "**the mass shooting committed by [the shooter] is a single 'incident or occurrence'** ... and the cumulative liability for all claims of injury resulting from the incident may not exceed the aggregate cap ... set forth in the statute." *Id.* at 519 (emphasis added). If it is reasonable to interpret the Parkland Shooting Incident as a single occurrence with multiple victims in the sovereign immunity context, then it is an equally reasonable interpretation in the insurance context—the only difference being who gets the benefit when there are multiple reasonable interpretations. With sovereign immunity, an ambiguous term must be construed narrowly in

favor of the government, *Guttenberg*, 303 So. 3d at 516; with insurance, it must be construed in favor of the policyholder. *Wash. Nat'l*, 117 So. 3d at 949-50. Accordingly, it follows that the Court should construe the Parkland Shooting Incident to be a single occurrence under the Policy because that is the interpretation of the term occurrence, which is ambiguous under the facts in this case, that is favored by the insured.

That courts from various jurisdictions have reached differing conclusions on the meaning of the term "occurrence" when construing insurance policies in incidents involving multiple shootings constitutes further proof of ambiguity. *See St. Paul Mercury Ins. Co. v. F.D.I.C.*, 774 F.3d 702, 709–10 (11th Cir. 2014) ("However, it seems to us that the most compelling argument is that courts who have addressed similarly worded insured v. insured exclusions have reached different results."); *Sec. Ins. Co. of Hartford v. Investors Diversified Ltd., Inc.*, 407 So. 2d 314, 316 (Fla. 4th DCA 1981) ("The insurance company contends that the language is not ambiguous, but we cannot agree and offer as proof of that pudding the fact that the Supreme Court of California and the Fifth Circuit in New Orleans have arrived at opposite conclusions from a study of essentially the same language."). For example, in *Donegal Mut. Ins. v. Baumhammers*, 938 A.2d 286 (Pa. 2007), the son of the insureds shot multiple people over a span of two hours resulting in five deaths and serious bodily injury to a sixth person and the insured parents of the shooter were subsequently sued for negligence. *Id.* at 288. The insurance policy similarly defined "occurrence" as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results, during the policy period in … [b]odily injury or [p]roperty damage." *Id.* at 289. The Pennsylvania Supreme Court held that, because the claims were predicated on the parents' negligence, and the resulting injuries to the victims stemmed from that one cause, the parents' alleged negligence constituted "one accident and one

occurrence." *Id.* at 295. In *Bomba v. State Farm Fire & Cas. Co.*, 879 A.2d 1252 (N.J. Super. Ct. App. Div. 2007), police officers sued insured parents for negligence after their son shot two police officers multiple times, seeking a declaration from the court that each gunshot constituted a separate occurrence under the policy. *Id.* at 1252-53. The New Jersey Superior Court concluded that there was only one occurrence under the policy. *Id.* at 1255. *See also RLI Ins. Co. v. Simon's Rock Early College*, 765 N.E.2d 247 (Mass. App. Ct. 2002) (insured's alleged negligence in failing to prevent shooter from using gun at school constituted the sole "occurrence" where student embarked on a shooting rampage that resulted in two dead and four others injured); *Travelers Indem. Co. v. Olive's Sporting Goods Inc.*, 764 S.W.2d 596 (Ark. 1989) (one "occurrence" within meaning of policy where insured was sued for negligence by each victim of shooting spree). These decisions from various jurisdictions construing the term "occurrence" in insurance policies in the context of mass shooting incidents reinforce the Florida Supreme Court's conclusion that "occurrence" in commercial general liability policies is ambiguous when applied to a mass shooting situation like the Parkland Shooting Incident.

Based upon the foregoing, the term "occurrence" within the meaning of the Policy is ambiguous as applied to the facts in this case, as it reasonably can be interpreted to mean either the entire shooting spree by Cruz or each shot he fired that resulted in separate injuries to a separate victim. Applying *Koikos* and its progeny, because BSO favors the Parkland Shooting Incident to be a single "occurrence" under the Policy, that is the interpretation this Court adopts under Florida's well-settled principles of insurance policy interpretation, which require ambiguity in an insurance policy to be construed in favor of the insured. *See Koikos*, 849 So. 2d at 273; *Taurus*, 913 So. 2d at 534; *Maddox*, 129 So. 3d at 1182. Accordingly, the Court denies Defendant Evanston's motion to dismiss for failure to state a claim.

> **d.    Defendant Evanston's Motion to Strike Claims for Supplemental Relief and Pre-Judgment and Post-Judgment Interest**

Alternatively, in the event the Court does not dismiss BSO's declaratory judgment claim, Defendant Evanston moves to strike BSO's claims for supplemental relief in its prayer for relief, as well as its claims for pre-judgment and post-judgment interest pursuant to Rule 12(f).

First, Evanston moves to strike BSO's request in Paragraph D of its prayer for relief that the Court "direct EIC to fulfill its obligations under the Policy" and BSO's request in paragraph F of its prayer for relief that the Court retain jurisdiction for further supplemental relief Evanston argues that it is unclear what relief BSO seeks in these requests.  In response, BSO clarifies that BSO is not yet seeking to have the Court direct Evanston to indemnify it, but rather only to declare that, upon exhaustion of a single Self-Insured Retention of $500,000, Evanston is obligated to pay BSO the amount BSO becomes legally obligated to pay within the liability limits of the Policy. BSO also asserts that Evanston has failed to demonstrate that BSO's prayer for this Court to retain jurisdiction for the purposes of further supplemental relief and enforcing the Court's orders somehow is improper. It appears from Evanston's Reply that it is not pursuing striking these requests.  Accordingly, Court denies Evanston's motion to strike these requests from BSO's prayer for relief.

Second, Defendant Evanston asserts that BSO's claims for pre- and post-judgment interest should be stricken as improper because no amount of damages is sought in BSO's instant action for declaratory judgment.  BSO disagrees, asserting that relief in a declaratory action claim can include a money judgment for damages, and therefore that pre- and post-judgment interest are reasonable requests. *See, e.g., Hill v. Palm Beach Polo, Inc.,* 805 So. 2d 1014, 1016 (Fla. 4th DCA 2001) ("Relief is not limited to declaratory relief but also includes all relief necessary, including money judgments.").  However, as Evanston notes in its Reply, BSO's

action does not seek monetary damages from Evanston and therefore there is no present basis for requesting pre- and post-judgment interest. Accordingly, the request for pre- and post-judgment interest shall be stricken without prejudice.

IV.    **Conclusion**

Based upon the foregoing, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion to Dismiss and Motion to Strike [DE 21] is hereby **GRANTED in part and DENIED in part**;

2. Defendant's motion to dismiss for failure to state a claim is **DENIED**;

3. Defendant's motion to strike BSO's requests for supplemental relief in its prayer for relief is **DENIED**;

4. Defendant's motion to strike BSO's requests for pre- and post-judgment interest is **GRANTED**. BSO's requests for pre- and post-judgment interest are hereby stricken without prejudice;

5. Defendant shall file its answer to the Amended Complaint on or before **June 7, 2023**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 24th day of May, 2023.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:
Counsel of Record