CHAPTER 12. CRUZ'S EDUCATIONAL SERVICES

The following recommendations were proposed by CEN to address specific areas of improvement needed by BCPS :

1. *Review and revise as needed the focus of staff development regarding guidelines and procedures for the placement of students in ESE center school to incorporate training and practice in facilitating emotionally charge meetings to ensure staff have a complete understanding of the requirements as the apply to all possible scenarios.*

2. *Review and revise as needed the policies, procedures and staff development implemented to ensure students enrolled in OCLC sites who are suspected of having a disability and needing special education services are referred and evaluated within established timelines.*

3. *Review and revise current training and guidance regarding revocation of consent, with attention to less common situations such as when: an adult student revokes consent for their own services against advice of the parent and continued informal contact with designated school staff could result in the student's decision to reestablish services; a student is known to have social/emotional or behavioral needs and therefore, as a general education student, should have access to the counseling and mental health services available to all students through the district's multi-tiered system of supports; or a parent or adult student orally states their desire to revoke consent but does not submit the request in writing as required, so that staff remain neutral and are able to act without either promoting or hindering the revocation.*

4. *Review and revise as needed procedures and current guidance documents regarding reentry into ESE after consent has been revoked to more explicitly consider situations such when: there is a history of supporting data indicating that the student has been a high-needs ESE student; IEP team members strongly disagreed with the decision to revoke consent based on the data available at the time of revocation; or there is substantial evidence indicating the student needs ESE services and no recent evidence from the general education record indicating the student no longer has a disability and needs special education services.*

CHAPTER 12. CRUZ'S EDUCATIONAL SERVICES

5. *Review existing data systems to identify redundancies and inefficiencies and determine the most effective way to integrate multiple systems, maximizing accuracy and shareability across users.*

6. *Establish a protocol for reviewing the records of students transferring to alternative education programs to include discipline and ESE records in addition to course and credit information. The process must be designed to prohibit potentially discriminatory practices while ensuring the receiving program has the educational information needed to provide effective and appropriate placements and services.*

7. *Establish a protocol for communicating with all relevant staff in a receiving school or program when a student with social/emotional or behavioral needs transitions from an ESE center school or ESE separate class setting in a traditional school building to a less restrictive general education setting. In addition to the annual goals and positive behavioral supports included within an IEP, a behavior intervention plan or similar document that more explicitly details the actions to be taken in response to student behavior and includes a formal system for monitoring and/or tracking student performance should be considered for transitioning students.*

8. *Develop an audit process to be implemented for all records that pertain to discipline and safety, including but not limited to consequences and interventions imposed in response to disciplinary infractions and threat assessments. The purpose of the process is three-fold: (1) to determine the extent to which the actions proposed are implemented as stated in the relevant documentation; (2) identify and correct flaws in communication systems that may impede implementation; and (3) hold accountable the staff members responsible for implementation.*

**RECOMMENDATIONS**:

There should be a Florida workgroup established to determine necessary changes to federal law regarding ESE and then coordinate with the Florida congressional delegation to request the identified changes. State law changes can follow if federal law is revised.

CHAPTER 12. CRUZ'S EDUCATIONAL SERVICES

School personnel must be properly trained on their ESE obligations under federal and state law so that the requirements are not under- or overapplied.

Threat Assessment Teams and IEP committees must coordinate information and courses of action regarding ESE students.

Students with IEPs that involve severe behavioral issues should be referred to and evaluated by the threat assessment team.

CHAPTER 13. FLORIDA SAFE SCHOOLS ASSESSMENT TOOL

Assessing district and individual campus safety is an integral part of effective school hardening. Schools and districts have to know their strengths, weaknesses and vulnerabilities before they can make informed decisions about what to fix and establish enhancement priorities.

Between 2001 and 2014, Florida law required that each school district assess physical site security on a districtwide basis and submit an annual report to FDOE. The report concerning districtwide site security was not an automated report. During the same period—2001 to 2014—the State recommended to each district that it was a best practice to assess each school, but these school-specific assessments were not required. FDOE did not track whether districts did school-specific assessments because it was a "best practice" and not a requirement.

In 2014, the Florida legislature authorized expenditures to create an electronic Florida Safe Schools Assessment Tool (FSSAT), and it automated the assessment reporting process. Each district was required to submit the electronic districtwide FSSAT annually.  A school-specific version of the FSSAT was also created, but completion was optional.

The districtwide FSSAT assessment tool has seven general focus areas: Efficiency and Effectiveness; Health and Safety Planning; Discipline Policies and Code of Student Conduct; School Climate and Community Outreach; Safety Programs and Curricula; Facilities and Equipment; and Transportation.  The school-specific assessment has three focus areas: School Data; School Infrastructure; and School Security and Threat Management.

***Findings:***

1. When we look at the districtwide FSSATs submitted between 2015 and 2017, it appears that the FSSATs submitted in 2015 (the first year of the automated system) were lengthy reports, many over 100 pages.
2. There was no MSDHS-specific assessment submitted during this period.
3. The FSSATs submitted in years 2016 and 2017 by school districts across Florida appear to be perfunctory submissions, with most in the 25-page range that contained simple self-serving "yes" responses to questions.

CHAPTER 13. FLORIDA SAFE SCHOOLS ASSESSMENT TOOL

4. In 2015, four districts did not submit a districtwide FSSAT; in 2016, five districts failed to submit an FSSAT; in 2017, seven districts did not submit FSSATs; and the 2018 reports were due October 31, 2018, but several districts did not submit reports.

5. As to the optional school specific assessments, in 2015, the first year of the automated FSSAT, only 116 schools out of 3,900 were shown as completed in the FSSAT system; the number declined from there, with only 16 assessments reported in 2017—16 out of 3,900 schools in the year before the MSDHS shooting.

6. There were no consequences for non-compliance with the FSSAT process.

7. FDOE did not, and still does not, have regulatory authority over the districts. FDOE is the entity to which the districts report the data, but FDOE does not oversee the districts' submissions, or lack thereof.  FDOE did provide training to the districts on completing the FSSAT.

8. There are numerous concerns with the FSSAT instrument in addition to the lack of submission accountability and perfunctory responses. The instrument itself is problematic in that it asks questions that are mostly long narratives for which the call of the question is a self-serving yes or no response. There is minimal call for a substantive narrative response to FSSAT questions.

9. In addition to the overall FSSAT deficiencies, the districtwide and MSDHS-specific FSSATs submitted by the BCPS contain inconsistent statements and lack the necessary information to effectively assess physical site security within the Broward County school district or at MSDHS.

**RECOMMENDATIONS:**

The legislature should require that the FSSAT be the primary instrument used by the school districts to assess physical site security.

The Florida legislature should provide FDOE with compliance authority over the districts to ensure that each school, and each district as applicable, submits an annual FSSAT.

CHAPTER 13. FLORIDA SAFE SCHOOLS ASSESSMENT TOOL

FDOE should be tasked with, and funded for, providing each district with training on how to assess physical site security and how to properly complete the FSSAT.

Each site assessment should be required to be conducted in conjunction with law enforcement.

The annual districtwide FSSAT should specifically set forth the physical site security priorities for the district in descending order of priority.

The FSSAT should also explain what progress was made in implementing the previous year's FSSAT priorities.

It should be required that any significant deficiencies identified during the FSSAT assessment process that adversely affect the safety and security of any school campus or facility must be reported in a timely manner to the school board, and a remedial plan should approved by the board.

The legislature should provide statutory sanctions for non-compliance with the annual FSSAT submission requirement.

The legislature should require that the school-specific FSSAT be approved by the superintendent or his/her designee before submission to FDOE. The designee must be a deputy/assistant superintendent or the district's school safety specialist.

The current school-specific and districtwide FSSAT should be revised with stakeholder input, especially from law enforcement and industrial security experts.

**THIS PAGE INTENTIONALLY LEFT BLANK**

CHAPTER 14.  INFORMATION SHARING

14.1 Federal and State Privacy Laws Affecting Information Sharing—School, Medical and Mental Health Records (Florida Educational Privacy Requirements, FERPA, and HIPAA)

**Family Educational Rights and Privacy Act (FERPA)**

On August 8, 2018, the Commission listened to testimony from Francisco M. Negron, Jr., the Chief Legal Officer for the National School Boards Association. Mr. Negron's testimony provided the Commission with background knowledge on the following information.

The Family Educational Rights and Privacy Act (FERPA), first passed in 1974, is federal law found collectively in 20 U.S. Code § 1232g and 34 CFR Part 99. FERPA applies to all educational institutions in the United States. This legislation primarily addresses how schools deal with student educational records and personally identifiable information. While the purpose of FERPA has always been to ensure student privacy rights, adjustments to the law over the years have leaned toward improving necessary information-sharing practices in times of emergencies or threats, as happened after the Virginia Tech University shooting.

FERPA does not create a private right of action to compel compliance by educational institutions. Instead, FERPA ties institutional compliance to its privacy requirements through federal funding. The ultimate threat for non-compliance by educational institutions is that the U.S. Department of Education may respond by withholding federal funding. To date, the Department of Education has never withheld funding for FERPA violations.

As a general matter, FERPA prohibits the sharing, accessing or disclosure of private student educational records. Student educational records are defined as records or documents directly related to a student that are maintained by an educational agency or by some party acting on behalf of the school or institution. Educational records do not necessarily include conversations or observations, unless those things are included somewhere within an educational record. Educational records also do not include records kept in in the sole possession of their maker, or records that are temporary, serve as a memory aid, or are made available to a temporary substitute. Ultimately, whether a document or record

CHAPTER 14.  INFORMATION SHARING

qualifies as an educational record under FERPA depends on how and for what purpose the record is maintained. A school district may set policies to include defining what may constitute an educational record. Law enforcement records are not educational records, and records created for a law enforcement function (to include School Resource Officer (SRO) or security personnel records) are not educational records. In contrast, discipline records that may incorporate SRO documents may be educational records if not created or maintained for a law enforcement purpose.[9] If an SRO on a threat assessment team acts as both a school official and a law enforcement officer, the SRO can share educational record information.

Once a determination is made that personal identifying information (PII) is part of an educational record, FERPA provides for when a school or school district may disclose sensitive student PII. While student educational records are generally confidential, there are exceptions that allow disclosure in situations such as consent, the existence of a legitimate educational interest, an exception for health and safety concerns and for certain compelled legal processes such as a court order. A school may disclose PII from student education records with the consent of the student and the student's parent/guardian. Otherwise, a school is able to disclose PII from student education records without consent to school officials with a legitimate educational interest; this ability to disclose PII also extends to contractors, volunteers, or those who may serve as school officials while performing a school service or function. When a school provides PII to these non-employee partners, the outside party must agree to abide by FERPA and to protect the disclosed information. Schools will often have procedures in place to ensure these processes are completed safely and appropriately.

As noted above, SROs have unique challenges between educational and law enforcement purposes. SROs on threat assessment teams may dually serve as a law enforcement officer and a school official. SROs who serve on a school threat-assessment team are prohibited under FERPA from re-disclosing educational records they review to other law enforcement

---

[9] U.S. Department of Education, Letter to Montgomery County Public Schools (MD) re: Law Enforcement Unit Records, https://studentprivacy.ed.gov/resources/letter-montgomery-county-public-schools-md-re-law-enforcement-unit-records

CHAPTER 14.  INFORMATION SHARING

personnel unless there is an articulable emergency, triggering the health and safety exception under FERPA, or unless there is a lawfully compelled legal process. Threat assessment members can only use PII from educational records for the purpose of conducting threat assessments. If, however, threat assessment team members (or the school district) determine there to be an articulable and significant threat to health and safety, FERPA allows a law enforcement officer on the threat assessment team to share PII on behalf of school officials.

FERPA's health and safety exception is critically important for the Commission's work. Found in 34 CFR Part 99.36, FERPA's health and safety exception defines the "appropriate parties" with whom PII can be shared, including law enforcement. This can be done if knowledge of the information is necessary to protect the safety of the student or other individuals. "Appropriate parties" are those to whom such knowledge is necessary to protect the health and safety of students, including parents, medical professionals and law enforcement. School districts have the capability to determine who may fall under that definition. A determination that specific facts trigger the health and safety exception is left to the school district pursuant to federal law, requiring the totality of the circumstances guide such a determination. However, the facts that trigger the health and safety exception must include an "articulable and significant threat" to the safety of students or other individuals. Generally, the health and safety exception will apply time, place and manner considerations on the execution of an articulable threat. This means that understanding time, place and manner considerations can be useful in determining an articulated and significant threat. The health and safety exception is generally limited to the period of the emergency, and does not allow for a blanket release.

Schools and school districts may historically be circumspect in sharing PII out of a concern of making incorrect determinations as relating to the health and safety exception; however, to date, the federal government has never revoked funding for prior FERPA violations. The Department of Education typically applies a "good faith" standard when interpreting the actions of school officials—so long as there is a rational basis for a school district's actions, the federal government has not substituted its own judgments for the judgment of the

school district. FERPA allows for school districts to enter into memoranda of understanding that outline and define how processes should work to resolve potential threats. These MOUs can include how law enforcement will be involved. The MOU can define (1) what information will be shared, and (2) under what circumstances such information may be shared, highlighting the articulated exception used. Further, while disclosure of records under the health and safety exception requires an "impending or imminent threat," such as a natural disaster, a terrorist attack, a campus shooting or the outbreak of a disease, school districts have the flexibility to define such terms in an MOU.

**Florida K-12 Education Privacy Requirements**

On August 8, 2018, the Commission listened to testimony from Brent McNeal, Deputy General Counsel at the Florida Department of Education. Mr. McNeal's testimony provided the Commission with background knowledge on the following information.

The above-noted federal law, FERPA, largely controls the discussion on educational records. In Florida, FERPA has largely been codified into state requirements as well. Florida student privacy requirements (including the incorporation of FERPA into state law) can be found in Chapter 1002, Florida Statutes, establishing student and parental rights and educational choices.

Beginning in 2009, the Florida legislature explicitly implemented FERPA into Florida law. Chapter 1002, Florida Statutes, requires the Board of Education to administer rules for the implementation of FERPA. Section 1002.22, Florida Statutes, provides for a cause of action for parents and students to bring forth an injunction in civil court for violations of rights. Attorney's fees may flow from a granted injunction. Section 1002.221, Florida Statutes, provides that education records are confidential and exempt from public records, and that such records may not be released as public records without written consent except as otherwise allowed by FERPA. That same statute provides schools or districts with the ability to enter into interagency agreements for the purpose of releasing education records for determining or delivering services to a juvenile. In Section 1003.53, Florida Statutes, school districts may cooperate with appropriate agencies for dropout prevention and

academic intervention programs. Rule 6A-1.0955, Florida Administrative Code, also requires school boards to adopt policies on records, including provisions for the disclosure of PII where prior consent is not required, as well as provisions for disclosures in health and safety scenarios. Section 1002.222, Florida Statutes, limits the kind of information a school or district can collect, prohibiting the collection of biometric information and certain information associated with individual civil liberties.

**HIPAA**

The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is another federal law that heavily influences the sharing of sensitive information. On August 8, 2018, the Commission listened to testimony from Tracey Jaensch, a Regional Managing Partner of FordHarrison LLP, and a subject matter expert on HIPAA. Ms. Jaensch's testimony provided the Commission with background knowledge on the following information.

The primary purpose of HIPAA is to protect electronically sent and stored medical records. Generally speaking, there are two parts of HIPAA: a privacy component and a security component. HIPAA controls protected health information (PHI) in any form, including oral communications. HIPAA was enacted into law in 1996, as found in Public Law 104-91, and subsequently the Hi-Tech Act amended HIPAA in 2009. The relevant regulatory provisions can be found at 45 CFR Parts 160, 162 and 164. There is no private right of action for HIPAA violations, though the federal government enforces HIPAA breaches and can levy significant monetary fines.

Only specified covered entities and their business associates are required to comply with HIPAA. Covered entities only include health plans, healthcare providers and healthcare clearinghouses. Healthcare providers are only subject to HIPAA if they send and receive electronic healthcare records. Applicable business associates include those who receive private health information from covered entities for a specified purpose, such as a provider's law firm or accountant, which may require sensitive PHI to accomplish tasks for the provider. Many entities are specifically not required to comply with HIPAA, including employers, certain forms of insurance, law enforcement agencies and, potentially, schools,

depending on what services are provided by the schools and who pays for those services. It is possible, though unlikely, that a school or school district that chooses to provide student PHI to a law enforcement agency could trigger HIPAA requirements.

Generally speaking, HIPAA requires written consent to share PHI; however, the associated rules do provide for the sharing of PHI without consent. PHI disclosures must be the minimum amount necessary to provide information for a specified purpose. Providers can provide PHI to law enforcement, family members or others if the provider believes that the patient presents a serious and imminent threat to themselves or others. This disclosure is allowable if provided to someone who can reasonably serve to lessen or mitigate the threat. In such cases, covered entities are presumed to act in good faith if acting on actual or apparent knowledge.[10] If an official inquiry is relevant to an investigation, it must be targeted and sufficiently narrow to satisfy the purposes sought.

**State Privacy Laws**

Beyond the above-noted provisions, Florida law provides for individual privacy rights in a number of relevant areas. On August 8, 2018, the Commission listened to testimony from Paul Rozelle, Senior Associate Counsel with the Pinellas County Sheriff's Office. Mr. Rozelle's testimony provided the Commission with background knowledge on the following information.

Much of the debate between privacy rights and government expectations of transparency can be found in Florida's public records laws, primarily cited in Chapter 119, Florida Statutes. The Florida Constitution also balances a similar set of concerns in its articulated right to privacy, as found in Article I, Section 23, and its right of access to public records, as found in Article I, Section 24(a). Chapter 119, Florida Statutes, provides for the further contours of these rights. Chapter 119 broadly defines a public record, but also provides for exemptions and confidentiality of certain documents. Confidential records do not have a constitutional right of public access, and a governmental agency may only release that information with specific authorization—either the individual to whom the information

---

[10] 45 CFR 164.512(j)(4).

