UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
CASE NO: 0:22-cv-62076

GREGORY TONY, in his official
capacity as Sheriff of Broward County,

      Plaintiff,

vs.

EVANSTON INSURANCE COMPANY,

      Defendant.

_____/

**<u>EVANSTON'S MOTION FOR FINAL SUMMARY JUDGMENT AND
INCORPORATED MEMORANDUM OF LAW</u>**

1

Evanston Insurance Company ("Evanston"), pursuant to Rule 56, *Fed. R. Civ. P.* files its Motion for Final Summary Judgment against Plaintiff, GREGORY TONY, in his official capacity as Sheriff of Broward County ("BSO"). [1] The policy and years of precedent compel the determination that the Parkland Shooting Incident constitutes more than one "occurrence," requiring the payment of a separate Self-Insured Retention ("SIR") for each gunshot/victim.

## **MEMORANDUM OF LAW**

### I.    ***Summary Judgment Standard***

Summary judgment should be rendered when, viewing the record in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 911 (11th Cir. 2007); *Fed. R. Civ. P.* 56(a). The movant bears the burden of demonstrating there is no genuine dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party satisfies its burden, the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact. *Celotex*, 477 U.S. at 324.

### II.    ***The Amended Complaint Impermissibly Seeks An Advisory Opinion.***

A complaint for declaratory relief is subject to dismissal if it merely seeks an advisory opinion. *Santa Rosa Cnty. v. Admin. Comm'n, Div. of Admin. Hearings*, 661 So. 2d 1190, 1193 (Fla. 1995) (declaratory relief cannot seek "legal advice by the courts or the answer to questions propounded from curiosity"); *Emory v. Peeler*, 756 F.2d 1547, 1552 (11th Cir. 1985).

The ripeness doctrine protects "federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Atain Specialty Ins. Co. v. Sanchez,*

---

[1] Pursuant to Local Rule 56.1, this Motion is accompanied by a separately filed Statement of Material Facts cited throughout as "SMF".

No. 8:17–cv–1600, 2018 WL 1991937 at *1 (M.D. Fla. April 27, 2018) (insurer's suit seeking a declaration that it had no duty to indemnify amounted to an impermissible advisory opinion). Here, BSO has not pleaded, much less shown, that it incurred amounts that constitute "ultimate net loss" in excess of the SIR and applicable deductible[2], or that the lawsuits against it have resulted in a judgment for covered amounts in excess of the SIR. BSO has not pleaded or shown that the Policy[3] has been triggered or that it made any demand for indemnity under the Policy.

The lawsuits arising from the Parkland Shooting Incident against BSO remain pending and it is undisputed that there are no outstanding claim bills that would potentially implicate any amount in excess of the limitation of liability to which BSO is entitled. SMF ¶ 8. That BSO will face any liability above the $200,000/$300,000 statutory caps (or any liability whatsoever) is therefore purely hypothetical and impossible according to BSO's own witness. *Greene Dep.*[4] at 86:20-87:2 ("we cannot legally pay anything other than 300"); 89:21-25. Given that the litigation has not concluded and another public entity (the Broward County School Board) has paid amounts to the underlying plaintiffs well over the statutory limits, BSO agrees that it cannot be liable for any amount, much less any amount in excess of the statutory caps. SMF ¶ 77; (*Greene Dep.* at 87:13-14; 89:21-90:4). At the very least, BSO agrees that whether there is liability for the underlying lawsuits, including for damages in excess of $300,000, is speculation at this point. *Greene Dep.* at 26:1-14; 27:14-20. Nevertheless, BSO improperly asks this Court to decide, in advance of any evidence that it has satisfied conditions precedent to coverage, and absent an adverse determination of liability against it, whether it will have to satisfy more than one SIR in

---

[2] As discussed in Section III *infra*, the Policy has an Annual Aggregate Deductible of $500,000 that can only be met by payment of covered judgments or settlements.
[3] Throughout this Motion, the term "Policy" means the Evanston Policy No. MPEM1D0002-16-01.
[4] The Deposition of John Greene is attached to the Declaration of Kristen Perkins at Exhibit B.

connection with the Parkland Shooting Incident. This is not a proper justiciable controversy, and the Court should grant summary judgment in Evanston's favor on this basis.

**III.** ___*The Policy Cannot Be Triggered By The Parkland Shooting Incident.*___

The Policy is clear that Evanston can only be liable to pay "ultimate net loss" once the $500,000 SIR is exhausted *and* the Annual Aggregate Deductible ("AAD") of $500,000 has been satisfied by payment of "ultimate net loss". "Ultimate net loss" does not include "claim expenses". While "claim expenses" can satisfy the SIR, they cannot satisfy the AAD, which can only be satisfied by the payment of "ultimate net loss" – i.e., judgments or settlements. Because, as admitted by BSO, its potential liability for the Parkland Shooting Incident has been reduced to zero dollars (and at most $300,000) by operation of Florida law, there can be no circumstance where BSO will incur "ultimate net loss" to trigger the Policy.

As alleged in the Amended Complaint [D.E. 20], the Policy provides that it will only pay "ultimate net loss" in excess of the SIR. [D.E. 20, ¶ 12, D.E. 20-3, pp. 11]. Per Endorsement, "ultimate net loss" does not include "claim expenses" such as defense and investigation costs. [D.E. 20, ¶ 20; D.E. 20-3, pp. 54]. Therefore, as amended, the definition of "ultimate net loss" is:

> the total amount of damages [], including any attorney fees awarded in favor of third parties that the insured is legally liable to pay because of "bodily injury", "property damage" or "personal and advertising injury".

[D.E. 20-3, p. 27, Definition Y.] By endorsement, the Policy was amended to include the AAD of $500,000. [D.E. 20-3, p. 53]. The AAD provides:

> Our obligation to pay "ultimate net loss" in excess of the Self-Insured Retention under this policy does not apply until you have paid the full amount of the Annual Aggregate deductible shown in the Schedule above. The Annual Aggregate Deductible applies to all "ultimate net loss" in excess of the Self-Insured Retention, regardless of the number of Coverage Parts attached to this policy, insureds, claims ("claims") made or "suits" brought.

> The Annual Aggregate Deductible is not considered a part of the Self-Insured Retention and does not accrue to the exhaustion of the Self-Insured Retention or Annual Aggregate Self-Insured Retention, if applicable.