CHAPTER 14.  INFORMATION SHARING

applies, or from a specific statutory authorization. Exemptions to inspect public records differ from confidentiality; exempt records belong to an agency, and an agency may choose to disclose records. An agency can choose to release exempt records, but has little choice in not releasing confidential records.

Several types of records relevant to the Commission's mission have confidentiality or exempt statuses under Florida law. For instance, psychiatric records are confidential under Section 456.059, Florida Statutes. However, a psychiatrist may disclose psychiatric records to warn the victim or a law enforcement agency of a threat if the psychiatrist believes that a patient has the means to carry out a threat against identifiable persons, and if the psychiatrist believes the patient will more likely than not carry out the threat.

Hospital records are generally confidential under Florida law, but can be disclosed in certain circumstances, including to the Department of Children and Families for the purposes of providing services or for investigative cases. Generally speaking, medical records may not even be discussed without authorization, save for certain exceptions. Mental health clinical records are confidential and exempt under Section 394.4615(1), Florida Statutes. Clinical records are those which pertain to a patient's hospitalization or treatment.[11] However, records that include information relevant to threats of harm to another person may be released with an articulable threat of specific harm. Similarly, Baker Act records under Chapter 394, Florida Statutes, are confidential and exempt from public disclosure; however, the separate incident report(s) documenting the underlying law enforcement contact is not confidential or exempt.

Arrest and crime reports are not generally confidential. However, juvenile criminal records do have certain privacy protections, as outlined in Chapter 985, Florida Statutes. Criminal histories pertaining to juveniles are generally confidential and exempt from disclosure, with certain exceptions. These exceptions include felony offenses committed by a juvenile. Juvenile criminal justice records are also available to criminal justice agencies for criminal justice purposes. Additionally, juvenile criminal justice records may also be made available to law enforcement, the Department of Juvenile Justice, the Florida Department of

---

[11] Fla. Stat., 394.455(6).

CHAPTER 14.  INFORMATION SHARING

Corrections or other licensed professionals for the purpose of providing programs and services to a juvenile, pursuant to Section 985.04(1)(b), Florida Statutes. Moreover, juvenile criminal justice records have unique seal and expunction requirements; such records are generally expunged upon the subject turning 21 years of age with certain exceptions that may delay or prohibit expunction.

***Findings:***

1. Based on the testimony before the Commission and discussion among Commission members, it is evident that there is significant misunderstanding and overapplication of several privacy laws, including FERPA and HIPAA. The misunderstanding and overapplication of privacy laws is a barrier to necessary and successful information sharing.

2. Many aspects of educational privacy laws fail to consider appropriate exceptions for an incident such as this where full public disclosure of prior conduct, especially misconduct is beneficial and necessary. The inability for public disclosure of probative information and the attendant information void leads to misinformation and distrust that erodes the public's confidence in the system and it officials. If there is to be an erosion of public trust, it must be based on fact and not speculation because information is hidden from the public eye.

3. It is unclear what actually constitutes an educational record under FERPA, including whether recorded video surveillance is an educational record.

## 14.2    School Incident Reporting to FDOE and Crime Reporting to Law Enforcement

Florida Statute 1006.13 outlines the policy on zero tolerance for crime and victimization.

The statute details the following:

(1)    District school boards shall promote a safe and supportive learning environment in schools by protecting students and staff from conduct that poses a serious threat to

school safety. A threat assessment team may use alternatives to expulsion or referral to law enforcement agencies to address disruptive behavior through restitution, civil citation, teen court, neighborhood restorative justice or similar programs. Zero-tolerance policies may not be rigorously applied to petty acts of misconduct and misdemeanors, including, but not limited to, minor fights or disturbances. Zero-tolerance policies must apply equally to all students regardless of their economic status, race or disability.

(2) Each district school board shall adopt a policy of zero tolerance that:

(a) Defines criteria for reporting to a law enforcement agency any act that occurs whenever or wherever students are within the jurisdiction of the district school board.

(b) Defines acts that pose a serious threat to school safety.

(c) Defines petty acts of misconduct.

(d) Minimizes the victimization of students, staff or volunteers, including taking all steps necessary to protect the victim of any violent crime from any further victimization.

(e) Establishes a procedure that provides each student with the opportunity for a review of the disciplinary action imposed pursuant to s. 1006.07.

(f) Requires the threat assessment team to consult with law enforcement when a student exhibits a pattern of behavior, based upon previous acts or the severity of an act that would pose a threat to school safety.

## 14.3    School Incident Reporting to FDOE – SESIR

In order to track statewide student criminal conduct data, school districts are required to submit data to the Florida Department of Education (FDOE) through the School Environmental Safety Incident Reporting (SESIR) System. Some data elements are

CHAPTER 14. INFORMATION SHARING

ultimately reported federally. This aggregate data at the state level allows FDOE to analyze patterns and trend lines to identify significant changes over time and follow up with school districts to provide further support at the local level. SESIR collects discipline data on 26 incident types of crime, violence and disruptive behaviors that occur on school grounds, on school transportation and at off-campus school-sponsored events, during any 24-hour period, 365 days per year. Districts utilize standardized SESIR codes and definitions to report incidents to FDOE.

The following SESIR codes and definitions were developed to enable school districts to accurately code data used to report incidents that are against the law or represent serious breaches of the Code of Student Conduct. This includes those incidents considered severe enough to require the involvement of a School Resource Officer (SRO) or incidents reported to law enforcement. The definitions were not meant to match exactly with the Uniform Crime Report, nor are they intended to be an additional reporting system for law enforcement. When school districts are interpreting student behavior for SESIR reporting, consideration should be given to both developmental age-appropriate behavior and to those students with an Individual Educational Plan (IEP) or a 504 Plan.

**Incidents that MUST be reported to SESIR and law enforcement:**

- Battery
- Homicide
- Kidnapping
- Sexual Battery
- Weapons Possession

**Incidents that MUST be reported to SESIR and <u>ARE EXPECTED to include consultation with law enforcement</u>:**

- <u>Alcohol</u> (ALC) - Level IV
  (possession, use or sale) Possession, sale, purchase or use of alcoholic beverages.

CHAPTER 14.  INFORMATION SHARING

Use means the person is caught in the act of using, admits to use or is discovered to have used in the course of an investigation.

- <u>Arson</u> (ARS) - Level I

  (intentionally setting a fire on school property) To damage or cause to be damaged, by fire or explosion, any dwelling, structure or conveyance, whether occupied or not, or its contents.

- <u>Breaking and Entering/Burglary</u> (BRK) - Level II

  (illegal entry into a facility) Unlawful entry with force, or unauthorized presence in a building or other structure or conveyance with evidence of the intent to damage or remove property or harm a person(s).

- <u>Disruption on Campus-Major</u> (DOC) - Level III

  (major disruption of all or a significant portion of campus activities, school-sponsored events and school bus transportation) Disruptive behavior that poses a serious threat to the learning environment, health, safety or welfare of others. Example: Bomb threat, inciting a riot, initiating a false fire alarm. (Do not use this code for students defying authority, disobeying or showing disrespect to others, using inappropriate language or gestures or classroom disruption.)

- <u>Drug Sale/Distribution Excluding Alcohol</u> (DRD) - Level II

  (illegal sale or distribution of drugs) The manufacture, cultivation, sale or distribution of any drug, narcotic, controlled substance or substance represented to be a drug, narcotic or controlled substance.

- <u>Drug Use/Possession Excluding Alcohol</u> (DRU) - Level III

  (illegal drug possession or use) The use or possession of any drug, narcotic, controlled substance, or any substance when used for chemical intoxication. Use means the person is caught in the act of using, admits to use or is discovered to have used in the course of an investigation.

- <u>Hazing</u> (HAZ) - Level III

  Any action or situation that endangers the mental or physical health or safety of

CHAPTER 14.  INFORMATION SHARING

a student at a school with any of grades 6 through 12 for purposes of initiation or admission into or affiliation with any school-sanctioned organization. "Hazing" includes, but is not limited to: (a) pressuring, coercing or forcing a student to participate in illegal or dangerous behavior, or (b) any brutality of a physical nature, such as whipping, beating, branding or exposure to the elements.

- <u>Physical Attack</u> (PHA) - Level II
  Physical attack refers to an actual and intentional striking of another person against his/her will, or the intentional causing of bodily harm to an individual.

- <u>Robbery</u> (ROB) - Level II
  (using force to take something from another) The taking or attempted taking of anything of value that is owned by another person or organization, under the confrontational circumstances of force, threat of force or violence and/or by putting the victim in fear.

- <u>Larceny/Theft</u> (STL) - Level III
  (taking of property from a person, building, or a vehicle) The unauthorized taking, carrying, riding away with, or concealing the property of another person, including motor vehicles, without threat, violence or bodily harm. (The item(s) value must be $300 or more to report in SESIR.)

- <u>Sexual Assault</u> (SXA) - Level II
  An incident that includes a threat of: rape, fondling, indecent liberties, child molestation or sodomy. Both male and female students can be victims of sexual assault. The threat must include all of the following elements: 1) intent; 2) fear; and 3) capability.

- <u>Sexual Offenses (Other)</u> (SXO) - Level III
  (lewdness, indecent exposure) Other sexual contact, including intercourse, without force or threat of force. Subjecting an individual to lewd sexual gestures,

sexual activity or exposing private body parts in a lewd manner. (Law enforcement must be notified to investigate.)

- <u>Threat/Intimidation</u> (TRE) - Level III

  (instilling fear in others) A threat to cause physical harm to another person with or without the use of a weapon that includes all of the following elements: 1) intent—an intention that the threat is heard or seen by the person who is the object of the threat; 2) fear—a reasonable fear or apprehension by the person who is the object of the threat that the threat could be carried out; and 3) capability—the ability of the offender to actually carry out the threat directly or by a weapon or other instrument that can easily be obtained.

- <u>Trespassing</u> (TRS) - Level II

  (illegal entry onto campus) To enter or remain on school grounds/campus, school transportation, or at a school-sponsored event/off campus, without authorization or invitation and with no lawful purpose for entry.

- <u>Vandalism</u> (VAN) - Level III

  (destruction, damage, or defacement of school or personal property) The intentional destruction, damage or defacement of public or private/personal property without consent of the owner or the person having custody or control of it. (Damage must be $1000 or more to report in SESIR.)

- <u>Other Major</u> (OMC) - Level III

  (major incidents that do not fit within the other definitions) Any serious, harmful incident resulting in the need for law enforcement intervention not previously classified. Examples: Student producing or knowingly using counterfeit money, participating in gambling activities, possessing child pornography or possessing drug paraphernalia.

**Incidents that MUST be reported to SESIR, but <u>MAY NOT need to include consultation with law enforcement:</u>**

CHAPTER 14.  INFORMATION SHARING

- <u>Bullying</u> (BUL) - Level IV

  (intimidating behaviors) Systematically and chronically inflicting physical hurt or psychological distress on one or more students or employees that is severe or pervasive enough to create an intimidating, hostile or offensive environment or unreasonably interfere with the individual's school performance or participation.

- <u>Fighting</u> (FIT) - Level III

  (mutual combat, mutual altercation) When two or more persons mutually participate in use of force or physical violence that requires either 1) physical restraint or 2) results in injury requiring first aid or medical attention. (Do not report to SESIR lower level fights such as pushing, shoving, or altercations that stop upon verbal command. Use local codes.)

- <u>Harassment</u> (HAR) - Level IV

  (insulting behaviors) Any threatening, insulting, or dehumanizing gesture, use of data or computer software or written, verbal or physical conduct that 1) places a student or school employee in reasonable fear of harm to his or her person or damage to his or her property, 2) has the effect of substantially interfering with a student's educational performance, opportunities, or benefits or 3) has the effect of substantially disrupting the orderly operation of a school including any course of conduct directed at a specific person that causes substantial emotional distress in such a person and serves no legitimate purpose.

- <u>Sexual Harassment</u> (SXH) - Level III

  (undesired sexual behavior) Unwanted verbal or physical behavior with sexual connotations by an adult or student that is severe or pervasive enough to create an intimidating, hostile or offensive educational environment, cause discomfort or humiliation or unreasonably interfere with the individual's school performance or participation (<u>6A-19.008(1) SBE Rule</u>). An incident when one person demands a sexual favor from another under the threat of physical harm or adverse consequence.

CHAPTER 14. INFORMATION SHARING

- <u>Tobacco</u> (TBC) - Level IV

  (cigarettes or other forms of tobacco) The possession, use, distribution or sale of tobacco *or nicotine* products on school grounds, at school-sponsored events or on school transportation by any person under the age of 18.

***Findings*:**

1. SESIR reporting for MSDHS during the 2016-2017 school year reflected little to no activity reported for the reportable incidents.

2. BSO reports for the same period reflect reports of trespassing, battery, robbery and theft at MSDHS.

3. According to a June 20, 2018, *Sun-Sentinel* article, SESIR data shows 193 weapons found districtwide in the 2016/17 school year, which reflected a 10-year low with the the number of weapons seized being half of that of the previous year. The article says the district admitted it changed its reporting criteria and stopped reporting some weapons incidents. The article states Superintendent Runcie has acknowledged underreporting.

4. Only certain incident types are required to be reported to law enforcement under SESIR and under Senate Bill 7026's revisions; reporting to law enforcement is mandatory for second or subsequent misdemeanor crimes, but more serious offenses like robbery are still not required to be reported to law enforcement.

5. FDOE has no way to determine underreporting by districts or schools because it is not present on campuses and cannot know the daily events that occur. Expulsion and suspension trends are way down, and this raises serious questions about underreporting.

6. FDOE monitors SESIR reporting, and, when it sees concerning incident trends, it has no authority to compel changes at schools with a high number of incidents.

**RECOMMENDATIONS:**

1. There needs to be extensive training provided to all stakeholders on the appropriate application of FERPA, HIPAA and other often-misunderstood and overapplied laws. The overapplication of these laws and the barriers thus imposed must cease.

CHAPTER 14.  INFORMATION SHARING

Knowledge of the laws' exceptions are as equally important as their initial applicability.

2. HIPAA and 42-CFR are subject to interpretation, which can be unnecessarily detrimental. The State of Florida should research and offer a correct interpretation for providers to follow and provide resources for providers to access when information sharing is in question.

3. The Florida legislature should consider changes to Florida school privacy laws that are not preempted by federal law to better allow information sharing in appropriate circumstances, and to encourage changes to federal law.

4. The Florida congressional delegation should evaluate FERPA, HIPAA, 42-CFR and other federal laws and sponsor changes to those laws that will allow broader information sharing and public disclosure.

5. SESIR reporting requirements to FDOE and law enforcement should be evaluated and increased.  Several types of incidents—such as robbery—that are not currently required to be reported to law enforcement should be required reportable offenses.

6. School Districts must ensure that each school accurately reports all required SESIR incidents and that underreporting is eliminated. School districts should be held accountable for accurate reporting, and the districts should hold their administrators accountable.

7. The legislature should provide FDOE with SESIR oversight authority and authorize FDOE to impose sanctions on districts that do not accurately report required data. FDOE should be provided inspection authority of districts' records and be required to conduct audits to ensure compliance.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

While not specifically assigned to the Commission, the MSDHSPSA addresses several other issues related to school safety and school violence that provide law enforcement, courts and schools with the tools to enhance public safety. Approximately 400 million dollars was allocated to implement various parts of Senate Bill 7026. The Commission heard presentations on many of these issues, and some findings and recommendations in this report may have an impact on the future implementation and responsibilities as assigned in law. The following is a summary of these aspects of the MSDHSPSA and updates on implementation.

**Office of Safe Schools**

The MSDHSPSA codifies the Office of Safe Schools (OSS) within the Florida Department of Education (FDOE) as the central repository for the best practices, training standards and compliance regarding school safety and security.  Their mission is to support districts in providing a safe learning environment for students and educators. The primary goals of the office include prevention, intervention and emergency preparedness planning.

Specifically, under the MSDHSPSA, the OSS shall:

- Establish and update the school security risk assessment tool.
- Provide ongoing professional development to district personnel to include technical assistance and guidance on school safety and security recommendations, addressing any findings.
- Develop and implement a School Safety Specialist Training Program to include providing an active shooter training program.

The OSS has been established, with a Director appointed and 4 employees assigned to the office.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

**Physical Security of School Buildings**

The MSDHSPSA provided $98,962,286 for grants to schools to fund fixed capital outlay costs associated with improving physical security of school buildings as identified by their security risk assessment (FSSAT).

Grant guidelines were issued by FDOE on August 21, 2018. The application submission deadline for grant funds was December 1, 2018. The average award per school is approximately $27,467. Grants will be awarded no later than January 15, 2019.

**Centralized Integrated Data Repository**

MSDHSPSA directs  that the Office of Safe Schools will work with the Florida Department of Law Enforcement to create a centralized "data repository" and analytics resources to improve access to information from sources including social media, the Department of Children and Families, the Department of Law Enforcement, the Department of Juvenile Justice and local law enforcement agencies.

***In May 2018, FDOE established three workgroups that consist of members from the Department of Children and Families, theDepartment of Law Enforcement, the Department of Juvenile Justice and the Agency for Health Care Administration. The three groups are User and Data Governance, Technology and Legal.  These groups are reviewing existing tools available for data sharing.

A social media monitoring tool is being considered to help school districts monitor threats of violence against students, employees and schools. The system will scan social media to identify signs of bullying, self-harm or threats of violence against students, employees and schools.