Further, the "Limits of Liability" section, as amended by endorsement, specifies that Evanston can only be liable for "claim expenses" *if* it is obligated to pay "ultimate net loss".[5] Therefore, Evanston cannot be obligated to pay "ultimate net loss" or "claim expenses" unless and until:

1. The $500,000 per occurrence SIR (or SIRs) is satisfied by the payment of covered judgments, settlements or "claim expenses"; *and then*
2. The $500,000 AAD is satisfied by the payment of covered judgments or settlements *only.*

As applied to this case, and assuming for the sake of argument that only one $500,000 SIR applies to the Parkland Shooting Incident (which is disputed), in order to trigger coverage BSO would have to prove that it paid $500,000 in covered judgments, settlements or defense costs *and* an additional $500,000 in covered judgments or settlements. As explained below, because it is undisputed that BSO cannot be liable for any amount with respect to the Parkland Shooting Incident and/or any amount over the statutory caps of $200,000/$300,000, the Policy cannot be triggered by the Parkland Shooting Incident as a matter of law.

As an initial matter, BSO has not pleaded or otherwise maintained that the AAD has been satisfied or that the Policy has been triggered in any respect by the Parkland Shooting Incident. *See* [D.E. 20]. Moreover, BSO agrees that it does not face liability for a judgment arising out of the Parkland Shooting Incident in excess of the SIR.

Section 768.28(5), *Fla. Stat.* operates as a limited waiver of immunity for certain tort actions.[6] This section provides that the state and its agencies will be solely liable to pay a claim or

---

[5] "If we have an obligation under this Coverage Part to pay 'ultimate net loss' in excess of the [SIR], any "claim expenses" we pay will be in addition to, and will not reduce, the applicable Limits of Insurance." [D.E. 20-3, p. 54].

[6] Under Section 768.28, *Fla. Stat.*, and the Florida Constitution, BSO/Sheriff Tony is considered to be a county official and therefore entitled to sovereign immunity, subject to this limited waiver applicable to certain tort actions. SMF ¶ 14.

judgment up to $300,000 for all claimants with respect to the same incident **and as against all state agencies or subdivisions**. In 2021, the Broward County School Board reached a $25 million settlement with the Plaintiffs in the Underlying Litigation (the "School Board Settlement"). SMF ¶ 7.  Because the School Board is another state subdivision, and the amount of the School Board Settlement far exceeds the statutory cap, the School Board Settlement precludes further recovery from BSO (or any other state agency). Therefore, BSO cannot incur any "ultimate net loss" that would satisfy the AAD or otherwise trigger any coverage obligation under the Policy.

BSO's corporate representative, John Greene, confirmed that this understanding was correct and *at most* BSO can only be liable for $300,000, which would not satisfy the AAD. *Greene Dep.* at 86:23 – 87:2; 89:21-89:25. This is consistent with Mr. Greene's understanding expressed to Evanston after the shooting incident. SMF ¶ 77. Greene was not aware of any facts suggesting that the underlying plaintiffs have challenged BSO's application of Section 768.28 in any respect.

There are only two exceptions to Section 768.28(5), which are not present here and which would be excluded by the Policy in any event:

> However, a judgment or judgments may be claimed and rendered in excess of these amounts and may be settled and paid pursuant to this act up to $200,000 or $300,000, as the case may be; <u>and that portion of the judgment that exceeds these amounts may be reported to the Legislature, but may be paid in part or in whole only by further act of the Legislature</u>.

As an initial matter, there is currently no amount reported to the Legislature with respect to BSO's liability to the underlying plaintiffs, and such liability is presently disputed and without resolution. Further, BSO's corporate representative was clear that in the event the Legislature approved any amount with respect to BSO's liability (i.e., a "claims bill"), that amount would be paid by the State, not BSO: "The state of Florida would pay it out of a fund, not the agency." [*Greene Dep.* at 26:10-22]. Therefore, in the event the Legislature were to approve any amount

with respect to the Parkland Shooting Incident, BSO admits it would not be liable for that amount, which would therefore not qualify as "ultimate net loss" under the Policy.[7]

Even in the event an act of the Legislature resulted in liability to BSO in excess of the statutory cap, it would not be covered by the Policy, which by its terms does not recognize any waiver of sovereign immunity of the insured. In the "Common Policy Conditions", Paragraph G. **Governmental Immunity**, states that "[w]e will not waive, either in the adjustment of claims ('claims') or in the defense of 'suits' against the insured, any governmental immunity of the insured." [D.E. 20-3, p. 5]. An act of the Legislature agreeing to liability in excess of the limitation provided by Section 768.28 would be a clear waiver of governmental immunity and, while it may be authorized by law, such amounts would not be covered under the Policy. *See Atl. Specialty Ins. Co. v. City of College Park*, 313 Ga. 294, 303 (2022) (making clear that policy language is paramount, even where statute permits waiver of sovereign immunity).

Section 768.28(5) provides one other permissive exception as follows:

Notwithstanding the limited waiver of sovereign immunity provided herein, the state or an agency or subdivision thereof may agree, within the limits of insurance coverage provided, to settle a claim made or a judgment rendered against it without further action by the Legislature …

Like the claims bill, this exception does not confer any liability on BSO. Rather, it *permits* but does not require BSO to settle claims or judgments against it within its insurance limits without legislative authorization, if the policy so permits. In the event BSO were to attempt to agree to pay a settlement with the Policy limits, it would clearly violate the "Governmental Immunity" condition of the Policy. *See City of College Park, supra*. Further, any settlement by BSO in excess of the SIR requires Evanston's prior written consent. [D.E. 20-3, p. 12, Section B.2.] There is no

---

[7] Notably, all claims under Section 1983 (and any other claims not subject to the statutory cap) have already been dismissed. *Greene Dep.* at 27:9-11.

authority holding that Evanston would be required to consent to any settlement that waives BSO's immunity or an express condition of the Policy.

In accordance with the foregoing, BSO has not and cannot incur liability with respect to the Parkland Shooting Incident that would result in it paying "ultimate net loss" in excess of the SIR *and* the AAD, and BSO can present no evidence that it could. As such, there is no circumstance where the Policy can be triggered and Evanston is entitled to judgment as a matter of law.

**IV.**      ***The Allegations of the Parkland Cases Constitute More Than One Occurrence.***

The Florida Supreme Court's decision of *Koikos v. Travelers Ins. Co.*, 849 So. 2d 263 (Fla. 2003) compels the determination that the Parkland Shooting Incident constitutes multiple occurrences under the Policy. As addressed by *Koikos*, each gunshot causing injury is a separate "occurrence" as a matter of Florida law.

*Koikos* dealt with a factually similar scenario where an assailant entered a restaurant and shot two individuals in the aftermath of a dispute. The insured, Koikos, was sued for negligent security and sought a determination as to whether the separate gunshots constituted a single or multiple occurrences under his insurance policy. The definition of "occurrence" at issue in *Koikos* was materially identical to that in the Policy and the countless policies reviewed by BSO's risk manager over the course of his career [*Greene Dep.* at 39:6-17] – "an accident, including continuous or repeated exposure to substantially the same harmful conditions."[8] In applying this definition and following Florida's "cause theory", the Florida Supreme Court held that each shooting constituted a separate occurrence. *Id.* at 273. The Florida Supreme Court made clear that pursuant to the "cause theory" courts must focus on the independent immediate act giving rise to the injury – *not* on the basis for liability asserted against the insured (i.e., negligent security). *Id.*

---

[8] The "occurrence" definition in *Koikos* included "… same *general* harmful conditions."