The tool should be available in mid-2019. The social media monitoring tool searches social media postings for keywords based on specific geographical areas compared to the FortifyFL app, which receives anonymous tips from anyone who downloads the app. The tool will generate immediate notifications to school districts and local law enforcement.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

**Fortify Florida**

MSDHSPSA required the Florida Department of Law Enforcement to collaborate with the Department of Legal Affairs to procure a mobile suspicious activity reporting application. The "Fortify Florida" app, officially known as "FortifyFL," allows students to anonymously report unsafe, potentially harmful, dangerous, violent or criminal activities, or the threat of these activities to the appropriate law enforcement agencies and school officials, using any electronic smart device.

The FortifyFL mobile application went live in October 2018. There are 6,922 public and private schools identified in the app that are assigned for response to 222 law enforcement agencies. Numerous tips have been received through the app, and one arrest has been made as a result of a tip.

**Coach Aaron Feis Guardian Program**

The law permits a sheriff and school district to establish a Coach Aaron Feis Guardian Program. The legislation allows school districts to decide whether to participate in the Guardian Program if it is available in their county. A guardian must complete 132 hours of comprehensive firearm safety and proficiency training, pass a psychological evaluation, submit to and pass drug tests and complete certified diversity training. The Guardian Program is completely voluntary for a sheriff to establish, for a school district to participate in, and for an individual to volunteer to be a part of.

Currently, 25 sheriffs throughout Florida have agreed to train volunteers as guardians. Some sheriffs have refused to authorize the program. Application requests total approximately $9,307,862.04.

**Safe School Officers**

MSDHSPSA requires each district school board and school district superintendent to cooperate with law enforcement agencies to assign one or more safe-school officers at each school facility.  The safe-school officer requirement can be satisfied by appointing any

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

combination of a school resource officer, a school safety officer or a school guardian. Data is being compiled to determine compliance with this requirement.

**School Safety Specialists**

MSDHSPSA requires each district school board to designate a district school safety specialist to serve as the district's primary point of public contact for public school safety functions.

As reported by the safety specialists, most school districts have confirmed they are implementing active shooter training exercises at their schools.  Most districts have presented their risk assessments to their school boards, and most districts have reported that the district school safety specialist coordinates with appropriate public safety agencies.

The law also provided funds to develop training for the school safety specialist regarding active shooters. It is anticipated that a vendor for the training will be contracted by January 2019. Training dates will be scheduled to maximize participation. Six FEMA Independent Study courses have been identified as prerequisites. The training will be based on national and state best practices on school safety and security, to include roles and responsibilities, threat assessment, crisis management, staff and student safety preparedness, post-incident recovery and family reunification.

**Threat Assessment Teams**

MSDHSPSA requires each school district to designate a threat assessment team at each school, and requires the team to operate under the district school safety specialist's direction.

Many districts have reported that they have threat assessment teams that are trained in evaluating behavioral and academic concerns and are providing school staff training regarding such support. Compliance with the threat assessment team requirement is still being evaluated, and implementation of effective teams across the state is still in progress.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

**FSSAT**

The law requires FDOE to contract for the assessment and further development of the Florida Safe Schools Assessment Tool, which assists school districts in conducting physical site security assessments to identify threats and vulnerabilities.

FDOE contracted a consultant to provide a detailed and comprehensive technical review of FSSAT that will include the intent, history, current use and future use of FSSAT. The Commission and others will be working with the consultant on FSSAT recommended revisions.

Fiscal Year 2018-19 FSSAT assessments were due by August 1, 2018, for all districts' school sites. All schools have completed their assessments, but not without prodding from FDOE. District assessments were due by October 31, 2018. Some have not complied. Across-the-board compliance with the FSSAT is an area that must be improved.

**Mental Health Assistance Allocation**

MSDHSPSA created the mental health assistance allocation to assist school districts in establishing or expanding school-based mental health care.

Plans must be focused on evidence-based mental health care treatment. School districts shall submit approved plans, including approved plans of each charter school in the district, to the commissioner by August 1 of each fiscal year. FDOE provided technical assistance to districts on June 1, 2018, and hosted regional meetings. Approved plans can be viewed at: http://www.fldoe.org/safe-schools/mental-health.stml. Every district met the August 1 deadline.

Requires Department of Children and Families to contract for community action treatment teams to provide behavioral health and support services.

**Youth Mental Health Awareness Training**

Beginning with the 2018-2019 school year, the Department of Education was required to establish an evidence-based youth mental health awareness and assistance training

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

program to help school personnel identify and understand the signs of emotional disturbance, mental illness and substance use disorders and provide such personnel with the skills to help a person who is developing or experiencing an emotional disturbance, mental health or substance use problem.

As of December 2018, FDOE facilitated training for nationally certified Youth Mental Health First Aid trainers representing school districts in all 19 SEDNET regions throughout the state. FDOE collaborated with the National Council and established a six-hour training option for school district personnel as "first-aiders."

The law directs school boards to require student disclosure of mental health referrals at registration; allow an expelled student who is admitted to another district to be referred for mental health services; require the student code of conduct to include policies for referring violent or disruptive students for mental health services; require students expelled for firearms or certain threats to be referred for mental health services; and require student crime watch programs to allow anonymous reporting;

**Student Crime Watch**

At the time of this report, some districts have reported crime watch programs and school safety hotlines are in place and available in all schools. Some districts have procedures in place to inform the public about their crime watch/school safety hotlines. Compliance with this requirement is ongoing.

**Active Shooter Training and Drills**

The law requires the school district to develop emergency plans with public safety agencies and include active shooter and hostage situations, which must be conducted as often as other drills; plans should identify those individuals required to contact first responders and require periodic testing of communications systems.

Forty-six school districts have confirmed through FSSAT that they have policies and procedures for active assailant drills at their schools. Active shooter training ranges from videos for students to law enforcement-led courses for staff.  Districts report that drills are

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

conducted with first responder agencies. School districts are conducting their active shooter training drills either monthly, quarterly or once per semester. Some shared that they plan to conduct smaller drills on a monthly basis and more in-depth and intensive exercises each semester. All school districts are working with local agencies and first responders in planning for a response in the event of an active shooter

**Sharing of Confidential Information**

The law requires all state and local agencies that provide services to students "experiencing or at risk of an emotional disturbance or mental illness" to share confidential information and records if the information is "reasonably necessary to ensure access to appropriate services for the student or to ensure the safety of the student or others."

**Firearms**

Senate Bill 7026 authorizes a law enforcement officer who is taking a person into custody for an involuntary examination under the Baker Act to seize and hold a firearm or ammunition from the person for 24 hours after the person is released, even if the individual does not have a risk protection order against them or is the subject of a firearm disability.

The law prohibits a person who has been adjudicated mentally defective or who has been committed to a mental institution from owning or possessing a firearm until a court orders otherwise.

It creates a process for a law enforcement officer or law enforcement agency to petition a court for a risk protection order to temporarily prevent persons who are at high risk of harming themselves or others from accessing firearms when a person poses a significant danger to himself or herself or others, including significant danger as a result of a mental health crisis or violent behavior. It also allows a court to issue a risk protection order for up to 12 months and requires the surrender of all firearms and ammunition if a risk protection order is issued while also providing a process for a risk protection order to be vacated or extended. This Risk Protection Order process is in effect across Florida.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

Senate Bill 7026 requires a three-day waiting period for all firearms—not just handguns—or until the background check is completed, whichever is later. it provides exceptions for concealed weapons permit holders and also provides exceptions for the purchase of firearms other than handguns for individuals who have completed a 16hour hunter safety course, hold a valid Florida hunting license or are law enforcement officers, correctional officers or service members (military and national guard).

The law also prohibits a person less than 21 years of age from purchasing a firearm and prohibits licensed firearm dealers, importers and manufacturers from selling a firearm, except in the case of a member of the military or a law enforcement or correctional officer when purchasing a rifle or shotgun. (Persons under 21 years of age are already prohibited from purchasing a handgun under federal law.)

It also prohibits bump-fire stocks from being imported, transferred, distributed, sold, kept for sale, offered for sale, possessed or given away within the state.

Florida statute now prohibits a person from making, posting or transmitting a threat to conduct a mass shooting or an act of terrorism.

Funding allocations resultant from the passage of Senate Bill 7026 includes:

- More than $69 million to the Department of Education to fund the mental health assistance allocation.
- $1 million for the design and construction of a memorial honoring those who lost their lives on February 14, 2018, at Marjory Stoneman Douglas High School.
- More than $25 million for replacing Building 12 at Marjory Stoneman Douglas High School.
- More than $67 million for sheriff's offices who decide to establish a school guardian program.
- More than $97 million to aid the safe schools allocation.
- More than $98 million to implement a grant program for improving and hardening the physical security of school buildings.

CHAPTER 15. MARJORY STONEMAN DOUGLAS HIGH SCHOOL PUBLIC SAFETY ACT

- $18.3 million to the Department of Children and Families for additional mobile crisis teams to ensure reasonable access among all counties.

The Commission will continue to monitor the implementation of Senate Bill 7026 and update the progress in subsequent report.

**THIS PAGE INTENTIONALLY LEFT BLANK**

GLOSSARY OF TERMS

**Active Shooter**: An individual using a firearm in an ongoing event to wound or kill persons usually in a public area, office, school, church or commercial location.

**Active Shooter Policy**: The standing order for law enforcement officers on their duty and how to respond when an individual is firing a weapon at victims.

**Active Shooter Training:** The training associated with events related to an active shooter event.

**AR-15**: A type of semi-automatic rifle.

**Assistant Principal (AP)**: The deputy or second level administrative position at a school

**Campus Monitor**: An employee of the Broward County School system that is unarmed and assigned general duties including observation and reporting related to on campus activities.

**Baker Act**: An evaluation of an individual by law enforcement and mental health professionals that identifies individuals immediately at risk for self-harm or harming others.

**Body-worn Camera or Body Camera (BWC)**: An audio-video recording device worn by law enforcement officers.

**Breaching tool**: A device utilized by law enforcement to defeat the locks on doors in order to force entry.

**Broward County Sheriff's Office (BSO)**: The law enforcement agency reporting to the elected sheriff established under the Florida constitution.

**Building 12 (The freshman building)**: The three story classroom building on the Marjory Stoneman Douglas Campus in which the targeted attack occurred on February 14, 2018.

**Bump Stock**: An after-market device that can be added to a semi-automatic rifle that increases its rate of fire.

**Captain**: A senior supervisor in a law enforcement agency above the level of lieutenant.

GLOSSARY OF TERMS

**Chief**: A title for a member of the command staff of a law enforcement organization.

**Code Red**: The alert that warns administrators, teachers and students that an attack is occurring which requires the campus to lock down and students not in safe areas to flee.

**Command Post**: The physical location at which the equipment and the incident commander is located.

**Computer-aided dispatch (CAD)**: The method of dispatching and recording the dispatch of emergency services aided by computer hardware and software.

**Crime Suppression Team (CST)**:  A specially trained law enforcement unit with the ability to respond to violent situations.

**Deputy**: A sworn law enforcement officer.

**Deputy Chief**: A command staff position in a law enforcement agency below the level of chief.

**Detective**: A sworn law enforcement officer assigned investigative duties.

**Dispatcher or Dispatch:** The individual at a law enforcement base station or a 911 center that is listening to and broadcasting information to law enforcement or other first responder personnel.

**Drywall**: Common wall construction made up of panels of matrix material held in place by wood or metal supports.

**Emergency Medical Services (EMS)**: Paramedics, ambulances and other medical resources that respond to emergencies and then transport victims to hospitals.

**Exceptional Student Education (ESE)**: Federal and state educational programs for students aged 3 to 21 that have certain disabilities or are gifted.

**Family Educational Rights and Privacy Act (FERPA):** a federal law that protects the privacy of student educational records.

GLOSSARY OF TERMS

**Florida Education Finance Program (FEFP)**: The funding formula that is adopted annually by the Florida legislature that allocates funding to county school districts.

**Fire Alarm Panel:** The centralized base panel that is attached to remote fire alarm sensors that provides information on the location and type of the alarm.

**Florida Congressional Delegation:** Refers collectively to the elected members of the United States House of Representative and United States Senate that represent the citizens of the State of Florida.

**Florida Identification Card**: An official card issued by the State of Florida that provides identification including age in lieu of a driver's license.

**Florida Safe Schools Assessment Tool (FSSAT):** A mandatory mechanism required by state law by which the school districts conduct and report physical site security assessments.

**FortifyFL:** A state wide app that facilitates public reporting of school security concerns to law enforcement and school districts.

**Geographic Position System:** An electronic device that identifies a specified physical location by latitude and longitude.

**Glow Stick:** A small tube that can be carried and caused to glow in different colors utilized to mark a location.

**Hard Corner:** The part of a class room or other school space that cannot be observed from outside of the room when the door is locked.

**Health Insurance Portability and Accountability Act (HIPPA):** A federal law that protects the security of certain patient health information.

**Hot Zone:** An unsafe area in an active shooter event.

**Improvised Explosive Device (IED):** A homemade bomb.

GLOSSARY OF TERMS

**Individual Education Plan; 504 Plan (IEP):** A plan prepared by professionals, the student and the student's parents that sets out goals and mechanisms to achieve those goals for a student involved in Exceptional Student Education programs.

**Interoperability:** The capacity for different agency radio systems that allows the agency personnel to talk to each other.

**Junior Reserves Officer Training Corps (JROTC):** A youth development high school program sponsored by the U.S. Department of Defense.

**Juvenile:** Defined in the criminal justice system as a person less than 18 years of age.

**K9:** A specially trained dog that works with a sworn police officer to form a team used in law enforcement activities.

**K-12:** The public and private school system including kindergarten through twelfth grade.

**Leakage:** Identified by the United States Secret Service; the term identifies the phenomena of telling, posting on line, or writing by an attacker about an attack in advance.

**Lieutenant (Lt):** A supervisory position in a law enforcement agency above a sergeant and below command staff.

**Long gun:** A term for a rifle.

**Mass Casualty Incident (MCI):** A designation applied to an event where multiple persons are injured or killed.

**Medic; SWAT medic; TAC medic:** An individual trained and certified in advanced first aid able to apply life saving techniques in field settings under difficult conditions.

**Memorandum of Understanding (MOU):** An agreement between two or more agencies that assigns responsibility for activities between the agencies.

**Marjory Stoneman Douglas Public Safety Commission (MSDPSC):** Twenty person commission established in Florida law to study and report on the Marjory Stoneman Douglas High School shooting and other mass violence incidents.

GLOSSARY OF TERMS

**Marjory Stoneman Douglas High School (MSDHS):** The high school in the Broward County Public School system that came under attack on February 14, 2018 resulting in the death of 17 persons and the wounding of 17 others.

**Office of Safe Schools (OSS):** A division of the Florida Department of Education.

**Officer:** A sworn police officer.

**Patch:** An electronic system that allows two or more different law enforcement radio systems to cross communicate.

**Preventing Recidivism through Opportunities, Mentoring, Interventions, Supports and Education (PROMISE):** A program designed to reduce school based arrests for minor offenses and provide second chances to school aged children.

**Principal:** The senior most administrative official in a school.

**Public Access Line (PAL):** A system operated by the United States Federal Bureau of Investigation that provides around the clock opportunity for the public to report concerns.

**Public Address System (PA):** A system of interconnected microphones and speakers that allows information to be widely broadcasted.

**Rescue Task Force (RTF):** An ad-hoc group of trained medical personal that provide initial on-scene medical care in the hot and warm zones of a mass casualty event.

**Safe Schools Allocation:** An amount of funds set aside in the State of Florida budget that is allocated to county school systems.

**Student with Emotional/Behavioral Disabilities (SEDNET) -** Multiagency network that creates and facilitates a network of key stakeholders committed to assisting in the care for students with or at-risk of emotional and/or behavioral challenges.

**Sergeant:** A supervisory law enforcement position.

GLOSSARY OF TERMS

**School Environmental Safety Incident Reporting System (SESIR):** A mechanism for schools in Florida to report crime, violence and disruptive behaviors on school grounds and transportation.

**School Radio:** A radio system used by school personnel to exchange information with each other consisting of portable devices and a base station.

**School Resource Officer (SRO):** A sworn law enforcement officer assigned to work on a K-12 school campus.

**Security Specialist:** A non-sworn unarmed employee of the Broward County School system assigned general security duties.

**Special Weapons and Tactics (SWAT):** a unit of a law enforcement agency that receives specialized training to carry out duties related to specific types of events.

**Tactical Operations Center (TOC):** A specialized command post to guide tactical police operations.

**Targeted attack:** A violent event planned and carried out with weapons and/or explosive devices by one or more persons frequently resulting in the wounding of individuals and loss of life.

**Threat Assessment Team (TAT):** a program required in every Florida school that is to identify and ameliorate threats from students.

**Throttling:** A technical term that is applied when a radio system is degraded because it has more transmissions occurring than it can handle.

**Tourniquet:** A medical device utilized to stop bleeding on an arm or leg.

**Triage area:** An area designated at the scene of a casualty event for first aide and for determining order of patients dispatched to hospitals.