The principal holding of *Koikos* is this: that in accordance with the "cause theory", in the case of a multi-victim shooting incident, each gunshot constitutes a separate "occurrence". As demonstrated below, this has been the universally accepted view of *Koikos* since its holding, including by binding precedent from the Eleventh Circuit. *See Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317 (11th Cir. 2005); *see also South Central Ed. Risk Mgt. Program v. Star Ins. Co.*, 2018 WL 1135289 (S.D. Fla. Dec. 18, 2018) (noting the holding of *Koikos* and the binding precedent of *Guideone*).

Contrary to BSO's position, the *Koikos* Court did *not* base its holding on a finding that the standard definition of "occurrence" is ambiguous. *Koikos* provides that when there is a shooting with multiple victims, and the policy defines "occurrence" like the Evanston Policy, "each shooting constitutes a separate occurrence" as a matter of Florida law. 849 So. 2d at 274. The Florida Supreme Court reached its **<u>"decision by looking at the language of the policy in a manner consistent with precedent regarding the construction of insurance policies in this State."</u>** *Id*. at 273 (emphasis added).

Evanston acknowledges that *Koikos* contains dicta regarding ambiguity. However, a careful reading of the decision demonstrates that the key holdings were decided as a matter of law, not ambiguity. First, neither the certified question nor the answer to the question references ambiguity or indicates that the issue was decided on the basis of ambiguity.[9] Next, the Florida Supreme Court analyzed relevant precedent, none of which were decided on the basis of ambiguity, and adopted the "cause theory" – definitively ruling that under Florida law, the gunshots causing

---

[9] The certified question as revised by the *Koikos* Court was: WHEN THE INSURED IS SUED BASED ON NEGLIGENT FAILURE TO PROVIDE ADEQUATE SECURITY ARISING FROM SEPARATE SHOOTINGS OF MULTIPLE VICTIMS, ARE THERE MULTIPLE OCCURRENCES UNDER THE TERMS OF AN INSURANCE POLICY THAT DEFINES OCCURRENCE AS "AN ACCIDENT, INCLUDING CONTINUOUS OR REPEATED EXPOSURE TO SUBSTANTIALLY THE SAME GENERAL HARMFUL CONDITIONS"?

the injuries are the "occurrences", not the underlying theory of liability.[10] While the *Koikos* Court indicated the holding would be the same *if* they had found an ambiguity, there is expressly no finding of ambiguity. Instead, the language is equivocal: "*even if* we accepted [the insurer's] construction of the policy as a reasonable interpretation, the insurance policy *would be* ambiguous because the language *would be* susceptible to more than one reasonable interpretation – one providing coverage and the other limiting coverage." *Id.* (emphasis added). Evidently, the *Koikos* Court did *not* accept the insurer's construction as reasonable, and did not find the policy ambiguous as to whether the "occurrence" was the shots fired by the shooter rather than the alleged negligence in preventing it. Critically, the *Koikos* Court stated, "[t]hus, in this case, *the immediate cause s of the injuries were the intervening intentional act s of the third party – the intruder's gunshots*." *Id.* at 271. (emphasis added).

The *Koikos* Court then addressed the alternative argument that, given the close proximity of the shots causing injury (nearly concurrent), the shooting itself should be deemed a single occurrence, and *dismissed this argument immediately. Id.* at 272. In other words, the *Koikos* Court did not hold that this was a reasonable interpretation that would result in an ambiguity under the policy.[11] Rather, the Court expressly rejected the obligation to analyze the time and proximity between each shot fired in determining the number of occurrences. According to the *Koikos* Court:

---

[10] In adopting the "cause theory", the Florida Supreme Court relied on *New Hampshire Ins. Co. v. RLI Ins. Co.*, 807 So. 2d 171, 172 (Fla. 3d DCA 2002), another shooting case finding that where "[t]here were three separate acts of shooting, causing three separate injuries to three separate persons in three separate instances … liability attached [to the insured] when the aggressor fired three shots which resulted in injury to the three victims." *Koikos*, 849 So. 2d at 271. The issue of ambiguity was not discussed. The *Koikos* Court agreed with *RLI* and stated that "*[t]he accident – the event that was neither expected nor intended from Koikos's standpoint – was the shooting incident and not Koikos's own failure to provide security*." *Id.* (emphasis added).

[11] It is axiomatic that in order to find an ambiguity in any insurance policy or contract, there must be two competing interpretations, *both of which are reasonable. Certain Underwriters at Lloyds of London v. Pero Fam. Farm Co.*, No. 18-CV-81680, 2020 WL 3268274, at *3 (S.D. Fla. Apr. 9, 2020). Courts should not look for ambiguity when there is none or put strain and unnatural construction on the policy terms to create ambiguity. *Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 412 F.3d 1224, 1228-29 (11th Cir. 2005).

"To hold that the number of occurrences is determined by the time between each shot would turn an insurance coverage issue into an intensive fact-based inquiry requiring the selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences." *Id.* The *Koikos* Court went on to state that "we conclude that using the number of shots fired as the basis for the number of occurrences is appropriate because each individual shooting is distinguishable in time and space." *Id.* Therefore, the court expressly held that the *only reasonable interpretation* is that each individual shot is a separate occurrence.[12]

In *Koikos*, the gunman fired two rounds of gunshots that were *nearly concurrent*; the two victims were injured by gunshots *from the first round*. 849 So. 2d at 265. Thus, even under facts demonstrating that the separate gunshots were only seconds (if not fractions of a second) apart, the Florida Supreme Court dismissed the idea that those shots could constitute a single occurrence.

The facts of the Parkland Shooting Incident fit even more directly within the Florida Supreme Court's analysis of the cause theory. Cruz entered the school building on the first-floor and proceeded for two minutes to shoot multiple rounds into four different classrooms, killing 11 people. SMF ¶ 3(a-f).[13] He then made his way up to the second and third floors of the building, alternating between shooting in the corridors and classrooms. SMF ¶ 3(g-h). Cruz exited the building about six minutes after he entered. SMF ¶ 3(i) As such, in a situation involving gunshots that were even further separated by time and distance, the Florida Supreme Court's holding in *Koikos* results in multiple occurrences as a matter of law.

      i.      **The Eleventh Circuit *Guideone* Case Is Binding And Compels A Finding of Multiple Occurrences.**

---

[12] For a fulsome analysis of the steps taken by the *Koikos* Court, Evanston respectfully refers this Court to its Opposition to Plaintiff's Motion for Judgment on the Pleadings [D.E. 52] expressly incorporated herein.
[13] See also Exhibit A to Perkins Decl. at pp. 43-52.