**Uber:** A service that provides customers a ride from point to point similar to a taxi cab service.

GLOSSARY OF TERMS

**Vest or Ballistic Vest:** Protective gear worn by law enforcement officers on the upper body.

**Warm Zone:** A clear, but not secure area in an active shooter event.

**THIS PAGE INTENTIONALLY LEFT BLANK**

ADDITIONAL INFORMATION AND RESOURCES

**Additional Information and Resources**

Information related to membership, meetings and testimony before the Marjory Stoneman Douglas High School Public Safety Commission. (2018). Available from http://www.fdle.state.fl.us/MSDHS/Home.aspx

Legislation establishing the Marjory Stoneman Douglas High School Public Safety Act. CS/SB 7026: Public Safety.  Chapter 2018-3 Laws of Florida. March 9, 2018. Available from https://www.flsenate.gov/Session/Bill/2018/07026

Information about the Florida Department of Education Office of State Schools. (2018). http://www.fldoe.org/safe-schools/

Broward County Grand Jury State of Florida vs Nikolas Jacob Cruz Indictment.  March 7, 2018. Available from http://www.trbas.com/media/media/acrobat/2018-03/70318704060120-07145652.pdf

Research on School Shootings and Targeted Attacks. United States Department of Homeland Security, Secret Service, National Threat Assessment Center. (2018). Available from https://www.secretservice.gov/protection/ntac/research/

Research on Active Shooter Incidents. United States Department of Justice Federal Bureau of Investigation. (2018). Available from https://www.fbi.gov/resources/library

Foundational work on the school shooter. Mary Ellen O'Toole, Supervisory Special Agent FBI. Federal Bureau of Investigation. National Center for the Analysis of Violent Crime. 1998. Available from https://www.fbi.gov/file-repository/stats-services-publications-school-shooter-school-shooter/view

Information related to school shootings in the United States. School Peter Langman. Shooters. Info.  (2018). Available from https://schoolshooters.info/

Information about "School Violence: Prevention" from the United States Department of Health and Human Services Center for Disease Control.

ADDITIONAL INFORMATION AND RESOURCES

(2018). https://www.cdc.gov/violenceprevention/youthviolence/schoolviolence/prevention.html

Information on the Safe Communities Safe Schools model. (2018). Available from https://cspv.colorado.edu/

Information on the Columbine High School attack. Columbine Review Commission. May 2001. The Report of Governor Bill Owens' Columbine Review Commission. Available from https://schoolshooters.info/sites/default/files/Columbine%20-%20Governor's%20Commission%20Report.pdf

Information on the Columbine High School attack. Jefferson County, Colorado Sheriff. (2018). Available from http://edition.cnn.com/SPECIALS/2000/columbine.cd/Pages/TOC.htm

Information on school safety.  Oregon Task Force on School Safety.  2015. *Report to the Oregon State Legislature.* Available from https://www.oregon.gov/osp/Pages/Task-Force-on-School-Safety.aspx

Information on Sandy Hook. Sandy Hook Advisory Commission. March, 2015. *Final Report of the Sandy Hook Advisory Commission.* Available from http://www.shac.ct.gov/SHAC_Final_Report_3-6-2015.pdf

Information on the Arapahoe High School Shooting. Goodrum, S. and Woodward, W. January 2016. *Report on the Arapahoe High School Shooting: Lessons Learned on Information Sharing, Threat Assessment, and Systems Integrity.* The Denver Foundation. Boulder, Colorado. Center for the Study and Prevention of Violence, University of Colorado boulder. Available from https://cspv.colorado.edu/publications/AHS-Report/Report_on_the_Arapahoe_High_School_Shooting_FINAL.pdf

Information about the Virginia Threat Assessment Model. Virginia Department of Criminal Justice Services. 2016.*Threat Assessment in Virginia Public Schools: Model Policies, Procedures, and Guidelines.* Second Edition. Available

ADDITIONAL INFORMATION AND RESOURCES

from https://www.dcjs.virginia.gov/sites/dcjs.virginia.gov/files/publications/law-enforcement/threat-assessment-model-policies-procedures-and-guidelinespdf.pdf

Information about United States School Resource Officers. National Association of School Resource Officers. (2018). Available from https://nasro.org/

Information about Florida School Resource Officers. Florida Association of School Resource Officers (2018). Available from https://www.fasro.net/

Information about FERPA. United States Department of Education. Family Educational Rights and Privacy Act (FERPA). 20 U.S.C § 1232g; 34 CFR Part 99. (2018) Available from  https://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html

Information about the Health Insurance Portability and Accountability Act of 1996 (HIPPA). (2018). Available from https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html

Information about "Incident Command". Department of Homeland Security, Federal Emergency Management Agency. (2018). Available from https://www.fema.gov/incident-command-system-resources#

Information about Exceptional Student Education and Individual Education Plan. Florida Department of Education. (2018) Available from http://www.fldoe.org/core/fileparse.php/7674/urlt/0064541-ese2011.pdf

Information about Baker Act data from the Florida Baker Act Reporting Center. (2018). Available from https://www.usf.edu/cbcs/baker-act/for-consumers/managingentities.aspx

Information about Broward County. (2018). Available from http://www.broward.org/Pages/Welcome.aspx

Information about the Broward County Sheriff's Office. (2108). Available from http://www.sheriff.org/Pages/Home.aspx

ADDITIONAL INFORMATION AND RESOURCES

Information about the Broward County Office of Regional Communications and Technology. (2018) Available from https://www.sheriff.org/LE/Pages/CommunicationsDispatch-911.aspx

Information about the Broward County School District. (2018). Available from https://www.browardschools.com/

Information about the Promise Program. (2018). Available from https://www.browardschools.com/Page/32438

Information about Marjory Stoneman Douglas High School (2018). Available from https://www.browardschools.com/stonemandouglas

Information about Parkland. (2018). Available from https://www.cityofparkland.org/

Information about the City of Coral Springs. (2018). Available from https://www.coralsprings.org/

Information about Coral Springs Police Department. (2018). Available from https://www.coralsprings.org/government/other-departments-and-services/police

Information about Coral Springs Communication Center (2018). Available from https://www.coralsprings.org/government/other-departments-and-services/police/divisions/communications

Information about the Coral Springs – Parkland Fire Department. (2018). Available from https://www.coralsprings.org/government/other-departments-and-services/fire

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Alhadeff, Alyssa | Student (Deceased) |
| Alfin, Dave (Detective) | Coral Springs Police Department |
| Babinec, Frank (Chief) | Coral Springs Fire Department |
| Backer, Shawn (Deputy Chief) | Coral Springs Police Department |
| Baez, Ashley | Student (Wounded) |
| Beigel, Scott | MSD Staff/Teacher (Deceased) |
| Best, Richard (Officer) | Coral Springs Police Department |
| Bienenfled, Jared | Henderson Behavioral Health Employee |
| Bienkievitz , Eric (Deputy) | Broward Sheriff's Office |
| Blaine, Katherine | Friend of Lynda Cruz |
| Bonner, Elliott | MSD Staff/Campus Monitor |
| Borges, Anthony | Student (Wounded) |
| Bradley, Gareth (Captain) | Broward Sheriff's Office Fire Rescue/SWAT |
| Burton, Tim (Officer) | Coral Springs Police Department |
| Butler, Al (Detective) | Broward County Schools Police |
| Carbocci, George (Deputy) | Broward Sheriff's Office |
| Cardinale, Craig (Lt.) | Sunrise Police Department |
| Carvalho, Augusto (Officer) | Coral Springs Police Department |
| Ceciliano, Ivo | Coral Springs Police Department/SWAT Medic |
| Chequer, Isabel | Student (Wounded) |
| Clark, Scott (Officer) | Coral Springs Police Department |
| Colton, Justin | Student (Wounded) |
| Cooper, Deborah | Reported Nikolas Cruz shot her chickens |
| Cruz, Lynda Kumbatovich | Nickolas Cruz Adoptive Mother |
| Cruz, Nikolas | Alleged Gunman |
| Cruz, Roger Paul | Nickolas Cruz Adoptive Father (Deceased) |
| Cruz, Zachary | Nickolas Cruz biological half brother |
| Dajani, Brad | M.D. Neurologist |

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Dale, Jack (Colonel) | Broward Sheriff's Office |
| Daugherty, Brian (Officer) | Coral Springs Police Department |
| Del Barrio, Ann | Henderson Behavioral Health Employee |
| Deschamps | Family that temporarily housed Nikolas Cruz |
| Deschamps, Rock | Friend of Nickolas Cruz |
| Deschamps, Rocxanne | Mother of Rock Dechamps |
| ODejnak, Jeff (Officer) | Coral Springs Police Department |
| DeRosa, Ed (Sgt.) | Coral Springs Police Department |
| Deviat, Michael (Lt.) | Broward Sheriff's Office |
| Dimaggion, Michael (Lt. | Broward Sheriff's Office |
| Dittman, Dave (Officer) | Coral Springs Police Department |
| Dolcine, Gasner (Deputy) | Broward Sheriff's Office |
| Duque, Martin | Student (Deceased) |
| Dworet, Alexander | Student (Wounded) |
| Dworet, Nicholas | Student (Deceased) |
| Hoyer, Luke | Student (Deceased) |
| Eason, Edward (Deputy) | Broward Sheriff's Office |
| Feduik (Deputy) | Broward Sheriff's Office |
| Felley, Steve (Lt.) | Broward Sheriff's Office |
| Feis, Aaron | MSD Staff/Campus Monitor |
| Fernandes, Derek (Officer) | Coral Springs Police Department |
| Figeroa, Ivette | MSD Staff/Assistant Principal |
| Forrest, Tiffany | Henderson Behavioral Health Employee |
| Foti, Jason (Sgt.) | Coral Springs Police Department |
| Franklin, Sarah | Broward Sheriff's Office Fire Rescue/SWAT |
| Fuentes, Samantha | Student (Wounded) |
| Galan, Pamela | Henderson Behavioral Health Employee |
| Gallagher, Ryan (Captain) | Coral Springs Police Department |
| Garcia, Tony (sgt.) | Broward Sheriff's Office |

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Gariepy, Dave (Detective) | Coral Springs Police Department |
| Gonzales, Esteban (Detective) | Broward Sheriff's Office |
| Goolsby, Brian (Detective) | Broward Sheriff's Office |
| Grady, Samantha | Student (Wounded) |
| Grant, Ed (Major) | Broward Sheriff's Office |
| Greenleaf, Kelvin | MSD Staff/Security Specialist |
| Greetham, Chandler (Deputy) | Broward Sheriff's Office |
| Guarino, Joelle | Mother of Dylan Guarino |
| Guarino, Dylan | Child allegedly hit with a rock by Nickolas Cruz |
| Gutttenberg, Jaime | Student (Deceased) |
| Hamel, Mary | Friend of Lynda Cruz |
| Hanks, William (Deputy) | Broward Sheriff's Office |
| Harrison, John (Officer) | Coral Springs Police Department |
| Hays, Brenden (Detective) | Broward Sheriff's Office |
| Heinrich, Jeff (Sgt.) | Coral Springs Police Department |
| Hickox, Chris (Sgt.) | Broward Sheriff's Office |
| Hixon, Chris | MSD Staff/Campus Monitor (Deceased) |
| Hodgson, Dwight (Detective) | Coral Springs Police Department |
| Holmes, David (Major) | Broward Sheriff's Office |
| Hoyer, Luke | Student (Deceased) |
| India, John (Deputy) | Broward Sheriff's Office |
| Israel, Scott (Sheriff) | Broward Sheriff's Office |
| Brittany, Jacobs | Henderson Behavioral Health Employee |
| Jaensch, Tracey | FordHarrison LLP |
| Johnson, Jermaine (Detective) | Broward Sheriff's Office |
| Jordan, Jan (Captain) | Broward Sheriff's Office |
| Loughran, Cara | Student (Deceased) |
| Kabachenko, Marian | Student (Wounded) |
| Kallman, Michael (Sgt.) | Broward Sheriff's Office |

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Karpf, Laurie | M.D. Psychiatrist |
| Kozlowski, Bruce (Sgt.) | Coral Springs Police Department |
| Kratz. Michael (Deputy) | Broward Sheriff's Office |
| Laman, Kyle | Student (Wounded) |
| Lasseter, Grant (Captain) | Broward Sheriff's Office Fire Rescue/SWAT |
| Lees, Greg (Deputy Chief) | Coconut Creek Police Department |
| Leonard, Michael (Officer) | Coconut Creek Police Department |
| Loughran, Cara | Student (Deceased) |
| Lippel, Stacey | MSD Staff/ Teacher (Wounded) |
| Luthin, Martha | Henderson Behavioral Health Employee |
| MacLean, James (Officer) | Coral Springs Police Department |
| Mangapuram, Kheshava | Student (Wounded) |
| Marchese, Louis (Deputy) | Broward Sheriff's Office |
| Mayor, Samantha | Student (Wounded) |
| Mazzei, Nicholas (Sgt.) | Coral Springs Police Department |
| McCoy, Chris (Lt.) | Broward Sheriff's Office |
| McKenna, Chris | Student |
| McKeone, Brad (Deputy Chief) | Coral Springs Police Department |
| McNally, Michael (Chief) | Coral Springs Fire Department |
| McNeal, Brent | Florida Department of Education |
| Medina, Andrew | MSD Staff/Campus Monitor |
| Menescal, Daniela | Student (Wounded) |
| Miller, Brian (Sgt.) | Broward Sheriff's Office |
| Mock, Brad (Captain) | Coral Springs Police Department |
| Molamphy, G. (Sgt.) | Broward Sheriff's Office |
| Mondesir, Neil  (Deputy) | Broward Sheriff's Office |
| Montalto, Gina | Student (Deceased) |
| Monzon, Gil (Detective) | Coral Springs Police Department |
| Morford, Jeff | MSD Staff/Assistant Principal |

## APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Morse, Jeffrey (Captain) | Broward Sheriff's Office |
| Mormelo, Thomas (Lt.) | Broward Sheriff's Office Fire Rescue/SWAT |
| Mucenic, Mary Claire | Broward County Public Schools |
| Myers, Scott (Sgt.) | Coral Springs Police Department |
| Negin, Brett | M.D. Psychiatrist |
| Negron, Francisco M. Jr. | National School Boards Association |
| Noland, Thomas (Lt.) | Broward Sheriff's Office Fire Rescue/SWAT |
| Oliver, Joaquin | Student (Deceased) |
| Olson, William | Student (Wounded) |
| O'Neill, Steve (Lt.) | Broward Sheriff's Office |
| Osgood, Nathan (Major) | Broward Sheriff's Office |
| Parry, Clyde (Chief) | Coral Springs Police Department |
| Perry, Art (Deputy) | Broward Sheriff's Office |
| Peterson, Scot (Deputy) | Broward Sheriff's Office/MSD SRO Deputy |
| Petty, Alaina | Student (Deceased) |
| Phillips Warnell (Lt.) | Broward Sheriff's Office |
| Pianelli, Michael (Deputy) | Broward Sheriff's Office |
| Pollack, Meadow | Student (Deceased) |
| Polan, Jim (Colonel) | Broward Sheriff's Office |
| Polo, Danny (Detective) | Broward Sheriff's Office |
| Popock, Brett (Officer) | Coral Springs Police Department |
| Porter, Winfred | MSD Staff/Assistant Principal |
| Pumariega , Carlos (Captain) | Margate Fire Department |
| Pustizzi, Tony (Chief) | Coral Springs Police Department |
| Ramos, Anna | MSD Staff/Campus Monitor |
| Ramsay, Helena | Student (Deceased) |
| Reed, Denise | MSD Staff/Assistant Principal in Charge |
| Reid, William (Sgt.) | Coral Springs Police Department |
| Robson, Steven (Captain) | Broward Sheriff's Office |

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Rosario, Maximo | MSD Staff/Assistant Principal |
| Rosende, Edward (Captain) | Broward Sheriff's Office |
| Rospierski, Ernest | MSD Staff/Teacher |
| Rossman, Richard (Sgt.) | Broward Sheriff's Office |
| Rozelle, Paul | Pinellas County Sheriff's Office |
| Rubenstein, Lauren | MSD Staff |
| Ryen, Chad (Officer) | Margate Police Department |
| Schachter, Alex | Student (Deceased) |
| Schamis, Ivy | MSD Staff/Teacher |
| Schentrup, Carmen | Student (Deceasd) |
| Schmidt, George (Officer) | Coral Springs Police Department |
| Schroy, Brett (Detective) | Coral Springs Police Department |
| Schaub, Timothy (Detective) | Broward Sheriff's Office |
| Scott, Rick | Governor, State of Florida |
| Seward, Richard (Deputy) | Broward Sheriff's Office |
| Sherlock, Chris (Deputy) | Broward Sheriff's Office |
| Simerka, Amanda | Ex-Employee of Camelot |
| Sincoff, Steven | Henderson Behavioral Health Employee |
| Sklar, Ian (Sgt.) | Broward Sheriff's Office |
| Snead, James "JT" | Friend of Nikolas Cruz |
| Soberon, George (Captain) | Coral Springs Police Department |
| Stambaugh, Joshua  (Deputy) | Broward Sheriff's Office |
| Staubly, Brian | MSD Staff/Campus Monitor |
| Swadkins (Deputy) | Broward Sheriff's Office |
| Taylor, David | MSD Staff/Campus Monitor |
| Thompson, Ty | MSD Staff/Principal |
| Treijs, G. (Deputy) | Broward Sheriff's Office |
| Valdes, Roberto (Detective) | Broward Sheriff's Office |
| Valentin, Gensis | Student (Wounded) |

APPENDIX A. SUBJECT LIST

| | |
|---|---|
| Van Der Eems, Richard | Broward Sheriff's Office |
| Volpe, Gennaro (Deputy) | Broward Sheriff's Office |
| Vullo, Giovanni (Sgt.) | Coral Springs Police Department |
| Wang, Peter | Student (Deceased) |
| Wexler, Steven | Secret Service Agent, Retired |
| Whittington, Chad (Officer) | Coral Springs Police Department |
| Wikander, Ben | Student (Wounded) |
| Wilford, Madeleine | Student (Wounded) |
| Wilkins, Brian (Officer) | Coral Springs Police Department |
| Yurchuck, David (Deputy) | Broward Sheriff's Office |

**THIS PAGE INTENTIONALLY LEFT BLANK**

APPENDIX B.  TARGET HARDENING

**Level 1** Recommendations: policies and practices that can be implemented quickly and require little or no funding

**Campus Access (Public)**

Campuses should have single ingress and egress points to the extent that is consistent with this level's criteria of minimal cost. (If cost is significant then it should be considered later in the hardening process).