In *Guideone Elite Ins. Co.*, *infra*, a perpetrator kidnapped a woman, struck her on the head, threw her in a van, closed the door, robbed her, commanded her to perform oral sex and demanded she withdraw cash from her ATM account. The Eleventh Circuit, considering the same definition of "occurrence" at issue in *Koikos* found that each act of the perpetrator (rape, robbery, kidnapping, assault, and battery) constituted a separate occurrence as a matter of law under *Koikos* without any discussion of ambiguity. *Id.* at 1331-32. The Eleventh Circuit stated:

> Under Florida law, "when the insured is being sued for negligent failure to provide security, an 'occurrence' is defined by the immediate injury-producing act and not by the underlying tortious omission." *Koikos*, 849 So.2d at 271 (footnote omitted). In so holding, the Florida Supreme Court found that, in *Koikos*, "the immediate causes of the injuries were the intervening intentional acts of the third party—the intruder's gunshots." *Id.* at 272. The court reasoned that "[t]o hold that the number of occurrences is determined by the time between each shot would turn an insurance coverage issue into an intensive fact-based inquiry requiring the selection of an arbitrary time interval to distinguish a single occurrence from multiple occurrences." Id. (*citing American Indemnity Co. v. McQuaig*, 435 So.2d 414, 416 n. 3 (Fla. 5th DCA 1983)) ("Had [the insured] shot Pope, then left, and hours or days later shot McQuaig, there would be little argument that this was more than one occurrence. The only difference is that here, the time interval was relatively short.").

*Id.* at 1332. The *Guideone* court held that "[t]he various acts committed by the perpetrator were separated by sufficient 'time and space' so as to constitute separate occurrences under *Koikos*." *Id.*

In the section addressing *Koikos*, the Eleventh Circuit clearly decides the issue as a matter of law and did not apply any rule of construction based on ambiguity. District Courts are bound to follow the reported decisions of the Court of Appeals for its Circuit. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1570 (11th Cir. 1991); *Eleventh Circuit Local Rules* Note 2 (published opinions are binding precedent) (citing *Martin v. Singletary*, 95 F.2d 944 n.1 (11th Cir. 1992)). As such, the decision of the Eleventh Circuit is binding on this Court and requires a finding of multiple

occurrences under *Koikos* with respect to the Parkland Shooting Incident.[14] The holding of *Guideone* has never been altered or amended by subsequent decisions of the Eleventh Circuit.

### ii. *Taurus* Did Not Impact the Eleventh Circuit's View of *Koikos* As Articulated in *Guideone*.

BSO has argued that the case of *Taurus Holdings, Inc. v. U.S. Fidelity & Guar. Co.*, 913 So. 2d 528 (Fla. 2005), which was decided one month after *Guideone*, confirmed that *Koikos* was decided on the basis of ambiguity. [D.E. 38, p. 10.] This is inaccurate, and the statement regarding *Koikos* in *Taurus* is *dicta* at best. Indeed, the *Taurus* court did not in any way apply *Koikos* in reaching its decision. *Id.* at 534. Therefore, its description of *Koikos* is not controlling law. *Lewis v. State*, 34 So. 3d 183, 186 (Fla. 1st DCA 2010) ("When a court makes a pronouncement of law that is ultimately immaterial to the outcome of the case, it cannot be said to be part of the holding in the case.").

Further, the statement regarding *Koikos* written by Justice Cantero (who was not part of the *Koikos* Court) appears to be inconsistent with the central holding of *Koikos.* The reasoning of *Koikos* demonstrates that it was not decided on the basis of ambiguity – it was decided by applying the "cause theory" and precedent to the facts of the case. Therefore, *Taurus* should not be relied on to find that *Koikos* was decided based on ambiguity.

If there was any doubt about the Eleventh Circuit's view of *Koikos* post-*Taurus*, that has been clarified by several Eleventh Circuit decisions, two of which have applied *Guideone's* interpretation of *Koikos* on the precise issue presented here. Each time the Eleventh Circuit interprets *Koikos* to address the issue of number of occurrences with respect to claims involving

---

[14] Evanston notes that the *Guideone* decision was cited in its Motion to Dismiss [D.E. 21] but was not addressed by the Court in the Order on Evanston's Motion [D.E. 38]. Plaintiff also neglected to address *Guideone's* treatment of *Koikos* in its Opposition to Evanston's Motion. [D.E. 23]. Evanston again cited to *Guideone* in its Motion for Reconsideration [D.E. 44, p. 16].

multiple injuries, it finds that *Koikos* compels the result that there are multiple occurrences where there are injuries to multiple claimants. It has never held that *Koikos* was based on ambiguity and therefore requires whatever result the insured chooses when it comes to occurrences.[15]

In *State Nat. Ins. Co. v. Lamberti*, 362 F. App'x 76 (11th Cir. 2010), a case involving BSO in which a number of lawsuits were filed relating to BSO's policing of a protest, the Eleventh Circuit, held that the claims, which included multiple plaintiffs alleging similar civil rights violations, involved multiple occurrences. *Id.* at 81-82. Critically, citing to *Guideone*, the court found that each interaction with BSO officers was a separate occurrence under the precedent set by *Koikos*. *Id.* at 82. The court noted that because there were multiple occurrences, if BSO settled each claim for less than the amount of the SIR, BSO might never be entitled to any reimbursement from the State National policy. *Id.* at 81.

Following *Lamberti*, Judge Seitz decided *State Nat'l Ins. Co. v. City of Miami*, No. 08-22861-CIV-SEITZ/O'SULLIVAN, 2010 WL 11506250 (S.D. Fla. May 11, 2010), which was unanimously affirmed by the Eleventh Circuit. 403 Fed. App'x 478 (11th Cir. 2010). Like here, *City of Miami* was a case where the insured preferred multiple gunshots to be a single occurrence due to a $500,000 per occurrence SIR. Nevertheless, Judge Seitz held that "*Koikos* requires that the Court find that the separate shots constitute separate occurrences in the policy." *Id.* Judge Seitz was directly presented with the argument that *Taurus* confirmed that *Koikos* was decided on the basis of ambiguity in the underlying briefs. *See City's Motion for Summary Judgment* [D.E. 44-2, pp. 13-14]. Judge Seitz addressed the argument head on, holding that "Miami reads *Koikos*

---

[15] It is also notable that six months after *Koikos*, the Florida Supreme Court declined jurisdiction of *RLI's* appeal of the Third DCA's ruling, holding: "Upon review of the responses to this Court's order to show cause dated July 14, 2003, the Court has determined that it should decline to exercise jurisdiction in this case. *See Koikos v. Travelers Ins. Co.*, 849 So. 2d 263 (Fla. 2003). The petition for discretionary review is, therefore, denied." *N.H. Ins. Co. v. RLI Ins. Co.*, 858 So. 2d 331 (Fla. 2003).