Interior access should be limited by co-locating Attendance, Guidance, Main Office and other public business offices. (many schools have these functions spread throughout multiple locations on campus)

Clear signs should direct visitors to appropriate entry points.  All entry/exit doors should indicate a closed campus and direct visitors to report to the front office.

Install a door alert or notification system to the main entry for visitor control. Non-essential visitors should be limited and when allowing visitors they should be required to show positive identification, state their purpose for entering the school, be issued a visitor badge and, when appropriate,  have a staff escort during the entire time the person is inside the school.

Visitor management. All campus perimeter ingress and egress points shall be staffed when opened for student arrival and dismissal.

Each school should have a written campus access policy that is distributed to all personnel.

Staff members should be trained to challenge, if appropriate, or report anyone unauthorized to be on campus or any vehicle not parked in an authorized area.

**Campus Buildings  (First Responders)**

Ensure all campus doors and buildings are clearly marked with easily identifiable markings known to first responders. Mark exterior classroom windows so first responders can

APPENDIX B.  TARGET HARDENING

identify classrooms from the exterior of the building.

Building numbers should be placed on the roof for aerial support.

Provide keys/access to on duty law enforcement so they can quickly enter the school.

**Campus Monitoring**

All school districts should allow law enforcement at its discretion to live monitor all existing camera systems at all schools within the district.

Multiple school staff members should be trained on the operation of campus monitoring systems.

**Building Exterior Doors**

There should be locks on all exterior/classroom doors and other areas where students assemble in mass (cafeterias, libraries, auditoriums). All doors should self-close and lock upon closing.

**Interior Classroom Doors/Windows**

All classroom doors should be able to be locked from inside or there must be an enforced policy that all doors remain locked at all times without exception.

Classroom doors should either have no windows or every door should be equipped with a device that can readily block line of sight through the window, but does not indicate occupancy.

First floor outside windows should be able to be blocked from line of sight.

Policies should include that doors be checked regularly throughout the school day to ensure they are secure.

**Communication**

There should be effective two-way communications between lockdown spaces and school administrators, SRO or law enforcement.

APPENDIX B. TARGET HARDENING

Schools should implement policies prohibiting students and staff from wearing any type of headphones or ear buds that prevent them from hearing emergency warnings and instructions. If earbuds are allowed, it is recommended that students be allowed to only have one and not two at the same time.

**Accountability**

There should be consequences for not following safety and security measures in place (Students Code of Conduct, Employee Handbook, School Board Policy).

---

**Level II:** May Require some low to moderate funding and a moderate implementation

**Ingress/Egress**

Fenced campuses with single ingress and egress points (could be a level III based on campus size and complexity). All fencing should be constructed in a way or  high enough to prevent easy climbing.

Use protective bollards at campus entrances

**Communications**

There should be redundant two-way communications systems in every classroom and student assembly area. All interior building hallways and exterior common areas where students or staff move about should be equipped with speakers tied to the school's intercom system. This includes portable classrooms. Two-way communication systems are preferred but at least one-way notification systems are paramount.

**Common Areas (Locks)**

All common use closed areas in a school should have electronically controlled doors that can be locked remotely or locally with appropriate hardware on single and double doors to resist forced entry.

Install door sensors and cameras on all doors vulnerable to unauthorized access use by

APPENDIX B.  TARGET HARDENING

students and staff to ensure all doors are locked at all times.

**Video Coverage**

Enhance current video surveillance systems to eliminate any interior/exterior gaps in camera coverage including front door access control.

 Consider video surveillance systems capable of internet access that include first responder and emergency communications centers access via the internet during an emergency.

**Funding for High Tech Infrastructure**

DOE should ensure that each of the districts are fully aware and partaking in the E-rate program (also referred to as Schools and Libraries program) to fund and utilize current high speed broadband as it relates to school security i.e. enhancing camera and audio capability as technology is being implemented.

---

**Level III:** May require moderate to significant funding, but no law or regulation changes and moderate to long term implementation

**Doors/Windows (Some mentioned in Level II)**

Install electronically controlled door systems.

Install ballistic resistant glass covering on classroom interior door windows.

Install door alert systems that can be monitored from a central location to determine if a door is closed or propped open.

Install classroom door windows that are small enough to restrict access and located a sufficient distance from the door handle to prevent a person from reaching through to unlock the door from the interior.

Install a ballistic glass vestibule or double door system at the single point of entry to limit entry for visitors and prevent or delay a perpetrators entrance to campus.

APPENDIX B.  TARGET HARDENING

**Parking and Bus Lots**

All parking areas should be outside of the single point of entry perimeter.

Ensure that there is adequate lighting that allows for clear observation of all entry points and parking lots.

Bus loading and unloading areas should have physical separation from visitor parking, parent drop off and walkers.

Install GPS locators  on all school buses

**During a Lockdown**

If a Code Red or other active assailant response is initiated, make sure that message is displayed on all computer screens connected to the school's computer network.

Establish a system that notifies staff, district officials, parents and students off campus by email, text, and/or phone about an active assailant response being implemented.

Provide school personnel with a device that could be worn to immediately notify law enforcement of an emergency,

---

**Other:** May require significant funding and/or changes in laws or regulations and long term/multi-year implementation. If feasible, the following should be considered:

All school radio traffic should be recorded

Metal detectors and x-ray machines at campus entrances**.**

Implement real time crime centers or their equivalent with live video monitoring capability of all cameras on all school campuses.

Gunshot location sensor should be tied into camera system

Use tactical tablets that are directly fed to the E911 system.

RFID and Near field communications (NFC) card readers should replace all door locks on campus.

APPENDIX B. TARGET HARDENING

Install electronic message board in every classroom

New buildings or major renovations must include sensors that alert the office staff when exterior doors are not secured with electronic monitoring that automates the process of identifying the cause of the open door.

Shipping and receiving areas should be designed to allow access without breaching the single point of entry containment system and have electronic monitoring.

Interior corridors between classrooms should have the ability to electronically seal the movement of intruders but allow staff to move easily with electronic access control.

Faculty should be trained in "Stop the Bleed" procedures with adequate kits for all schools.

This should be covered in First Aid Training with properly trained school personnel.

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS



**Sheriff Scott Israel**

**DATE:**        August 30, 2018

**MEMO TO:**      Captain Christopher Mulligan
Parkland District/DLE

**FROM:**        Daniel Losey, Director
Professional Standards Committee
Department of Professional Standards

**SUBJECT:**     **DIVISION OF INTERNAL AFFAIRS CASE # 2018-0041**
**ACKNOWLEDGMENT OF FINAL DISPOSITION**

A final disposition of IA Case # 2018-0041 has been affirmed by the Sheriff's designee. Attached to this memorandum is a copy of the action to be imposed against **Deputy Edward Eason, CCN 10558**. The discipline for Deputy Eason is: *SPM 2.4*
*DLE SOP 3.6.1(B) reporting requirements*

### Three Day (24 hours) Suspension

*After signing, please give a copy of this memo, with attachment, to the employee and forward **THIS ORIGINAL MEMO ONLY** to the Department of Professional Standards for filing even if the employee intends to appeal. Please provide verification of served discipline within 30 days after appeal time has expired (if applicable), in one of the formats indicated below:*

  **X**  **Suspension**:  Please have timekeeper print the PeopleSoft Timecard Report for the employee indicating TRC code SNP for the day(s) of suspension and forward a copy to the Department of Professional Standards.

_____ **Written Reprimand**: Forward this memo to the Dept. of Professional Standards.

*Lt. C. Calavetta #9913*

_____      *9-4-18*
**Received by Supervisor**                   **Date**

*D/S Edward Ea #10558*

_____      *9-4-18*
**Received by Employee**                     **Date**

_____      _____
**Dates Suspension Served**                **Date**

DL/dda
Enc

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS



**Sheriff Scott Israel**

**DATE:**        August 30, 2018

**MEMO TO:**     Colonel John Dale, Executive Director
                 Department of Professional Standards

**FROM:**        Daniel Losey, Director
                 Professional Standards Committee
                 Department of Professional Standards

**SUBJECT:**     **Division of Internal Affairs Case # 2018-0041**
                 **Final Disposition**

On 06/20/2018, the Professional Standards Committee reviewed IA Case # 2018-0041.  The
Committee **sustained** the following allegations involving **Deputy Edward Eason, CCN 10558,** and
recommended disposition as indicated:

**Allegations:**     SPM 2.4       Meeting BSO Standards, to wit: DLE SOP 3.6.1 (B) Reporting
                                   Requirements

Subsequently, the Professional Standards Committee recommended:

### 3 Day Suspension

On 08/15/2018, Deputy Edward Eason and his representative attended a Pre-Disciplinary Conference.
Deputy Eason had an opportunity to provide documents, information and testimony related to this case.
The final recommendation is as follows:

  X   Professional Standards Committee recommendation

____   Command recommendation

Upon your approval, the final action will be imposed.

_____      _____      _____
**APPROVED**                    **DATE**        **NOT APPROVED**
**Colonel John Dale**                           **Colonel John Dale**
**Dept. of Professional Standards**             **Dept. of Professional Standards**

DL/dda

cc:     Major Nathan Osgood, Patrol Region North/DLE
        Captain Christopher Mulligan, Parkland/DLE
        Deputy Edward Eason, Parkland/DLE
        Andi Nelson, Esq., IUPA

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS



**Sheriff Scott Israel**

# INTERNAL MEMO

Date:      August 30, 2018

To:        Colonel John D. Dale, Executive Director
           Department of Professional Standards & Investigations

From:      Director Daniel Losey, Chairman
           Department of Professional Standards Committee

Subject:   **Deputy Edward Eason, 10558**
           **IA Case # 2018-0041**
           **Pre-Disciplinary Conference**

---

**Explanation:**

On February 21, 2018, BSO Internal Affairs began an investigation regarding Deputy Edward Eason, CCN 10558, handling of an incident on February 5, 2016.

On February 5, 2016, Deputy Eason was dispatched to call a complainant who alleged that her son advised her that another juvenile posted a photo of himself, with a gun, on Instagram. The juvenile posted that he was going to shoot his school.  After calling the complainant Deputy Eason did not complete an Incident Report but made certain entries into the CAD (Computer Added Dispatch) notes more specifically, Deputy Eason noted that a female caller, who wanted to remain anonymous, reported that a kid named Nikolas Cruz from Douglas High School, had knives and a BB gun in his Instagram photos. Deputy Eason went on to note that there were no threats and the information was forwarded to School Resource Deputy Peterson at the school.

The result of the Internal Affairs Investigation alleged that Deputy Eason violated SPM 2.4, Meeting BSO Standards; to wit: DLE SOP 3.6.1 (B) Reporting Requirements.

On June 20, 2018, this investigation was presented to the members of the Professional Standards Committee for their recommendation. The members of the Professional Standards Committee recommended that the allegation be Sustained and that Deputy Eason receive a Three (3) Day Suspension.

After reviewing all of the above information I also reviewed Deputy Eason's disciplinary history. Significantly, in 2010 Deputy Eason was suspended for One (1) Day for his failure to properly follow upon a call for service. Later in 2010 Deputy Eason was suspended for Two (2) Days for his failure to properly handle another call for service. Specifically, Deputy Eason failed to complete an Incident Report when a report was necessary.

Colonel John D. Dale

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS

Page 2
August 30, 2018


In Consideration of all of the particular facts in this case and Deputy Eason's prior disciplinary history I concur with the recommendation by the Professional Standards Committee.

DL/dda

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS

PRE-D MEMO: __X__ Yes ___ No                                3:00pm

## Pre-Disciplinary Conference

The following is a Pre-Disciplinary conference for **Deputy Edward Eason, CCN 10558** regarding Division of Internal Affairs case number **2018-0041**. Today's date is **August 15th, 2018** and the time is **3:00pm**.

I, **Director Dan Losey**, will be conducting this hearing and present also are ANDI NELSON, CAPT. J. JORDAN, SGT. OLIVA, SGT. KEARNEY , LT. B. LINDQUIST

1. Did you or your representative have access to the Internal Affairs Investigative Report and the entire case file?    ~~YES~~ YES

2. Do you understand the factual nature of the allegations and the discipline recommended? **(SPM 2.4 Meeting BSO Standards, to wit: DLE SOP 3.6.1(B) Reporting Requirements; 3 Day Suspension)**

3. Do you have any additional witnesses whose version of the events should be considered? YES

4. Any additional document(s) or other matters which should be considered? NO (Identify each document and matter and their importance).

5. Do you have any complaints concerning the investigation or disciplinary process? NO (Have employee identify each complaint and basis for such).

6. Would you like to make any additional statements, comments or explanation that need to be considered prior to the final determination of disciplinary action? YES

This pre-disciplinary conference concludes on **August 15th, 2018 at** _____.

---

### DISCIPLINARY RECOMMENDATION

X Concur

____ Not Concur; Recommended Discipline: _____.

**Director Dan Losey** _____
                          (initial)

# BROWARD COUNTY SHERIFF'S OFFICE
# INTERNAL AFFAIRS
# INVESTIGATIVE REPORT

**IA #: 2018-0041**
**DATE: May 30, 2018**

**INVESTIGATION INITIATION DATE:** February 23, 2018

**PERIOD TOLLED:** N/A

**180th DAY:** August 22, 2018

**INVESTIGATOR:** Sergeant Hector Oliva, CCN 10526

**COMPLAINANT:** Sheriff's Policy Manual

---

**SUBJECT EMPLOYEE:** **Edward Eason, CCN 10558**

---

**SHERIFF'S POLICY:** 1. SPM 2.4, Meeting BSO Standards; to wit: DLE SOP 3.6.1(B), Reporting Requirements

**COMMAND:** Department of Law Enforcement / Parkland District

**DATE OF HIRE:** October 16, 2000

**RANK:** Deputy Sheriff / DLE

**DATE OF MOST RECENT PROMOTION:** N/A

**PROBATION STATUS:** N/A

**BARGAINING UNIT:** International Union of Police Associations (IUPA)

---

Page 1 of 19

**INTRODUCTION:**

On February 5, 2016, Deputy Eason responded to 6255 NW 80th Terrace, Parkland, FL, in reference to a complaint made by a third party that Nikolas Cruz planned to shoot up a school (17-1602-000212). Per the complainant, Nikolas Cruz had posted a picture on Instagram of him in possession of a firearm. This was reported to be a one month time delay and it did not specify which school. Per CAD entry, Deputy Eason made contact with an anonymous female who reported that Nikolas Cruz from Douglas High School has knives and a BB gun in his Instagram photos. Deputy Eason wrote that no threats were noted and he forwarded the information to the SRD Deputy Scot Peterson, CCN 4308.

On February 17, 2018, Detectives Kami Floyd, CCN 17022, and Bruce Link, CCN 10154, obtained a sworn statement from the caller (Ms. Joelle Guarino). She advised that her son saw the Instagram post, which had a picture of a gun and stated that something similar to "I am going to get this gun when I turn 18 and shoot up the school." Per Ms. Guarino, Deputy Eason had contacted Ms. Cruz, who stated that Nikolas Cruz did not have anything like that on his Instagram page. Ms. Guarino did not take a snap shot of the post when her son showed it to her and it was no longer posted for them to show Deputy Eason.  Deputy Eason coded the call "Bravo" and did not prepare an incident report.

**ALLEGATION(S):**

1.  It is alleged that on February 5, 2016, Deputy Edward Eason did not complete an Incident Report regarding an unusual circumstance in which the caller was concerned for the safety of life, in violation of SPM 2.4, Meeting BSO Standards; to-wit: DLE SOP 3.6.1 (B), Reporting Requirements.

**THE FOLLOWING SHERIFF'S POLICIES SHOULD BE CONSIDERED WITH RESPECT TO THE ALLEGATION(S):**

**1.  SPM 2.4, Meeting BSO Standards**

A.  Employees will perform their duties properly and assume the responsibilities of their position.

- DLE SOP 3.6.1, Incident Report / Supplement

   B. Unless unusual circumstances are present, and no violations of law/criminal activity exist, the following types of incidents will not require an Incident Report:

   1.  Animal Complaint Complaints of barking, injured, or loose animals (including reptiles)
   2.  Police

Page **2** of **19**

3.  Civil Assistance/Civil Matters
4.  Traffic (Noncriminal)
5.  Open Door/Window: No evidence of entry
6.  Emergency Messages
7.  Alarm
8.  Bar/Business or Other Sensitive Area Check
9.  Foot Patrol
10. Disabled Vehicle
11. Complaint Refusal/Lack of Information/No Violation Observed: Canceled by complainant in noncriminal calls; complainant is Gone on Arrival (GOA) and there is no indication of a crime or suspicious/unusual circumstance; false reports; wrong or no such address; no violation or unusual circumstance observed; etc.
12. Off-Duty Assist
13. Field Contact
14. Crash Investigation: Settled on the scene

**INVESTIGATION:**

On February 21, 2018, this case was assigned to me by Executive Lieutenant Barry Lindquist, CCN 13979, from the Division of Internal Affairs.

I obtained and reviewed the Incident Details in reference to Incident Number L17160205000212. The incident date is listed as February 5, 2016, at 11:44:50 hours. The incident is classified as a Suspicious Incident. The call was received by Communications Operator III George Ramos, CCN 17444. Communications Operator III Jamie Benson, CCN 5328, dispatched the call and assigned it to Deputy Edward Eason, CCN 10558 (17B3). The comments in the call summary state the following:

**11:44:50 hours** – The complainant's son told her that the neighbor's son said on Instagram that he was going to shoot his school and there are pictures of the juvenile with guns. The complainant advised this happened about a month ago. The complainant advised that the juvenile subject was expelled from Westlake Middle School and now goes to another school, possibly a high school but the name is not known. The complainant advised that the subject lives 3 houses down from hers, on the opposite side of the street. The complainant is not home at this time. Have a unit call her. (Entered by Communication Operator George Ramos)

**11:45:12 hours** – (Communications Operator Jamie Benson dispatches the call to 17B3/Deputy Eason. The incident signal is updated from "Information" to "Suspicious Incident")

**11:46:28 hours** – (17B3/Deputy Eason advises that he's en route to the Parkland District Office to call the complainant)

Page **3** of **19**

**11:51:00 hours** – (17B3/Deputy Eason advised that he has arrived at the Parkland District Office)

**12:43:24 hours** – (Deputy Eason entered the following comment into the CAD notes)  The female, who wanted to remain anonymous, reported that a kid named Nikolas Cruz from Douglas High School, has knives and a BB gun in his Instagram photos.  No threats were noted and information was forwarded to SRD (School Resource Deputy) Peterson at the school.