incorrectly when it argues that the court interpreted the term 'occurrence' to mean each gunshot because the policy was ambiguous." *Id.* at *5, n. 11. This decision was upheld by the Eleventh Circuit in 2010 – five years after *Taurus*.[16]

In a more recent Eleventh Circuit decision, *Port Consolidated, Inc. v. Intern. Ins. Co. of Hannover, PLC*, 826 F. App'x 822 (11th Cir. 2020), the insured issued cards to its customer in order to pump gasoline and diesel fuel. Due to an error with a fuel dispensing system, drivers were able to exceed the 75 gallon limit despite only being charged for 75 gallons. The term "occurrence" was not even defined in the policy; however, the Eleventh Circuit found that the policy was not ambiguous and that, under Florida law as articulated by *Koikos* and *Guideone*, each theft of fuel by truck drivers (in excess of the 75 gallon limit) constituted a separate occurrence.[17] As none of the losses from each of the individual thefts exceeded the $1,000 per occurrence deductible, the insurer was not required to indemnify Port Consolidated.[18]

Four separate Eleventh Circuit decisions have either rejected the argument that *Koikos* was decided on the basis of ambiguity, or did not address ambiguity instead applying the "cause theory" and the holding of *Koikos*. The *Guideone* case is binding on this Court. *See South Central Ed. Risk Mgt. Program*, *infra* (noting that the binding precedent of *Koikos* and *Guideone* required finding multiple occurrences where there were multiple instances of abuse even on the same victim). All of the cases found multiple occurrences under *Koikos*. While three of the cases were not published,

---

[16] The Eleventh Circuit was also presented with the argument that *Taurus* confirmed that *Koikos* was decided based on ambiguity and rejected it unanimously. *Initial and Reply Briefs of City of Miami*, (attached hereto as Exhibits A and B) (Perkins Decl. at ¶¶ 44-45).

[17] *Port Consolidated* also cited *Taurus*, but still found the *Koikos* case was not decided on the basis of ambiguity. The insured also argued that *Koikos* was based on ambiguity and its holding was decided according to the interpretation that benefitted the insured. *Initial Brief of Appellant*, 2019 WL 6243320 (Nov. 20, 2019) (attached hereto as Exhibit C (Perkins Decl. at ¶ 46). This argument was rejected by the Eleventh Circuit.

[18] In the proceedings before Judge Zloch, he noted that the definite legal meaning of occurrence was established in *Koikos*. *See Port Consolidated, Inc. v. Intern. Ins. Co. of Hannover, PLC*, No. 16-60379-CIV-ZLOCH, 2019 WL 2009333 at *2 (S.D. Fla. Mar. 21, 2019).

they nevertheless confirm the Eleventh Circuit's holding in *Guideone* and the Eleventh Circuit's position that *Koikos* was not based on ambiguity. There is no basis for this Court to depart from binding precedent of the Eleventh Circuit.

> ### iii.    Numerous Other Courts Citing *Koikos* Held It Was Decided Without Any Resort to Ambiguity.

Numerous courts have applied *Koikos* as a matter of law whether or not the application benefited the insured or insurer and without any discussion of ambiguity.[19]

- *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293 (S.D. Fla. 2010) (affirmed 477 F. App'x 702 (11th Cir. 2012)): finding multiple occurrences in the context of a construction defect action where the insured worked on multiple buildings;
- *Great Am. All. Ins. Co. v. Monte Carlo of Miami Condo., Inc.,* No. 22-21238-CIV-ALTONAGA/Torres, 2023 U.S. Dist. LEXIS 30332 n.3 (S.D. Fla. Feb. 22, 2023), Judge Altonaga in a footnote held that the underlying incident constituted a single occurrence because there was only one shooting victim that was shot by a single bullet, entering summary judgment in favor of the insurer and citing to *Koikos.* There was no finding of ambiguity there nor any construction in favor of the insured. *Id.*
- *South Central Educ. Risk Mgmt. Program v. Star Ins. Co.*, *supra*: finding multiple occurrences in case involving sexual abuse and requiring payment of multiple SIRs;
- *Bray & Gillespie IX, LLC v. Hartford Fire Ins. Co.*, No. 6:07-cv-326-Orl-DAB, 2009 WL 1953649 (M.D. Fla. July 6, 2009): finding that when three hurricanes struck a property, each hurricane was a separate occurrence;
- *Liberty Mut. Ins. Co. v. State Farm Fla. Ins. Co.*, Nos. 20-12970, 20-13637, 2022 WL 1025164 at *7 (11th Cir. Apr. 6, 2022); multiple occurrences triggered policy's aggregate limit in construction defect case;
- *Belt v. USAA Cas. Ins. Co.*, 312 So. 3d 947 (Fla. 4th DCA 2021): discussing *Koikos* and the cause theory in an auto accident case, no reference to ambiguity.

---

[19] The only case to even suggest that *Koikos* was decided on the basis of ambiguity in a manner relevant to its decision is *Maddox v. Fla. Farm Bureau Gen.*, 129 So. 3d 1179 (Fla. 5th DCA 2014). However, *Maddox* consisted of three separate opinions, and thus, is not binding precedent. *See Musselwhite v. Fla. Farm Gen. Ins. Co.*, 273 So. 3d 251 n.* (Fla. 1st DCA 2019) (holding that a plurality opinion is not precedent binding on the court). Further, like every other court considering the issue, the Court held that there were multiple occurrences where there were multiple victims. Moreover, as discussed, the Eleventh Circuit continues to follow its precedent in *Guideone* even after *Maddox*, and the Eleventh Circuit is bound to follow its prior precedents absent a decision from a state appellate court casting doubt on its decision. *See EmbroidMe.com, Inc. v. Travelers Prop. Cas. Co. of Am.*, 845 F.3d 1099, 1105 (11th Cir. 2017).

BSO's argument that "the insured always wins" in these cases is an approach that simply has not been followed by any Florida court since *Koikos*.[20] Accordingly, Evanston's reading of *Koikos* should be applied. *See also Travelers Indem. Co. v. Garcia*, 2021 WL 2935425 (11th Cir. July 13, 2021) (applying *Koikos* and construing the policy language against the preferred interpretation of the insured).