**12:59:00 hours** – (Deputy Eason adds the following comment into the CAD notes)  The photos were posted over a month ago.

The disposition for the call is B (Bravo) – No written report.

**I obtained and reviewed the sworn, recorded witness statement taken by Sergeant Jonathan Brown, CCN 11100, of the BSO Criminal Investigations Division Homicide Unit, from Deputy Eason.  The statement was taken at the Public Safety Building on Friday, February 16, 2018, in reference to criminal case 17-1802-000525, as part of a criminal investigation regarding the shooting at Marjory Stoneman Douglas High School (MSDHS) which involved the subject, Nikolas J. Cruz, white male, date of birth September 24, 1998.  The following is a synopsis of the statement:**

Deputy Eason advised that he has worked for the Broward Sheriff's Office for approximately eighteen years.  Eason added that he had been assigned to the Parkland District for approximately five years as a road patrol deputy, and as a SRD (School Resource Deputy) periodically.  Eason explained that he was last an SRO at West Glades Middle School, where he was assigned for the first two months of the 2017-2018 school year.  Eason stated that on February 5, 2016, he was assigned to the Parkland District as a road patrol deputy.  Eason confirmed that he wore a uniform, drove a marked unit, and he was dispatched to calls via the radio and the computer CAD system.

Sergeant Brown explained to Deputy Eason that there was a lot of material that was being investigated regarding the criminal investigation of the shooting incident at MSDHS.  Brown advised that the investigation was very in-depth and encompassed a lot.  Brown further explained the purpose of the statement was to go back and figure out what happened in Cruz's history.

Sergeant Brown asked Deputy Eason if he remembered a call he received on February 5, 2016 at approximately 11:44 AM, while showing him the CAD notes to refresh his memory, and Eason replied, "I do not."  Brown asked if Eason did not remember the call at all, and Eason replied that it had been over two years ago and he did not remember.  Brown further asked if the CAD notes refreshed his memory and Eason replied, "No."  Eason advised that he received between one and twelve to fifteen calls on any given day in Parkland.

Sergeant Brown asked Deputy Eason if he knew the SRD (School Resource Deputy) at MSDHS and Eason replied that he did and identified the SRD as Deputy Scot Peterson, CCN 4308.  Eason stated that he knew Peterson for approximately five years and Eason had assisted Peterson on various calls

Page 4 of **19**



at the school. Eason advised that road patrol received many calls involving the school and deputies usually contacted Peterson immediately if there was a call regarding the school. Eason added that the contact was to let Peterson know and to assist him in handling issues at the school.

Sergeant Brown read the CAD comments to Deputy Eason and asked Eason if he received calls like that frequently, where the caller provided information about a student or an incident related to the school. Eason replied that over the years, he had received dozens of calls like that, directly or indirectly. Eason stated that if any information was obtained from a caller, regarding the school, he would usually call the SRD and give them the information. Eason added that the SRD could then conduct an investigation at their school. Eason advised that Deputy Peterson was very interested with anything related to his school. Eason stated that in the case of the February 5, 2016, call, he did not recall, but he would have called him, to notify him and give him the information received. Eason advised that on that occasion, the caller wished to remain anonymous. Brown asked Eason again if he remembered that particular call, and Eason replied, "No, I don't." When asked by Brown what Peterson did with the information he was provided by deputies, Eason replied he would do an investigation at the school and handle it with the school board. Brown asked Eason how he regularly notified a SRD of any information obtained and Eason replied that it was usually a phone call, usually while he was still on the dispatched call. Eason advised that he also emailed Peterson in the past, but he did not remember emailing him on that occasion. Brown asked Eason what Peterson's usual response was to any information provided and Eason replied that he wanted the information and he was usually very interested in those details. Eason added that Peterson had a good relationship with the students and staff, he wanted the information and would follow up with that information later.

Sergeant Brown asked Deputy Eason if he ever met or knew of Nikolas Cruz, and Eason replied that he did not, that he knew of. Brown asked Eason if he remembered talking to anyone about the call and he replied, "I don't remember anything about the call." Brown asked Eason if he would ever do some follow-up for a call after providing information to Deputy Peterson, and Eason replied that it was rare, but he would do something off campus to assist, if Peterson needed him to. Eason added that Peterson had never reached out to him for that type of assistance.

It should be noted that prior to concluding the statement, Sergeant Brown asked Deputy Eason if he had provided the statement on a voluntary basis, and Eason's response was, "Yes." Eason also confirmed that he had not been coerced or persuaded in any way, to provide the statement.

[End of synopsis]

**I also obtained and reviewed the sworn, recorded witness statement taken by Detective Jeffrey Curtis, CCN 15795, of the BSO Criminal Investigations Division Homicide Unit, from Deputy Scot Peterson. The statement was taken at the Public Safety Building on Friday, February 16, 2018, in reference to criminal case 17-1802-000525, as part of a criminal investigation regarding the shooting at Marjory Stoneman Douglas High School (MSDHS) which involved the subject, Nikolas J. Cruz, white male, date of birth September 24, 1998. Also present was**

Page 5 of 19



**Detective John Curcio, CCN 16048. The following is a synopsis of the portion of the statement that is relevant to my investigation:**

Deputy Peterson confirmed that he knew Deputy Eason, and that Eason was a Parkland deputy. Detective Curtis asked Peterson if he recalled Eason telling him or talking to him about contact Eason made with a person that lived a couple of houses away from Nikolas Cruz, concerning suspicious online posts, and Peterson replied, "No." Curtis elaborated that he would have learned about that incident in February 2016, and Peterson replied, "I don't recall, I don't recall that."

**[End of synopsis]**

**I obtained and reviewed the sworn, recorded witness statement of Ms. Joelle Guarino. The statement was taken by Detective Bruce Link, CCN 10154, of the BSO Criminal Investigations Division Special Victims Unit. This statement was taken on February 17, 2018, at Ms. Guarino's home residence, located at 6255 NW 88 Terrace, in the City of Parkland, in reference to criminal case 17-1802-000525, as part of a criminal investigation regarding the shooting at Marjory Stoneman Douglas High School (MSDHS) which involved the subject, Nikolas J. Cruz, white male, date of birth September 24, 1998.. Also present was Detective Kami Floyd, CCN 17022, of the BSO Criminal Investigations Division Special Victims Unit. The following is a synopsis of the statement:**

Ms. Guarino confirmed that she made the 9-1-1 call on February 5, 2016 at 11:44 AM, in reference to case number 17-1602-000212. Detective Link read Guarino the CAD comments of the call and she confirmed that the synopsis was correct and she remembered making the call. When asked what prompted her to make the call, Guarino replied that her son showed her an Instagram or Snapchat that Nikolas Cruz had written where he stated that he was going to get a gun and shoot up the school. Guarino stated that after seeing that, she called 9-1-1, and a deputy came out to her home. Guarino added that she told the deputy what she knew about Nikolas, and she recalled that the deputy went down to the Cruz residence to speak with Nikolas and his mother. Link asked Guarino if she knew who Nikolas was prior to her son showing her the post and she replied that she knew Nikolas since he was a baby. Guarino stated that the deputy walked to the nearby Cruz residence and Nikolas' mother told him essentially that Nikolas was a great kid and he would never post anything like that on Instagram. Guarino added that she did not take a picture of the online post and her son did not save it, so there was no record of it. Guarino further added that it was one of those posts that would show up then disappear a short time later, but she reiterated that she saw it herself. Guarino described the post as also showing a picture of a gun and something to the effect that Nikolas was going to get that particular gun when he turned 18 years old, and shoot up the school. Guarino recalled that the deputy came back to her residence and told her that the post was protected by the First Amendment right of free speech. Guarino stated that she asked if she could stop Nikolas from buying a gun when he turned 18 years old, but the deputy responded that his right to later purchase a firearm was protected by his Second Amendment rights and there was basically nothing that could be done at that time. Guarino stated that after speaking with the deputy and realizing nothing could be done, the deputy left.

Page 6 of 19



Detective Link asked Guarino if she had any interaction with Cruz's family after that and she replied that she was in fear of Nikolas Cruz and she also kept her kids away from him. Guarino added that she kept her distance, but she'd wave and try to keep Nikolas calm, because he'd been so destructive through the years. Guarino further added that Nikolas had destroyed her property, hurt her children, and hurt her dog, so she kept away from him. Guarino confirmed for Detective Link that her son, Zachary Guarino, was the person that showed her Nikolas' post, and that Zachary was 16 years old at that time. Guarino advised that her son had been attending Center Academy, a private school in the area, and she believed that Nikolas was attending Stoneman Douglas High School at the time. Guarino confirmed that the picture of the gun in the post looked like a picture that Nikolas found online, and she also confirmed that Nikolas was absolutely the person that had made the online post. Guarino confirmed again that it came from his Snapchat or Instagram account, and that she did not take a picture of the post.

[End of synopsis]

On February 23, 2018, I contacted Lt. Michael Devita, CCN 7523, and requested the daily roster for Deputy Eason's shift from February 5, 2016 (Bravo Shift/6:00 AM-6:00 PM). I received the Parkland District Payroll/Daily Roster via email and saw that Eason was assigned the call sign of 17B3 that day. I also saw that Deputy Richard Seward, CCN 11290, was the OIC (Officer in Charge) that day due to the only sergeant assigned to the shift, Sergeant Jeanne Tedesco, CCN 10385, being absent on annual leave and Restricted Administrative Assignment.

**On February 27, 2018, I met with Communications Operator III George Ramos, CCN 17444, at the South Regional Dispatch Site in Pembroke Pines, FL and obtained a sworn, recorded employee witness statement in reference to this incident. The following is a synopsis of his statement:**

Operator Ramos confirmed that he has been employed by BSO since October 2014, and he has been assigned to the South Regional Dispatch Site for approximately 3 years. Prior to starting the statement, I showed Ramos the CAD notes for case number 17-1603-000212, handled by Deputy Eason, to help refresh his memory. I asked Ramos if he recalled the incident relating to the CAD notes and he replied, "Not particularly, no." I asked Ramos if he had any independent recollection of taking that call, and he replied, "No." I asked Ramos if it was accurate to say that he did take the 9-1-1 call that day, which was listed in the CAD notes, and he replied, "Yes." Ramos also confirmed that the comments written in the call did look like comments that he would have written. I asked Ramos to explain the process when he put that information into the system and he explained that he would take the information from the caller, enter the notes into the system, and the dispatcher would be responsible for dispatching it to the deputy. Ramos confirmed the dispatcher in this case that was responsible for dispatching the call to the deputy, was Operator Jamie Benson. I asked Ramos if it was unusual for him to receive calls like the one documented in the CAD notes, and he replied that it was not unusual. Ramos added that calls about threats made against people and schools are common. I asked Ramos if the call he received, based on the CAD notes, was anything that he would have notified a supervisor about and he replied, "No." Ramos also confirmed that the CAD



notes stated that the deputy handled the incident over the phone, as requested by the caller.

[End of synopsis]

**On February 28, 2018, I met with Communications Operator III Jamie Benson, CCN 5328, at the North Regional Dispatch Site in Coconut Creek, FL and obtained a sworn, recorded employee witness statement in reference to this incident. The following is a synopsis of her statement:**

Operator Benson confirmed that she has been employed by BSO for 29 years, and she has been assigned to the North Regional Dispatch Site for approximately 4 years. Prior to starting the statement, I showed Benson the CAD notes for case number 17-1603-000212, handled by Deputy Eason, to help refresh her memory. I asked Benson if she had any recollection of that incident, and she replied, "No, not at all." Benson stated that her dispatch site handled calls from all over Broward County. I asked Benson if it was unusual for her to receive calls like the one documented in the CAD notes, and she replied that now it was common, but it was not common in 2016. I asked Benson if the call she dispatched, based on the CAD notes, was anything that she would have notified a supervisor about and she replied, "Now in 2018, definitely, but 2016, it was delayed, it was second, third hand from a friend or neighbor. No, unless it was in progress."

[End of synopsis]

**On February 28, 2018, I met with civilian witness Joelle Guarino, at her place of employment, located at 11776 W. Sample Road, Suite 102, in Coral Springs, FL and obtained a sworn, recorded witness statement in reference to this incident. The following is a synopsis of her statement:**

Ms. Guarino confirmed that she recalled providing BSO Detectives with a sworn statement on February 17, 2018, in reference to the criminal investigation of the Parkland shooting. I asked Guarino on record if it was possible that she mixed up some facts during her first statement, due to statements she made to me over the phone about the deputy possibly never having gone to Nikolas Cruz's residence. Guarino explained during that phone call that she had mixed up different responses by BSO deputies, due to having called them more than once for issues with Cruz. Guarino replied that she remembered the deputy responding to her home on February 5, 2016, but she did not think the deputy went to the Cruz residence. Guarino recalled that she was really afraid and she remembered the deputy telling her there was nothing he could do. Guarino recalled that she called 9-1-1 and the deputy responded out to her home. I asked Guarino to tell me again what happened on that date and she replied that when the deputy arrived, she told him what her son had shown her in reference to the online post and she also told the deputy the history of Nikolas Cruz (in reference to the issues she'd had with him over the years). Guarino stated that she hoped that the deputy could prevent Cruz from being able to buy a gun when he turned 18, but the deputy replied that he did not have the power to do that. Guarino added that she was "kinda pleading with him to help," but the deputy told her the law, which she understood, that Nikolas was not an immediate danger, because



he was only 17 and did not own any firearms at the time. Guarino added that she understood the deputy's explanation. Guarino further added she remembered the deputy asking her if she wanted him to go by the nearby Cruz residence, but she did not remember if the deputy ever went there.

I asked Ms. Guarino to clarify for the record why she had called for a deputy to respond to her residence, and she replied that her son had shown her an online post made by Nikolas Cruz that said that he couldn't wait to turn 18 to buy a gun, with a stock photo of a gun attached. Guarino added that Nikolas also made an online post that said something about wanting to shoot up the school. When I asked, Guarino clarified that it was two separate online posts made by Nikolas and that they were not posted on the same day. Guarino advised that she did not call to report the posts until she spoke with co-workers about them and they urged her to call the police to report it. Guarino stated that the first post from Nikolas about purchasing a gun happened a while prior to her calling the police, but the second post about shooting up the school occurred approximately one to two days prior to her calling the police. I asked Guarino what the deputy told her when he showed up and she replied that she asked him about the Baker Act. Guarino explained that she specifically asked if Nikolas could be Baker Acted and the deputy replied that the Baker Act would only apply if Nikolas was an immediate threat to himself or others. Guarino added that because this was a threat made in advance and essentially an empty threat because Nikolas did not have the means to shoot anyone, Guarino felt that the deputy did all he could do in that situation. Guarino confirmed that she told the deputy that she wished to remain anonymous. Guarino added that the deputy asked her if she wanted him to speak with Nikolas' family, but she replied that she did not remember what she specifically told him. Guarino stated that she wanted the deputy to do something, but he had already told her that there was nothing he could do in that situation.

Ms. Guarino confirmed that the deputy was very courteous, she felt that he listened to her situation, and she was very happy with the service he provided that day. I asked Guarino if she felt that the deputy handled the situation properly, she replied, "I do, yeah, for sure." Guarino confirmed that the deputy identified himself when she spoke with him, but she did not remember his name because of the time delay. I read Guarino the comments entered in the CAD notes by Deputy Eason, to confirm their accuracy based on Guarino's recollection, and she was sure that the photo posted by Nikolas was that of a real gun, not a BB gun, as listed by Eason in the notes. She added that it wasn't a gun belonging to Nikolas, it was a picture of a gun, similar to one found in an internet search. I asked Guarino if that post with the gun was made approximately one month prior, as stated by Eason in the CAD notes, and she replied that it was "somewhere around there." I asked Guarino if she had anything to add in reference to her interaction with the deputy, and she replied that it was the law that was frustrating. Guarino added that she thought the deputy did a good job and, "For what he had to deal with, I thought he did a good job." I asked Guarino if she ever demanded or requested a police report from the deputy, and she replied, "No, I didn't." I asked Guarino if the deputy provided her with a case number, and she first replied that he did not, but changed her response to, "But then again, it's two years ago. I could have, I don't remember." I asked Guarino how many times she had called 9-1-1 for any issues related to Nikolas Cruz, and she replied that she remembered a total of three occasions. Guarino explained that two were for this incident, and a rock throwing incident between Nikolas and her son several years prior. Guarino added that the third incident was related to

Page **9** of **19**



her son's vehicle being damaged by a rock, and she suspected that Nikolas was the culprit. However, Guarino stated that she could never prove that Nikolas was the person that caused the damage. I asked Guarino again if it was possible she might have confused some of the details of this call with the previous rock throwing incident, and she replied, "Yes."

**[End of synopsis]**

After meeting with Ms. Guarino, I conducted a search of Instagram and Snapchat in an attempt to locate the posts made by Nikolas Cruz that had been viewed by Guarino and her son, but I confirmed that those posts were no longer available.