## V. *The Rules Of Contract Construction Preclude A Finding Of Ambiguity Here.*

If a term has been judicially construed, it is not ambiguous. *S. Cent. Educ. Risk. Mgmt. Program, supra,* at *7-8 (noting *Koikos*, *Guideone* and *Lamberti* are binding precedent from the Florida Supreme Court and the Eleventh Circuit and mandate a finding that each individual gunshot in a shooting spree is a separate "occurrence"); Couch on Insurance, 2d ed., § 15:20 (if a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent).[21] Moreover, with respect to Florida contracts, the law in existence at the time of the making a

---

[20] Evanston anticipates that BSO will cite to *Washington National Insurance Co. v. Ruderman*, 117 So. 3d 943 (Fla. 2013) for the proposition that ambiguous terms are always construed against the insurer, regardless of the insured's bargaining power, sophistication or actual participation in policy negotiation. The *Ruderman* Court does not state that if a policy term is determined to be ambiguous, the insured gets to choose the outcome it desires. Instead, the decision says the policy will be liberally construed in favor of coverage. Moreover, *Ruderman* is inapplicable. The case involved a consumer class action against an insurer, with the class was comprised of ordinary consumers who purchased limited home health care insurance. *Id.* at 946. There was no issue concerning whether the insureds were sophisticated (they were not) and no evidence that any insured participated in the negotiations with respect to the policies they purchased. Indeed, the *Ruderman* Court recognized that the construction of ambiguous terms against the insurer was developed in order "to protect the *buying public* who rely upon the companies and agencies in such transactions." *Id.* at 951 (emphasis added).

[21] This principle is also followed by courts outside the state. *See Allstate Ins. Co. v. Chinn, 76 Cal. Rptr. 264, 267* (Ct. App. 1969); In *Morris v. Auto-Owners Ins. Co.,* No. 3:16-CV-00880-JMC, 2016 WL 7473430, at *4 (D. S.C. Dec. 29, 2016), the court held: "a term in an insurance policy is not ambiguous, and the rule construing ambiguities in favor of the insured does not apply, when the term has been judicially defined." In fact, "[w]here the language to be construed has, by judicial construction, acquired a clear and definite meaning, the rule of construction in favor of the insured does not apply since there is no ambiguity in such case." *Id. See also Energynorth Natural Gas, Inc. v. Continental Ins. Co.*, 146 N.H. 156, 160, 781 A.2d 969, 972 (N.H. 2001) (when a term is clearly defined by judicial decision, it is no longer considered ambiguous); *Order of United Comm. Travelers v. Knorr*, 112 F.2d 679, 682 (10th Cir. 1940)("there can be no ambiguity when a term has been judicially defined"). *McMillin Homes Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 35 Cal. App. 5th 1042 (Cal. App. 4th Dist. 2019) (holding "[w]here a policy term has been judicially construed, it is not ambiguous").

contract forms a part of that contract, as if it were expressly referred to in its terms. *General Dev. Cor. v. Catlin*, 139 So. 2d 901, 903 (Fla. 3d DCA 1962).

As recognized by this District, the holding in *Koikos* is that "each individual gunshot in a shooting spree was a separate 'occurrence' under the restaurant owner's liability policy." *S. Cent. Educ. Risk. Mgmt. Program, supra,* at \*7. Because the Florida Supreme Court definitively answered the issue and exact factual circumstances before this Court, no ambiguity can exist, and binding precedent must be applied without resort to contract construction.[22]

As a result of *Koikos*, *Guideone* and the body of law following these binding precedents, the term "occurrence" as defined in the Policy is not ambiguous as a matter of Florida law.

## VI.   *BSO Is A Sophisticated Insured And Cannot Rely On Contra Proferentem To Re-Write Policy Terms It Negotiated and Knowingly Accepted.*

BSO has argued that Florida generally follows "the traditional rule of contract construction known as *contra proferentem*[,]" where "ambiguities in contracts, especially those found in exclusionary provisions, are to be construed against the insurer as drafter of the policy and in favor of the insured." *Estate of Miller v. Principal Mut. Life Ins. Co.*, 791 F. Supp. 858, 860 (M.D. Fla. 1992). The "'rationale for the application of the traditional rules [of interpreting ambiguities in favor of finding of coverage], however, is that the insurance policy is generally an adhesion contract and therefore the insured has no ability to negotiate for or control the wording of the provisions contained therein.'" *Castleberry v. Goldome Credit Corp.*, 418 F. 3d 1267, 1272 (11th Cir. 2005) (changes in original) (quoting *Holmes's Appleman on Insurance* § 6.5, at pp. 213-14

---

[22] Notably, the Florida Supreme Court in *Koikos did not* conclude that the definition of "occurrence" leaves future courts free to apply whatever varying outcome the insured chooses when presented with a multiple victim shooting event. This would be untenable in the marketplace and contrary to Florida's rules of contract interpretation. *See e.g.*, *S. Cent. Educ. Risk. Mgmt. Program, supra*, at \*6 (finding that "[a]ny ambiguity that once existed as to whether a school's deliberate indifference to sexual harassment on campus constituted discrimination was settled by the Supreme Court in the late 1990's, long before this policy was negotiated and executed.").

(2d ed. 1996)). "Obviously, the rule that ambiguities must be construed against the insurer applies only when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction; it does not allow courts to rewrite the contracts, add meaning that is not present, or otherwise reach results contrary to the manifest intention of the parties." *Allstate Ins. Co. v. Shofner*, 573 So. 2d 47, 49 (Fla. 1st DCA 1990).

*Contra proferentem* does not apply here. First, the term "occurrence" is not ambiguous, as discussed in detail above. Second, even if there were an ambiguity, which there is not, BSO is a sophisticated party that was deeply involved in negotiating the Policy and was represented by Marsh – a large and highly specialized insurance broker[23] – during the negotiations. BSO cannot rely on *contra proferentem*, a rule of last resort even where (unlike here) a true ambiguity exists, to re-write policy terms it negotiated and knowingly accepted.

Senior Judge Daniel Hurley of this district has explained that *contra proferentem* has no application where the insured is a sophisticated entity with the means and ability to understand and negotiate the terms of an insurance policy. *RTG Furniture Corp. v. Industrial Risk Insurers*, 616 F. Supp. 2d 1258, 1264 (S.D. Fla. 2008). "[T]he doctrine of *contra proferentem* is sensibly applied in the insurance contract context where the insurer has typically drafted the policy; however, it has no logical application where the insured is a sophisticated commercial entity which has participated in drafting of the policy." *Id.* at 1264.