**On February 28, 2018, I met with Deputy Richard Seward, CCN 11290, at the Peppertree Plaza, located at 5438 West Sample Road in Margate, FL, and obtained a sworn, recorded employee witness statement in reference to this incident. The following is a synopsis of his statement:**

Deputy Seward confirmed that he has been a law enforcement officer for the last 30 years. Seward has been employed with BSO for approximately 17 years, and prior to that he was a City of North Lauderdale police officer for approximately 13 years, before the city police department was absorbed by BSO. Seward also confirmed that he has been assigned to the Parkland District since March of 2013. On record, I confirmed with Seward that prior to initiating my statement, I had shown him the Parkland District Payroll/Daily Roster for February 5, 2016, in an effort to refresh his memory. Seward confirmed that the shift supervisor, (now retired) Sergeant Jeanne Tedesco, CCN 10385, was on Restricted Administrative Assignment at that time and she was not working that day. Seward also confirmed that he was the OIC (Officer in Charge) that day, in lieu of Sergeant Tedesco. I asked Seward if that was a duty that he regularly had in the district, and he replied that he typically filled in for the extra 4 hours on Tedesco's 8 hour days. Seward also confirmed that he supervised that shift as the OIC for approximately 1 year due to Tedesco's restricted status. I asked Seward what his duties were as the shift OIC, and he replied his responsibilities were conducting roll calls and "handling" the radio. I asked Seward if he also completed supervisory paperwork or reviewed reports as part of his OIC duties, and he replied that he did not. Seward added that he may have possibly completed a Supervisory Use of Force Report, but he definitely did not review the Incident Reports of other deputies. On record, I confirmed with Seward that prior to initiating my statement I had shown him the CAD notes for case number 17-1602-000212, from February 5, 2016, in an effort to refresh his memory. I asked Seward if he remembered that particular call being broadcast over the radio, and he replied, "I do not. No recollection." I asked Seward if anything about the call stuck out in his memory after reading the call notes, and he replied, "No sir." I asked Seward if Deputy Eason had ever talked to him about that call, and he replied that he did not.

**[End of synopsis]**

**On February 28, 2018, I met with Lieutenant Michael Devita, CCN 7523, at the BSO Parkland District Office in Parkland, FL and obtained a sworn, recorded employee witness statement in**

Page 10 of 19



**reference to this incident.  The following is a synopsis of his statement:**

Lieutenant Devita confirmed that he has been employed by BSO for almost 25 years and he has been assigned as the Parkland District Executive Lieutenant since February of 2015.  Devita also confirmed that he was the District Executive Lieutenant on February 5, 2016.  On record, Devita confirmed that he had provided me with a copy of the Parkland District Payroll/Daily Roster for February 5, 2016, after I previously requested it from him.  Devita confirmed that Sergeant Tedesco was on Restricted Administrative Assignment that day and thus, Deputy Seward was the OIC (Officer in Charge) for the shift.  I asked Devita if the usage of OIC's was common in the Parkland District, and he replied that they were, because each shift was only assigned one sergeant.  Devita added that Seward was chosen as an OIC due to his vast experience, police knowledge, and his influence on the squad.  Devita further stated that Seward was seen as an older brother by the deputies on the shift and Seward was used as an OIC often.  Devita stated that Seward's position as an OIC had the same responsibilities as the shift sergeant.  I asked Devita if that included reviewing reports, and he elaborated that he did not allow OICs to review or approve reports.  Devita reasoned that he felt that responsibility should remain with a sergeant, even if it was the criminal investigations sergeant and not the regular shift sergeant.

On record, I confirmed with Lieutenant Devita that prior to initiating my statement I had shown him the CAD notes for case number 17-1602-000212, from February 5, 2016, in an effort to refresh his memory.  I asked Devita his opinion, on whether or not an Incident Report should have been completed by Deputy Eason, based on the information available in the CAD notes.  Devita replied that the comments typed by the 9-1-1 call taker were very disturbing, but he was trying to look at that call from a frame of mind prior to the recent shooting incident.  Devita stated that it appeared that Eason went through some investigative steps and he indicated that he notified the school resource deputy at Stoneman Douglas High School, after Eason discovered that Nikolas Cruz was a student there.  Devita added that there was certainly no harm in Eason writing a report, and it was Devita's personal policy for a deputy to write a report if they were on the fence about completing one.  Devita stated that in that instance, the complainant wanted to remain anonymous, which presented some difficulty with completing an accurate report.  Devita added that he was having a hard time indicating if Eason absolutely should have written a report in that instance.  Devita further added that Eason did take some steps to investigate and noted the information in the CAD notes, but an Incident Report with some additional investigative steps would have been prudent and a much better decision for Eason at that time.  Devita stated that Eason trying to make contact with Cruz or his parents to explain a public concern, would have likely been outlined in such a report and it would have shown a little more diligence in the deputy's actions.  Devita advised he would expect to see that effort, but it was hard to say when Eason did not have a cooperative reporting person that wished to have their information in the report.  Devita added that it presented some problems for the deputy in this case.  Devita stated that to be fair, without using hindsight, he would like to have seen more of an investigative effort on the part of Eason, and that would've been outlined in a report.  Devita added that he did not feel like Eason "shrugged" his duties that day either.  Devita further added that if he had seen the CAD notes two weeks after the call took place, he would understand why a report would not have been completed, due to the complainant wanting to remain anonymous and the

Page 11 of 19



Instagram posts no longer existing. I advised Devita that this situation needed to be looked at from the perspective of two years prior, without hindsight, and Devita agreed while stating, "That's why I'm trying to be fair here." Devita added that we had all felt this tragedy and we have to keep a level head and look at things as they were back then.

**[End of synopsis]**

On February 23, 2018, I called Deputy Eason's IUPA representative, Andi Nelson, and requested that she ask Eason if he would voluntarily attempt to obtain a copy of his February 2016 cellular phone bill. I advised Nelson that it could be beneficial for Eason to provide evidence of any communication between him and Deputy Peterson during that timeframe, to further that Eason had notified Peterson of the information he obtained during case number 17-1602-000212.

On March 1, 2018, I obtained and reviewed Deputy Eason's archived BSO emails from Information Technology Manager Guillermo Marsal, CCN 8029. I examined the emails in their entirety and determined that there had been no email communication between Eason and Deputy Peterson, in reference to the information obtained by Eason from case number 17-1602-000212. Additionally, there were no emails that mentioned Nikolas Cruz, or any other information about him.

On March 2, 2018, I obtained and reviewed Deputy Peterson's School Resource Officer Monthly Report for February of 2016. Peterson did not note any information obtained from Deputy Eason about Nikolas Cruz or any of the information gathered during case number 17-1602-000212.

I conducted a search of all the calls received or initiated in the Parkland District on February 5, 2016, between the hours of 6:00 AM and 6:00 PM (Deputy Eason's shift). A review of those calls determined that the district received or initiated eleven service calls during that twelve hour time period. A review of those individual calls revealed that Deputy Eason responded to a total of three documented calls during his shift that day. All three of those calls (case numbers 17-1602-000212, 17-1602-000213, and 17-1602-000216) were handled by Eason and coded out B-Bravo, indicating that a written report was not completed. Additionally, a review of the Parkland District Payroll/Daily Roster indicated that 7 deputies were working on road patrol on February 5, 2016, for all or some of the hours of the 6:00 AM to 6:00 PM shift. It should be noted that another deputy was also working that shift, however, he was on light duty and was working at the front desk of the Parkland District.

I searched Evidence.com for case number 17-1602-000212, but no video evidence existed. I examined the current list of BSO deputies that had been issued body worn cameras (BWC), and determined that Deputy Eason was issued his BWC on August 8, 2016, approximately six months after the date of Ms. Guarino's call.

**On March 15, 2018, I met with Information Technology Manager Guillermo Marsal, CCN 8029, at the Division of Internal Affairs and obtained a sworn, recorded employee witness statement in reference to this incident. The following is a synopsis of his statement:**

Page **12** of **19**



Guillermo Marsal confirmed he was the Network Manager of Operations for the Broward Sheriff's Office for the last 21 years, and he has been employed by the agency for approximately 22 years. Marsal also confirmed that he previously received my request for Deputy Eason's archived emails from the timeframe around February 5, 2016, and that he was able to successfully provide me with that information. Marsal stated he provided me with Eason's archived emails from the time frame I requested (February 5, 2016 and the following 30 days), as well as Eason's current emails. Marsal explained that the files were called "PSD files" and they were copies made from previous tape or disc backups. I asked Marsal to explain the email archiving process utilized at BSO and he advised that all employee emails are backed up every evening at 8:00 PM, where they remain indefinitely. Marsal further explained that backups completed within the last 60 days can be accessed on disc, and any emails older than 60 days old can be accessed from quarterly tape backups. Marsal confirmed that the historical emails he retrieved at my request were taken from a tape backup, due to the approximate 2 year delay. I asked Marsal if there was any way that emails could have been sent or received that would not have been archived, and he replied that it was possible. However, Marsal explained that it in order for any emails to not have been archived, there was a specific process that needed to be completed. Marsal further explained that the employee would have to delete the email from their Inbox or Sent mailbox, and then also delete it from the Deleted Items mailbox before 8:00 PM (for each individual email) in order for it to not be archived.

**[End of synopsis]**

On April 6, 2018, I called former Deputy Peterson, and requested that he provide me with a witness statement for my investigation. Peterson stated that he would need to consult with his attorney prior to providing me with a voluntary statement. I advised Peterson to consult with his attorney and to please call me to confirm whether or not he would be providing me with a statement. After not hearing back from Peterson, on April 10, 2018, I sent him a certified letter again requesting that he provide me with a voluntary statement. On May 14, 2018, I received the certified letter back from the U.S. Post Office, due to the letter being unclaimed.

On April 6, 2018, I called Joelle Guarino to request that her son Zachary Guarino, provide me with a witness statement. Ms. Guarino did not answer, so I left a voicemail advising her of my request. It should be noted that I called Ms. Guarino because I did not have a contact phone number for Mr. Guarino. After not hearing back from Ms. Guarino, I called her again on April 13, 2018, and May 3, 2018, and also left her voicemails on those occasions. On May 15, 2018, I received a call back from Ms. Guarino, when she advised me that she would ask Mr. Guarino to call me, but she added that he was apprehensive about providing me with a witness statement. On May 16, 2018, Mr. Guarino called me and declined to provide me with a statement.

**On May 17, 2018, I obtained a sworn, recorded Garrity statement from Deputy Edward Eason, CCN 10558, at the Division of Internal Affairs. Also present was Sergeant Al Rengifo, CCN 9981, from the Division of Internal Affairs, and Eason's representative, Andrea Nelson, from the International Union of Police Associations (IUPA). The following is a synopsis of his statement:**

Page **13** of **19**



At the beginning of the statement, I advised Deputy Eason on the record, that his previous statement to homicide detectives was only 2 days after the Marjory Stoneman Douglas High School shooting incident. (I further advised him that it was assumed that he had not been given ample opportunity to refresh his memory about the call he handled 2 years earlier, prior to that statement.) I further advised him that because he'd now had time to think about that call and potentially refresh his memory, there would be no issues regarding a Truthfulness charge, relating to the statement he previously provided, if he now recalled details about the call he handled on February 5, 2016. I then asked Eason, "Having had time to refresh your memory, do you now recall any details of the call that you handled that day on February 5, 2016, case number 17-1602-000212?" and he replied, "No sir." I then asked Eason what he did recall about that call, if anything, and he replied, "I don't recall anything about that call from February 2016." After Eason stated that he did not recall the incident at all, I provided him a copy of the complete CAD notes from that incident. The CAD notes depicted all of the call's notes, including the following notes added by Eason:

Time:          12:43:24.000          Console:          00          Operator:          Eason,          Edward
FEMALE WHO WANTED TO REMAIN ANON REPORTED A KID NAMED NIKOLAS CRUZ FROM DOUGLAS HS HAS KNIVES AND BBGUN IN HIS INSTAGRAM PHOTOS. NO THREATS NOTED AND INFO FORWARDED TO SRD PETERSON AT SCHOOL.

I asked Deputy Eason to confirm that he had written those notes and he stated, "My name is on the notes," and he added, "It appears that I wrote it, yes." I advised Eason to explain his comments, due to that being the only record of what transpired on the call, and Eason read the notes out loud, verbatim. I asked Eason what his notes meant to him, and he replied that he responded to a call, there was no evidence of a credible threat, and he relayed that information to the Stoneman Douglas School Resource Officer, Deputy Scot Peterson. I asked Eason if calls like that were frequent or if it was an unusual call, and he replied, "Frequent." I asked Eason how often he received calls like that, and he replied that threats made through social media calls were very common. I followed up by specifically asking him if those calls included threats made against schools or threats of shootings, and he replied, "Well, with weapons in general, yes, pretty common on social media." I asked him to specify if those calls were involving students from Stoneman Douglas High School and he replied, "From that school and outside of school, maybe graduated already."

I asked Deputy Eason to walk me through how he would normally handle a similar call where potential violence was threatened or questionable statements were made by a student and he replied, "I'd make contact with the complainant, find out what information they have and what evidence they have supporting the facts that they're telling me, and from there, depending on the evidence, conduct an investigation, talking to all the parties, notifying other people involved -- in this case, notifying the SRO at the school." I asked Eason if he normally notified the SRO at the school of a similar call, if the school was in Parkland, and he replied, "Yes." I further asked him if he would also notify the SRO of a school outside of Parkland, and he also replied, "Yes." I asked Eason if he would notify a supervisor for a similar call, and he replied, "If there's no evidence supporting a threat, a credible threat, I might, I might not, depending on the case." Eason added that it would be case by case for notification of a supervisor. I asked Eason if he would normally complete an incident report for a

Page **14** of **19**



similar incident, and he replied, "With no credible threat and an anonymous caller, a caller who wanted to remain anonymous, usually no." I reminded Eason that he documented in his notes that he forwarded the information obtained in the call to SRD Scot Peterson and that an archive I obtained of his BSO emails did not reveal any communication with Peterson, about this incident. I asked Eason how he forwarded the information to Peterson, and he replied, "Well, it's a small district. I could drive to his school, talk to him in person, or if I was at the station, a lot of times they would come in, the SRO's to complete paperwork or print out paperwork, especially towards the end of the week. I might have saw him in person and explained to him then what's going on."

I reminded Deputy Eason that I had previously requested that he voluntarily provide me with his personal cellular phone records, to determine if he had any communication with Deputy Peterson via telephone calls or texts, after obtaining the information from Ms. Guarino. Eason advised that he was able to obtain the records, but he did not bring them with him. Eason stated that he had already reviewed the records and they did not document any telephone communication between him and Peterson in February 2016. Eason elaborated that if anything was work related, he would usually use the phone at the Parkland District Office to make telephone calls. Eason confirmed that he would provide me with those historical phone records through his representative, on a later date. I reminded Eason that providing me with those records was voluntary, and he confirmed that he understood.

I asked Deputy Eason why he did not complete an incident report for the call, and he stated, "Well between, there was no credible threat, no evidence of a credible threat, and the caller wanted to remain anonymous due to being, you know, a close neighbor and a prior history with the family." I asked Eason if he thought it would have been reasonable to document the information he obtained in an incident report, and he replied, "With the information at that point, no." I asked Eason how he would handle a similar situation in the future and he stated, "Well, with everything going on in the media now, you know, we do event reports on that." (I asked Eason to answer the same question, but in a theoretical world where the Parkland shooting did not happen and he replied, "It wouldn't have changed anything from what happened two years ago, if there was no incident at the high school.") Eason confirmed that now, because the Parkland incident shooting happened, he would complete an incident report, as a precaution.

Sergeant Rengifo asked Deputy Eason what he considered a credible threat and Eason replied, "A credible threat if there's evidence supporting the carry-out of a threat. Like, if somebody says, 'You know what? I have a gun,' you know -- boyfriend, girlfriend, it happens all the time. They say, 'I'm gonna come to your house and shoot you,' that's a credible threat. If someone comes there saying, you know, that, you know, 'I'm in fear,' but they didn't make a threat. They said, 'You'll be sorry.' That's kind of vague. But you have to have, you know, a cre-, you have to have an apparent ability to do so, and the item to carry out the crime or the incident." Rengifo also asked Eason if he had ever been assigned to an investigative unit within BSO, and Eason confirmed that he had not. I asked Eason if he recalled ever dealing with Nikolas Cruz before or after the call he responded to on February 5, 2016, and Eason replied, "Not that I recall, no." I asked Eason if he recalled meeting Ms. Guarino in person or handling the call over the telephone, and he replied, "I don't recall. Yeah,



Page **15** of **19**

so, it was, it was a long time ago."

IUPA representative Nelson stated that she would provide me with news articles relevant to this case, that she requested that I add to my report. I confirmed that I would add the articles if she sent them to me. Nelson also confirmed that she would send me Eason's historical phone records via email, at a later date.

**[End of synopsis]**

On May 25, 2018, I contacted IUPA representative Nelson, who requested that I disregard her previous request to attach news articles to my report, which were relevant to this case. On May 30, 2018, Deputy Eason responded to the Division of Internal Affairs and physically showed me his historical phone records from February 2016. I confirmed that the records indicated that Eason did not contact Deputy Peterson with his personal cellular phone, for a three day timeframe after the February 5, 2016, call for service. Eason declined to provide me with a copy of the mentioned historical phone records for my case file, due to privacy concerns.