Numerous courts from around the country have ruled similarly. *See e.g. Industrial Risk Insurers v. New Orleans Public Servs.*, 666 F. Supp. 874, 881 (E.D. La. 1987) (*contra proferentem*

---

[23] *See Resolving Ambiguities in Insurance Policy Language: The Contra Proferentem Doctrine and the Use of Extrinsic Evidence*, by Scott G. Johnson, for the American Bar Association (May 2003) at p. 24 ("[t]oday, many commercial policyholders place their insurance through insurance brokers. Brokers such as Marsh and Aon, among others, have the resources and leverage to develop their own policy forms and to apply substantial pressure on insurers to accept them.").

does not apply where the insured, a large municipality, was represented by professionals, and was on equal footing with its insurers); *In re Delta America Re Ins. Co.*, 900 F.2d 890 n.4 (6th Cir. 1990) (doctrine did not apply as it was not a contract of adhesion or a contract negotiated between parties of unequal sophistication or bargaining power); *Eagle Easing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1261 (5th Cir. 1976) (doctrine did not apply in commercial insurance field where insured is a large corporation managed by sophisticated businessmen and represented by counsel); *Gabarick v. Laurin (Mar.), Inc.,* 650 F.3d 545, 555 (5th Cir. 2011) (presumption in favor of the insured does not apply where the insured is a sophisticated commercial entity that drafted the policy or used an agent or broker to secure the desired policy provisions.); *Stonegate Bank v. TD Bank N.A.*, 596 F. App'x 834, 844 (11th Cir. 2015) (*contra proferentem* did not apply as both parties were sophisticated business entities); *Owens-Illinois, Inc. v. United Ins. Co.,* 138 N.J. 437, 471, 650 A.2d 974, 991 (1994) ( "O-I was a sophisticated insured and cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer."); *Benjamin Moore & Co. v. Aetna Cas. & Sur. Co.*, 179 N.J. 87, 102, 843 A.2d 1094 (N.J. 2004) (doctrine of *contra proferentem* does not apply when the insured is a sophisticated commercial entity that does not "suffer from the same inadequacies as the ordinary unschooled policyholder[.]" and has bargaining power and sophistication.).

To the extent the Court determines that meaning of "occurrence" is/remains ambiguous, BSO is not entitled to the benefit of *contra proferentem* in order to achieve the meaning it prefers. As explained below, the record demonstrates that BSO is a sophisticated insured that actively negotiated its insurance coverage with its insurers, including Evanston. Further, the record demonstrates that both before and after the Evanston Policies, BSO obtained liability coverage for bodily injury claims resulting from its law enforcement activities containing specific language that

applied a single retention to separate but related occurrences – i.e., avoiding the result mandated by precedent finding multiple occurrences. Even though BSO knew and understood this language existed, BSO never requested that similar language be included in the Evanston Policy and it was not included. As such, *contra proferentum* does not apply.

     i.    <u>Summary Judgment Evidence Demonstrates that BSO is a Sophisticated Insured.</u>

At all relevant times, BSO was a sophisticated insured with bargaining power and knowledge of insurance coverage issues. BSO is the chief law enforcement agency in Broward County and one of the largest public/governmental organizations in the State of Florida. *Freda Dec.* at ¶ 6. BSO employs a professional risk manager to whom nine employees report, including a lawyer/CPA and individuals with specialized training in the insurance industry. SMF ¶¶ 17, 19-24; *Greene Dep.* at 13:14; 60:7-25. BSO's Assistant General Counsel is also involved with obtaining insurance for BSO through its commercial brokers, including Marsh. SMF ¶ 25.

Marsh is a large and highly specialized insurance broker that assists thousands of commercial, public and individual policyholders in placing their insurance. *Freda Decl.* at ¶ 10; *Perkins Dec. Ex. L;* SMF ¶ 27. Marsh possesses the resources, knowledge and leverage to negotiate significant modifications to policy language on behalf of its clients. *Freda Decl.* at ¶ 10-11; *Perkins Dec. Ex. L;* SMF ¶ 70. Marsh represents BSO in negotiations for its custom insurance program, and has monthly insurance calls and annual renewal strategy meetings with BSO to discuss the expiring program and BSO's priorities and specifications for the upcoming year. SMF ¶¶ 22, 31-35. *See also Perkins Decl. EX. QQ* (discussing 2015 renewal strategy meeting). Marsh ensures that all insurance policies are written according to BSO's best interests. SMF ¶ 31; *Greene Dep.* at 93:14-20. Marsh also answers BSO's coverage questions throughout the policy term. *See Perkins Decl. Ex. WW* (Marsh employees discuss appropriate responses to questions raised by BSO during

"our monthly open items call" regarding application of a corridor retention and "industry standards" with respect to liability coverage for PTSD claims.).

    ii.    <u>BSO and its Brokers Actively Solicited and Negotiated the Policy.</u>

In 2016, BSO's prior carrier, Lexington, sought to double its premium, which prompted BSO to seek out other "competitive quotes." SMF ¶ 59-60; Greene Dep. at 79:23-25. Marsh conveyed to BSO that it was working to obtain competitive excess liability quotes, and would "likely engage [London] as a market to see if they can create further competition." SMF ¶ 59; *Perkins Decl. Ex. Z.*

In September/October of 2016, Marsh broadly marketed the BSO account to excess insurers, several of which would not provide a quote to BSO. SMF ¶¶ 58, 59, 61; *Perkins Decl. Ex. RR & SS at p.5.* During negotiations for the Evanston policies, it was conveyed that BSO wished to retain more risk in order to keep its premium low after receiving the substantial proposed increase from Lexington. *Freda Dec.* at ¶ 14. SMF ¶ 64.  The facts demonstrate that the Policy was extensively negotiated, and the self-insured retention amount was a significant consideration for Evanston when it quoted the premium for the Policy. *Freda Dec.* at ¶14.  BSO also expressed that it wished to retain more risk in addition to the $500,000 SIR in order to lower its premium. *Freda Decl.* at ¶¶ 14-15. BSO and Evanston achieved this through an Annual Aggregate Deductible of $500,000 that applied in excess of the $500,000 SIR. Ultimately, Evanston agreed to issue an excess liability policy to BSO for the policy period of October 31, 2016 through October 31, 2017 that contained material differences from the prior Lexington Policy. SMF ¶¶ 62, 66. BSO was **"very aware of this, and saved a lot of money going with" Evanston.** *Perkins Decl., VV.*

The record shows Marsh and BSO negotiated various issues in connection with the Policy, including by requesting modifications to policy terms, forms, pricing and retentions. *Dec. of Freda*

22

at ¶¶ 13-14; SMF ¶ 65; *Perkins Decl. Ex. TT* (Marsh employees discuss plan to ask Evanston for a retroactively issued sexual abuse endorsement, and note that documentation was available to show BSO's "coverage intent[.]"); *Perkins Decl. Ex. UU* (Marsh provides BSO with a copy of the Policy, explains that the Policy must be reissued with an additional insured listed and an exclusion removed, confirms Evanston reissued the Policy, and asks BSO to review the Policy and advise "of anything which you believe is not in accordance **with the negotiated coverage terms**.") (emphasis added).