**BRIEF:**

- On February 14, 2018, suspect Nikolas Cruz committed a mass shooting at Marjory Stoneman Douglas High School, where 17 students and teachers were murdered.
- A criminal investigation was immediately initiated and any incidents where law enforcement personnel had contact with or obtained information about Cruz, were reviewed.
- A suspicious incident call handled by Deputy Edward Eason on February 5, 2016, was identified as one of those calls.
- A review of the CAD notes revealed that Deputy Eason spoke with the caller, Ms. Guarino, who stated that her son showed her questionable online posts made by Nikolas Cruz that depicted a firearm. The posts were deleted and no longer available at the time of Eason's response.
- Deputy Eason indicated in the CAD notes that no threats were noted and that the information he obtained from Guarino was forwarded to Deputy Scot Peterson (MSDHS School Resource Officer).
- On February 16, 2018, BSO Homicide Detectives interviewed Deputy Eason in reference to the criminal investigation and asked him about the February 5, 2016, incident. Eason replied that he did not remember any details about that call due to it being from 2 years prior.
- On February 16, 2018, BSO Homicide Detectives interviewed Deputy Peterson in reference to the criminal investigation and asked him about the February 5, 2016, incident. Peterson was asked if he was provided any information by Deputy Eason, in reference to the information obtained during his investigation, and Peterson replied that he did not recall that.
- On February 17, 2018, Ms. Joelle Guarino was interviewed by BSO Criminal Investigations Detectives in reference to her being the complainant of the February 5, 2016, incident. Guarino advised that she spoke with Deputy Eason in depth about the questionable online posts made by Nikolas Cruz. Guarino added that she wanted to know how Cruz purchasing a gun could be prevented, but she was told by Eason that there was nothing that could be done

Page **16** of **19**



at that time.

➤ On February 27, 2018, Communications Operator III Ramos, provided me with a sworn statement, due to having received the 9-1-1 call from Ms. Guarino on February 5, 2016. Ramos stated that he did not remember speaking with Guarino or entering the call.

➤ On February 28, 2018, Communications Operator III Benson, provided me with a sworn statement, due to having dispatched the call entered by Operator Ramos to Deputy Eason. Benson stated that she did not remember dispatching the call to Eason.

➤ On February 28, 2018, Ms. Guarino provided me with a sworn statement, due to being the complainant of the February 5, 2016, incident. Guarino stated that she wanted the deputy to do something, but she realized that there was nothing she could do based on the circumstances at that time. Guarino confirmed that she told Deputy Eason that she wished to remain anonymous, and that she was very happy with the service that Eason provided that day.

➤ On February 28, 2018, Deputy Seward provided me with a sworn statement, due to being the OIC (Officer in Charge) of the Parkland District on February 5, 2016. Seward stated that he did not recall anything about the incident.

➤ On February 28, 2018, Lieutenant Devita provided me with a sworn statement, due to being the Executive Officer of the Parkland District on February 5, 2016. Devita stated that Eason did take some steps to investigate and noted the information in the CAD notes, but an Incident Report with some additional investigative steps would have been prudent and a much better decision for Eason at that time.

➤ On March 15, 2018, Information Technology Manager Marsal provided me with a sworn statement, due to providing me with Deputy Eason's email history from the timeframe around February 5, 2016. The email history was obtained in an attempt to locate communication between Eason and Deputy Peterson about the information gathered during the February 5, 2016, incident. A check of those emails did not reveal any communication between Eason and Peterson.

➤ Deputy Peterson's February 2016 School Resource Officer Monthly Report was obtained and reviewed, but there was no information listed about Nikolas Cruz or any other details about the February 5, 2016, incident.

➤ A review of the February 5, 2016, incident on Evidence.com did not reveal any BWC videos attached to that case number. I reviewed the BWC database and determined that Deputy Eason was not issued a BWC until August 8, 2016.

➤ I asked former Deputy Peterson to provide me with a voluntary witness statement and he replied that he would need to consult with his attorney prior to providing that statement. Peterson never responded back to me and a certified letter sent to his residence was returned, due to being unclaimed.

➤ I asked Ms. Guarino's son, Zachary Guarino, to provide me with a voluntary witness statement, but he declined to provide me with a statement.

➤ On May 17, 2018, I conducted a sworn, Garrity interview with Deputy Eason and when I asked him about what he recalled about the February 5, 2016, call he handled, he stated, "I don't recall anything about that call from February 2016."

➤ Deputy Eason stated that calls like that were frequent and that threats made through social media

Page **17** of **19**



calls were very common. I followed up by specifically asking him if those calls included threats made against schools or threats of shootings, and he replied, "Well, with weapons in general, yes, pretty common on social media."

➢ I asked Deputy Eason to walk me through how he would normally handle a similar call where potential violence was threatened or questionable statements were made by a student and he replied, "I'd make contact with the complainant, find out what information they have and what evidence they have supporting the facts that they're telling me, and from there, depending on the evidence, conduct an investigation, talking to all the parties, notifying other people involved -- in this case, notifying the SRO at the school."

➢ I asked Deputy Eason if he would normally complete an incident report for a similar incident, and he replied, "With no credible threat and an anonymous caller, a caller who wanted to remain anonymous, usually no."

➢ I asked Deputy Eason how he forwarded the information to Peterson, and he replied, "Well, it's a small district. I could drive to his school, talk to him in person, or if I was at the station, a lot of times they would come in, the SRO's to complete paperwork or print out paperwork, especially towards the end of the week. I might have saw him in person and explained to him then what's going on."

➢ I asked Deputy Eason why he did not complete an incident report for the call, and he stated, "Well between, there was no credible threat, no evidence of a credible threat, and the caller wanted to remain anonymous due to being, you know, a close neighbor and a prior history with the family."

➢ " I asked Deputy Eason if he thought it would have been reasonable to document the information he obtained in an incident report, and he replied, "With the information at that point, no."

➢ I asked Deputy Eason how he would handle a similar situation in the future and he stated, "Well, with everything going on in the media now, you know, we do event reports on that."

➢ Deputy Eason confirmed that now, because the Parkland incident shooting happened, he would complete an incident report, as a precaution.

➢ Deputy Eason was asked what he considered a credible threat and Eason replied, "A credible threat if there's evidence supporting the carry-out of a threat. Like, if somebody says, 'You know what? I have a gun,' you know -- boyfriend, girlfriend, it happens all the time. They say, 'I'm gonna come to your house and shoot you,' that's a credible threat. If someone comes there saying, you know, that, you know, 'I'm in fear,' but they didn't make a threat. They said, 'You'll be sorry.' That's kind of vague. But you have to have, you know, a cre-, you have to have an apparent ability to do so, and the item to carry out the crime or the incident."

➢ I viewed Deputy Eason's personal phone records from the timeframe around February 5, 2016, and confirmed that he did not have any telephone call or text contact with Deputy Peterson for the two week period after that date. Eason declined to provide me with a copy of the records, due to privacy concerns.

**END OF REPORT.**

Page **18** of **19**

I, THE UNDERSIGNED, DO HEREBY SWEAR OR AFFIRM, UNDER PENALTY OF PERJURY, THAT TO THE BEST OF MY PERSONAL KNOWLEDGE, INFORMATION, AND BELIEF, I HAVE NOT KNOWINGLY OR WILLFULLY DEPRIVED, OR ALLOWED ANOTHER TO DEPRIVE, THE SUBJECT OF THE INVESTIGATION OF ANY OF THE RIGHTS CONTAINED IN ss. 112.532 AND 112.533, FLORIDA STATUTES.

THE UNDERSIGNED INVESTIGATOR ACKNOWLEDGES THAT THE FOREGOING REPORT CONSISTING OF____19____PAGES, EACH OF WHICH HAS BEEN INITIALED BY THIS INVESTIGATOR, IS A TRUE AND ACCURATE REPRESENTATION OF THE INVESTIGATION CONDUCTED.

Sgt. Hector Oliva  #10526                    5-31-18
INVESTIGATOR                    CCN                    DATE

THE FOREGOING REPORT HAS BEEN REVIEWED AND APPROVED BY:

Lt. Barry Lindquist CCN 13979                    5/31/18
REVIEWING SUPERVISOR            CCN                    DATE

Page **19** of **19**



**Sheriff Scott Israel**

**DATE:**          July 30, 2018

**MEMO TO:**    Colonel John Dale, Executive Director
                Department of Professional Standards

**FROM:**        Daniel Losey, Director
                Professional Standards Committee
                Department of Professional Standards

**SUBJECT:**    **Division of Internal Affairs Case # 2018-0042**
                **Final Disposition**

On 06/20/2018, the Professional Standards Committee reviewed IA Case # 2018-0042.  The Committee **sustained** the following allegation involving **Deputy Guntis Treijs, CCN 9714:**

Allegations:    **SPM 2.4    Meeting BSO Standards; to wit: DLE SOP 3.6.1(B)**
                **Reporting Requirements**

Subsequently, the Professional Standards Committee recommended:

                **Written Reprimand**

Deputy Treijs was apprised of the Committee's recommendation, and has **waived** a Pre-Disciplinary Conference.

Upon your approval, the final action of the Committee will be imposed.

_____          8/1/18          _____
**APPROVED**                   **DATE**            **NOT APPROVED**
**Colonel John Dale**                              **Colonel John Dale**
**Dept. of Professional Standards**                **Dept. of Professional Standards**

DL/om

cc:    Major Nathan Osgood, Patrol Region North/DLE
       Captain Jan Jordan, Parkland/DLE
       Deputy Guntis Treijs, Parkland/DLE
       Andi Nelson, IUPA
       Gary Lippman, Esq., IUPA

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS



**Sheriff Scott Israel**

**DATE:**  August 6, 2018

**MEMO TO:**  Lt. Chris Mulligan
Parkland District/DLE

**FROM:**  Daniel Losey, Director
Professional Standards Committee
Department of Professional Standards

**SUBJECT:**  **DIVISION OF INTERNAL AFFAIRS CASE # 2018-0042
ACKNOWLEDGMENT OF FINAL DISPOSITION**

A final disposition of IA Case # 2018-0042 has been affirmed by the Sheriff's designee. Attached to this memorandum is a copy of the action to be imposed against **Deputy Guntis Treijs, CCN 9714**. The discipline for Deputy Treijs is**:**

**Written Reprimand**

*After signing, please give a copy of this memo, with attachment, to the employee and forward __THIS ORIGINAL MEMO ONLY__ to the Department of Professional Standards for filing even if the employee intends to appeal. Please provide verification of served discipline within 30 days after appeal time has expired (if applicable), in one of the formats indicated below:*

___ **Suspension**:  Please have timekeeper print the PeopleSoft Timecard Report for the employee indicating TRC code SNP for the day(s) of suspension and forward a copy to the Department of Professional Standards.

_X_ **Written Reprimand**: Forward this memo to the Dept. of Professional Standards.

Lt. Chris Mulligan, CCN 9407
**Received by Supervisor**

8/9/18
**Date**

D/S Treijs CCN 9714
**Received by Employee**

8/9/18
**Date**

DL/om
Enc

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS
**Morales-Neloms, Olga**

| | |
|---|---|
| **From:** | Gary Lippman <glippman@iupa.org> |
| **Sent:** | Monday, July 30, 2018 9:40 AM |
| **To:** | Morales-Neloms, Olga |
| **Cc:** | Treijs, Guntis; Jeff Bell; Andi Nelson |
| **Subject:** | IA Case #2018-0042 (Deputy Sheriff Treijs) |

Dear Ms. Morales-Neloms:

Deputy Sheriff Treijs has authorized me to advise that he is waiving his right to a pre-determination hearing with regard to the referenced case.

Thank you for your attention to this matter,

Gary E. Lippman, Associate General Counsel
International Union of Police Associations, AFL-CIO
900 S. State Road 7
Plantation, FL 33317
Office:  954-960-3257
Mobile:  561-414-8542
glippman@iupa.org

**Morales-Neloms, Olga**

| | |
|---|---|
| **From:** | Morales-Neloms, Olga |
| **Sent:** | Wednesday, July 25, 2018 1:46 PM |
| **To:** | Treijs, Guntis |
| **Cc:** | Jordan, Jan; Zlochower, Andrea; Cirminiello, Jeffrey; Andi Nelson (anelson@iupa.org); Achilarre, Joe; Corbett, Kevin; Lindquist, Barry |
| **Subject:** | IA CASE# 2018-0042 |

| | |
|---|---|
| **Importance:** | Low |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | Treijs, Guntis | Read: 7/25/2018 3:19 PM |
| | Jordan, Jan | Read: 7/25/2018 1:56 PM |
| | Zlochower, Andrea | |
| | Cirminiello, Jeffrey | |
| | Andi Nelson (anelson@iupa.org) | |
| | Achilarre, Joe | |
| | Corbett, Kevin | Read: 7/25/2018 3:12 PM |
| | Lindquist, Barry | |

Deputy Treijs,

On 06/20/2018, the Professional Standards Committee reviewed **IA Case # 2018-0042**, in which you were the subject employee. The Committee made the following recommendations:

Allegation:
SPM 2.4      Meeting BSO Standards; to wit: DLE SOP 3.6.1(B) Reporting Requirements – **Sustained**

Recommended Discipline:  **Written Reprimand**

Per SPM, you are entitled to a pre-disciplinary conference regarding the above case. Your union representative or you may respond via email if you wish to request or waive your hearing. <u>You must respond in writing.</u> If you are <u>requesting</u> a hearing and would like a copy of your investigative report, you will need to email the records custodian for the Division of Internal Affairs, Betzaida Mendia, and she will advise you when to pick it up. Their office is located at the Public Safety Bldg., 1st floor. If you have any other questions, please call the office.

Thank you,

*Olga Morales-Neloms*
**Administrative Assistant to Director Daniel Losey**
**Dept. of Professional Standards**
P: 954-327-3912
F: 954-321-4352



**Sheriff Scott Israel**

**RTD-18-016**

**DATE:**          June 21, 2018

**TO:**             Deputy Guntis Treijs, CCN 9714
                     DLE/Parkland

**FROM:**          Lt. Barry Lindquist, Executive Officer
                     Division of Internal Affairs

**SUBJECT:**      **RETURN TO FULL DUTY WORK STATUS
                     CASE #IA2018-0042**

This memorandum will serve as notification that you are returned to full duty work status,
effective immediately.

You are directed to report to: **Lt. Chris Mulligan** at the **Parkland District** on **Thursday,
June 21, 2018,** for assignment.

RECEIVED BY: _____ 9714 _____ 6/21/18
                     Employee          CCN              Date

cc:     Colonel John Dale, Executive Director, Department of Professional Standards
        Colonel Jim Polan, Executive Director, Department of Law Enforcement
        Major Nathan Osgood, Patrol Region North
        Lt. Chris Mulligan, Parkland District
        Human Resources

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS

**LAB #**

## PROPERTY
## RECEIPT

Sheriff Scott Israel

| ☐ ABANDONED | ☐ EVIDENCE | ☒ SAFEKEEPING | ☐ PRISONER PROPERTY | ☐ FORFEITURE HOLD |
|---|---|---|---|---|

| Case # | Date and Time Received: | Investigating Unit/Agency: | Offense: |
|---|---|---|---|
| TBD | 2/22/18 12:23 | BSO IA | |

| NCIC/FCIC Agency: | Agency Case # |
|---|---|
| | |

| Suspect: | Address: | Race/Sex | DOB |
|---|---|---|---|
| | | | |

| Suspect: | Address: | Race/Sex | DOB |
|---|---|---|---|
| | | | |

| Found By: | Address: | Race/Sex | DOB |
|---|---|---|---|
| | | | |

| Owner/Claimant: | Address: | Race/Sex: | DOB: |
|---|---|---|---|
| Deputy Guntis Treijs | | w/m    CCN | 9714 |

| Victim's name (if applicable): | Address: | Telephone # |
|---|---|---|
| | | |

| Item Number | Number of Items | DESCRIPTION |
|---|---|---|
| 1 | 1 | Badge Id Wallet - Blck |
| 2 | 1 | BSO Id |
| 3 | 2 | Access Cards |
| 4 | 1 | BSO Badge # 4041 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

I hereby acknowledge the above list represents all the property taken from my possession and that if my property is taken and listed as Prisoner Property or Safekeeping I must contact the Broward Sheriff's Office Evidence Unit within Sixty (60) days of seizure. If I do not make contact within Sixty (60) days all my items will be considered abandoned and disposed of Pursuant to Florida Statute Chapter 705. Evidence Unit can be contacted at (954) 765-4351.

x D/S Treijs 9714
Signature

I hereby acknowledge the above list represents all property impounded by me:

CCN: 11989     District: IA     Division: IDLE

(Impounding Officer's)   Signature: _____

Printed Name: A Holmes

| RECEIVED BY: | REASON: | DATE | TIME |
|---|---|---|---|
| D/S Treijs 9714 | | | |
| | | | |
| | | | |
| | | | |

| Court Case # | CURRENCY: |
|---|---|
| | Verified By/CCN: _____ |
| | Signature: _____ |

**NOTE: For further distribution of this form, refer to Sheriff's Policy Manual.** | ACE #

BSO RP#54 (Revised 01/11)

EVIDENCE CONFISCATION

APPENDIX C. BROWARD COUNTY SHERIFF'S OFFICE INTERNAL AFFAIRS INVESTIGATIONS

# BROWARD COUNTY SHERIFF'S OFFICE
# INTERNAL AFFAIRS
# INVESTIGATIVE REPORT

**IA #:** IA2018-0042
**DATE:** May 31, 2018

**INVESTIGATION INITIATION DATE:** February 23, 2018

| | |
|---|---|
| **PERIOD TOLLED:** | N/A |
| **180th DAY:** | August 22, 2018 |
| **INVESTIGATOR:** | Sergeant Alexandra Holmes, CCN 11989 |
| **COMPLAINANT:** | SPM |
| **SUBJECT EMPLOYEE:** | Guntis Treijs, CCN 9714 |
| **SHERIFF'S POLICY:** | SPM 2.4 Meeting BSO Standards; to-wit: DLE SOP 3.6.1 (B) Reporting Requirements |
| **COMMAND:** | Department of Law Enforcement Parkland District |
| **DATE OF HIRE:** | August 30, 1999 |
| **RANK:** | Deputy Sheriff |
| **DATE OF MOST RECENT PROMOTION:** | N/A |
| **PROBATION STATUS:** | N/A |
| **BARGAINING UNIT:** | International Union of Police Associations (IUPA) |

1