The 2016-2017 Evanston Policy was renewed with several changes negotiated between BSO/Marsh and Evanston, resulting in the Policy at issue in this matter. SMF ¶¶ 65-67.

      iii.    Neither BSO nor Marsh Ever Requested Language Included in BSO's Prior Policy That Applied One SIR to Separate But Related Occurrences.

After BSO was unsuccessful in arguing a single occurrence in the *State National* litigation before the Eleventh Circuit (SMF ¶¶40) it included specific language in its policies to avoid the same result. The Lexington Policy immediately prior to Evanston's contained language that specified one self-insured retention would apply per occurrence *or* to separate related occurrences. SMF ¶¶ 46-48. *See also TIG Ins. Co. v. Smart School*, 401 F. Supp. 2d 1334 (S.D. Fla. 2005) (related endorsement deeming all sexual abuse acts as one occurrence was not ambiguous and rendered the cause theory inapplicable). The Evanston Policy did not contain similar language. [D.E. 20-3]. Nor was Evanston ever asked to include such language in its policy with respect to bodily injury claims arising from BSO's law enforcement activities. *Freda Decl.* ¶¶ 20-22.

Following the last Evanston Policy in 2018-2019, BSO again changed insurance carriers to Safety National. SMF ¶ 72. Like the Lexington policy, the Safety National policy covering BSO for bodily injury resulting from its law enforcement activities included specific language that would apply a single SIR to each "wrongful act" resulting in "bodily injury". SMF ¶ 76. A

"wrongful act" was defined in relevant part as "an actual or alleged error or omission, negligent act or breach of duty *or a series of connected or interrelated errors or omissions, negligent acts or breaches of duties*." *Id.*

      iv.     BSO Is Not Entitled to the Benefit of Language It Did Not Request or Negotiate.

In this action, BSO seeks the benefit of language it did not request or negotiate. BSO had provisions in its prior policy with Lexington that would have limited the application of its SIR in a situation such as the Parkland Shooting Incident.  The record demonstrates without question that BSO did not request any such language, provision or endorsement from Evanston, and no such language, provision or endorsement was included on the Policy at issue. Because BSO is a sophisticated insured and is not entitled to the automatic benefit of ambiguous language, and because BSO knew how to bargain for provisions limiting the application of its SIR, it cannot receive the benefit of an interpretation limiting the application of its SIR – especially when such interpretation is at odds with a multitude of Florida precedent under which insurers and insureds alike have been operating for decades.

This case is akin to *Warwick Corp. v. Alliant Ins. Services, Inc., et al.*, 227 So. 3d 621 (Fla. 4th DCA 2017). There, the insured ("Warwick"), was a "sophisticated business entity" that obtained primary and excess policies for four of its hotels, including Warwick's "New Orleans hotel." *Id.* at 622, 626. In response to Warwick's argument that the excess policy was ambiguous, Florida's Fourth District Court of Appeal did not apply an automatic interpretation in favor of the insured's outcome, but instead determined the parties' intent by considering extrinsic evidence. *Id.* at 623. On appeal, Warwick unsuccessfully argued that the trial court "erred in considering extrinsic evidence to resolve the allegedly ambiguous policy." *Id.* at 624. The appellate court found no error and agreed that the extrinsic evidence clearly established the parties' intent. *Id.* at 624-26.

24

(quoting *Zucker for BankUnited Corp. v. U.S. Spec. Ins. Co.*, 856 F. 3d 1343, 1353 (11th Cir. 2017), which also observed that although the insured believed it "did not get a good deal and wishe[d] that it had paid a higher premium for a [different] policy . . . . after the fact wishes are not enough to change before the fact choices."). *Ruderman* did not render *Warwick Corp.* meaningless; *Ruderman* doesn't even apply to *Warwick Corp.* or to the instant matter, as both deal with sophisticated insureds, not the general public.

BSO, like the insured in *Warwick Corp.*, negotiated its insurance coverage and "chose to buy the policy that it bought." The evidence shows that BSO was clearly aware of *Koikos* and its progeny (including the *Lamberti* case in which BSO was a party) when BSO negotiated the Policy. BSO's awareness if further evident by the Lexington Policy's inclusion of Endorsement # 003. *Freda Decl.* at ¶¶ 18-19. *See also SMF* ¶ 41.

Despite BSO's familiarity with *Koikos*, neither it nor its broker ever requested from Evanston policy terms similar to the Lexington Policy, i.e., language that grouped multiple related occurrences together for purposes of the retained limit. *Freda Decl.* at ¶¶ 20-22. If BSO had done so, Evanston would have considered the request, determined whether it was acceptable, and at what additional premium. *Freda Decl.* at ¶ 23. That did not occur as BSO clearly took on the risk of paying multiple self-insured retentions in exchange for a lower premium. BSO also knew that its excess program with Evanston had limited coverage. *Perkins Decl. Ex. DD* at p.3. (Marsh discusses BSO's interest in "xs coverage for claims involving section 1983 claims only" as BSO was "comfortable with their Sovereign Immunity for other claims" and believed obtaining limited coverage could help reduce cost. It is also noted that BSO's current excess program with Evanston already had "very limited exposure.").

In summary, BSO is a sophisticated insured who cannot use *contra proferentem* to compel a favorable construction of policy terms that it knowingly negotiated and accepted. Instead, ordinary rules of construction must be applied. First, there is no ambiguity so as to trigger the use of *contra proferentem*. Furthermore, if there were such an ambiguity, a consideration of extrinsic evidence to determine the parties' intent, as is done in contract disputes between parties with equal bargaining power, indicates BSO accepted the terms with "occurrence" language that should be interpreted in accordance with *Koikos*, *Guideone* and their progeny. *See, e.g., Elias v. Elias*, 152 So. 3d 749, 752 (Fla. 4th DCA 2014); *Warwick Corp.*, 227 So. 3d at 623-26.

## <u>CONCLUSION</u>

For all of the foregoing reasons and the record evidence in support, Evanston's Motion for Final Summary should be granted with judgment entered in favor of Evanston.

DATED this 12th day of January, 2024.

By:   */s Kristen D. Perkins*
KRISTEN D. PERKINS
Florida Bar No.: 611816

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing was filed electronically with the Court using the

CM/ECF system, which action will cause automatic electronic notification of the filing from the

Court to be served upon all parties who have registered for electronic service with this Court's e-

filing portal on this 12th day of January, 2024.

**KENNEDYS CMK, LLP**
1111 Brickell Avenue
Suite 1300
Miami, FL 33131
Tel.: (305) 371-1111

*/s/ Kristen D. Perkins*
By:_____
    KRISTEN D. PERKINS
    Florida Bar No.: 611816
    JORDAN H. LEWIS
    Florida Bar No.:  123592
    Kristen.Perkins@KennedysLaw.com
    Jordan.Lewis@KennedysLaw.com
    Tracy.Gowen@KennedysLaw.com

27